FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2015 FEB 26  P 4 28

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

TERRENCE E. TAYLOR,
LOUISE W. TAYLOR, and
PHILLIP D. TAYLOR,

                Plaintiffs,

v.

STRUCTURED ASSET FUNDING, LLC
d/b/a 123 LUMP SUM a/k/a 123 LUMP
SUM, LLC; BLAZINGSTAR FUNDING,
LLC; JAY GEE, LLC; BEXHILL, LLC;
iSETTLEMENTS LLC d/b/a 123
LUMPSUM; HPF CAPITAL d/b/a
HIGHPOINT FUNDING and
RHETT WADSWORTH

                Defendants.

Civil Action No.: 1:15-cv-271
TSE/TCB

JURY TRIAL DEMANDED

## COMPLAINT

      Plaintiffs Terrence E. Taylor, Louise W. Taylor, and Phillip D. Taylor hereby complain

and allege as follows with respect to Defendants Structured Asset Funding, LLC d/b/a 123 Lump

Sum a/k/a 123 Lump Sum, LLC; Blazingstar Funding, LLC; Jay Gee LLC; Bexhill, LLC; HPF

Capital d/b/a Highpoint Funding and Rhett Wadsworth.

      Plaintiffs' allegations herein are made upon information and belief, except those

allegations concerning Plaintiffs that are alleged upon personal knowledge. The facts are alleged

in their totality and in the alternative. Certain of the facts supporting the allegations contained

herein are known only to one or more of the Defendants, or are exclusively within the custody and

control of certain Defendants or their agents. Further, in some instances the real identities of the actual entities or individuals acting on behalf of these entities are known only to certain Defendants. Plaintiffs believe that further substantial evidentiary support for some of the allegations in this Complaint will become available after a reasonable opportunity for discovery.

## NATURE OF ACTION

This case at its core is about the systematic raiding of structured settlement funds through acts of fraud, misrepresentation and negligence that has left a seriously injured amputee burn victim without any means of supporting himself or his dependent child. This is an action to recover damages for statutory violations of the Virginia Structured Settlement Protection Act, Title 59.1, Chapter 41 ("Virginia Structured Settlement Protection Act"), and common law instances of negligence, fraud, and misrepresentation, which, through a series of transactions, wrongfully stripped Plaintiff Terrence Taylor of his structured settlement annuity in violation of the Virginia Structured Settlement Protection Act and this Court's order (the "Dismissal Order") in the action styled *Terrence E. Taylor, a minor, by and through his mother and next friend, Louise W. Taylor, et. al., Plaintiffs v. DeLonghi, S.P.A., et al., Defendants (Civil Action No. 89-0971-A* (U.S.D.C., Eastern District of Virginia, Alexandria Division) which incorporated the terms of the settlement agreement entered into by Plaintiffs in resolution of their personal injury claims.

## PARTIES

1.     Plaintiff Terrence E. Taylor is an individual residing in his parents' home located in Manassas, Virginia.

2.     Plaintiff Louise W. Taylor is Terrence's natural mother residing in Manassas, Virginia.

2

3. Plaintiff Phillip D. Taylor is Terrence's natural father residing in Manassas, Virginia.

4. Defendant Structured Asset Funding, LLC d/b/a 123 LUMPSUM a/k/a 123 LUMPSUM, LLC ("SAF") is a Nevada Limited Liability Company, with offices at 1250 E. Hallandale Beach Blvd., Hallandale, Florida.

5. Defendant Jay Gee, LLC ("Jay Gee") is a Wyoming Domestic Limited Liability Company with offices at 1621 Central Avenue, Cheyenne, Wyoming.

6. Defendant Bexhill LLC ("Bexhill') is a Wisconsin Domestic Limited Liability Company, with offices located at 1213 N. Sherman Avenue, Madison, Wisconsin 53704.

7. Defendant Blazingstar Funding LLC ("Blazingstar") is a Delaware limited liability company. Upon information and belief, the company has a listed business address of 14225 Ventura Boulevard, Suite 100, Sherman Oaks, CA 91423.

8. Defendant iSettlements LLC is a Nevada limited liability company with an address at 1250 East Hallandale Beach Blvd., Penthouse A, Hallandale, FL 33009.

9. Defendants SAF and iSettlements, LLC, are sometimes collectively referred to as the "SAF Defendants".

10. Defendant HPF Capital d/b/a Highpoint Funding LLC ("Highpoint") is a Florida limited liability company with an addresses at 20283 State Road 7, Suite 400, Boca Raton, FL 33498 and 18702 Shauna Manor Drive, Boca Raton, FL 33496.

11. Defendant Rhett Wadsworth is an individual, who at all times relevant to this action was an employee of Structured Asset Funding LLC or an affiliate thereof, and is, upon information and belief, currently a resident of the State of Florida.

3

## JURISDICTION AND VENUE

12.     Plaintiffs are all residents, domiciliaries, and citizens of the State of Virginia and, Defendants are all residents, domiciliaries, and citizens of states other than Virginia.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs and the Plaintiffs and Defendants are residents of different states.   Plaintiff has researched public records in the state of formation of all of the LLC Defendants and has not identified any member of any of the named Defendant LLC's who were residents of the State of Virginia as of the date of the filing of this Complaint. To the extent that Plaintiff learns, through discovery or otherwise, that any member of any Defendant LLC was in fact a resident of the State of Virginia as of the date of the filing of this Complaint, this action will be voluntarily dismissed against such Defendant, LLC and its members.

13.     This Court has venue over this action pursuant to 28 U.S.C. § 1391(c)(1) and (2) in that Plaintiffs reside in this judicial district and Defendants are subject to the Court's jurisdiction as a substantial part of the acts, events or omissions giving rise to the claims alleged in this action occurred in this district.

## FACTUAL BACKGROUND

14.     On or about April 6, 1988, Plaintiff Louise W. Taylor ("Louise") activated a defective heater in her master bedroom resulting in a horrific fire in the Taylor home that changed the Taylors' lives forever.

15.     As a result of this fire, Plaintiff Terrence E. Taylor ("Terrence") suffered severe and permanent injuries to his mind and body, including but not limited to third-degree burns (also referred to as a "full thickness burn") over 60% of his body, the loss of the fingers on his right

hand, the toes on his left foot, and his right leg. Terrence remains visibly scarred on his face, torso, and limbs and requires a prosthetic limb.

16.     Terrence suffered from severe post-traumatic stress disorder ("PTSD") and suffers from an ongoing dysthymic disorder, now known as Persistent Depressive Disorder, which translates into feelings of inadequacy, loss of self-esteem, decreased attention and concentration, and pessimism about the future. His severe injuries were expected to trigger severe depressive episodes that were expected to be compounded by his need for future surgeries. Even at an early age it was predicted that social stigma would likely cause further difficulties and Terrence's vivid recollection of the multiple traumas of the past were likely to make his PTSD more acute.

17.     Due to the severity of Terrence's injuries, plaintiffs Louise and Phillip D. Taylor ("Phillip"), incurred significant medical and other expenses related to the care of their son.

18.     The Taylors filed suit in federal court in the Eastern District of Virginia, Alexandria Division, in 1989 seeking damages from the manufacturer of the defective heater.

19.     On or about December 19, 1989, the parties entered into a confidential Settlement Agreement (the "Settlement Agreement") which was approved by the court and expressly incorporated by reference into the Dismissal Order.

20.     Subsequent to the entry of the Dismissal Order, Louise, as guardian for Terrence, became the payee under a single premium annuity contract that delivered periodic tax free payments as provided under the Settlement Agreement.

21.     The Settlement Agreement expressly ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

22.     Plaintiffs Louise and Phillip agreed to accept the terms and conditions of the Settlement Agreement based at least in part upon representations that the structured settlement annuity ███████████████████████████████████████████████
█████████████████████████████████████████

23.     In fact, recognizing Terrence's need for future care and the difficulties he would experience later in life, Louise and Phillip agreed to take less money for themselves in order to provide more in tax-free periodic payments to Terrence.

24.     In 2009, Louise resigned as guardian for Terrence during her recovery from a serious automobile accident and payments under the annuity contract were delivered to Terrence directly.

25.     While Louise, as guardian for Terrence, received the payments under the annuity contract, no assignments or other transfers of any periodic payments were made.

26.     Sometime in 2012, Terrence moved from Herndon, Virginia to Martinsburg, West Virginia, where he resided from sometime in June of 2012 until approximately June 19, 2014. Terrence had no credit so he paid an entire year's rent on his apartment in Martinsburg, West Virginia, in advance. He was evicted from those premises on or about June, 19 2014 and moved back to Manassas, Virginia to live with his parents, Louise and Phillip Taylor.

27.     In 2012 structured settlement factoring companies began contacting Terrence about selling his periodic payments Terrence entered into many ill-advised and improvident agreements to sell his periodic payments and as many as eleven (11) suspect transfer orders were granted which resulted in Terrence selling off all of his "guaranteed" periodic payments at steep discounts to their present value. Terrence was even convinced to sell off many of the life contingent payments under

6

his structured settlement annuity that are only payable to the extent Terrence remains alive on or after 2026.

28.     In just over 24 months, eleven (11) transfer orders were granted in the Commonwealth of Virginia which effectively divested Terrence of all of the financial security that was carefully provided for, and designed to last for his entire lifetime, under the Settlement Agreement and Dismissal Order of this Court as agreed to and so-ordered in 1989. The eleven (11) transfer orders are as follows:

i.    By Order dated June 7, 2012 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, seven (7) monthly payments of $3,540.65 beginning June 21, 2012 through and including December 21, 2012 and one hundred fifty –six (156) monthly payments in the amount of $3,717.58 (increasing 5% annually) beginning January 21, 2013 through and including December 21, 2025.[1]

ii.   By Order dated September 27, 2012 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred fifty-six (156) monthly payments of $1,300 (increasing 5% annually)   beginning on January 21, 2013 through and including December 21, 2025.

iii.  By Order dated January 31, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Blazingstar, one hundred fifty-three (153) monthly payments of $1,275 (increasing 5% annually) beginning April 21, 2013 through and including December 21, 2025 (the "Blazingstar Transaction").

---

[1] The transactions set forth in paragraph 28 (i), (ii), (iv), (v), (vi), and (x) herein are collectively referred to herein as the "SAF Transactions".

iv. By Order dated March 11, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $2,000 (increasing 5% annually) beginning January 21, 2015 through and including December 21, 2025.

v. By Order dated April 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $2,000 increasing 5% annually beginning December 21, 2015 and ending on December 21, 2025.

vi. By Order dated June 27, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $941.91 (increasing 5% annually) beginning January 21, 2015 through and including December 21, 2025.

vii. By Order dated July 31, 2013 (as amended by the "Amended Order Approving Transfer of Structured Settlement Rights" dated August 19, 2013)[2] by Portsmouth Circuit Court, Terrence sold to Defendant Jay Gee, two hundred four (204) monthly payments of $17,000 increasing 5% annually beginning on January 21, 2026 through and including December 21, 2042 (the "Jay Gee Transaction").[3]

---

[2] The Amended Order appears to have been entered solely for the purpose of indicating that the annuity payments transferred thereunder were "life contingent". Payments under a structured settlement annuity that are payable whether the payee (or annuitant) is alive or deceased are often referred to as "guaranteed". They are also sometimes referred to as "certain" payments in that they are not contingent upon the life of the annuitant. If the annuitant is not living these payments would go to the named beneficiary or the annuitant's estate.

[3] Plaintiff attempted to stop this transfer by writing a letter to the Portsmouth Circuit Court on July 22, 2013. Apparently Plaintiff's letter was not received by Judge Dean W. Sword, Jr., Portsmouth Circuit Court until August 9, 2013, after the transfer had been approved; nonetheless, the Amended Order Approving Transfer was entered without addressing Plaintiff's objection.

viii.  By Order dated August 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Bexhill, with designated assignee Compass Settlements LLC, (a) 150 monthly payments of $1,659.08 (increasing 5% annually) beginning January 21, 2026 through and including June 21, 2038, and (b) 25 annual payments of $15,394.55 (increasing 4% annually) beginning on January 21, 2014 through and including January 21, 2038.[4]

ix.  By Order dated August 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Bexhill, with designated assignee WFB Corporate Trust, (a) 150 monthly payments of $1,659.08 (increasing 5% annually) beginning January 21, 2026 through and including June 21, 2038, and (b) 25 annual payments of $15,394.55 (increasing 4% annually) beginning on January 21, 2014 through and including January 21, 2038.[5]

x.  By Order dated April 17, 2014 by Portsmouth Circuit Court, Plaintiff sold to Defendant iSettlements, LLC six (6) monthly payments of $5,958.92 beginning July 21, 2038 through and including December 21, 2038; forty-eight (48) monthly payments beginning with the payment of $6,256.87 on January 21, 2039, increasing 5% annually, and ending with the payment on December 21, 2042 in the amount of $7,243.11; six (6) annual payments beginning with the payment on January 21, 2039 in the amount of $82,078.71  increasing 4% annually, and ending with the payment on December 21, 2044  in the amount of $99,861.30; and fourteen (14)

---

[4] The transactions set forth at paragraph 28 (viii) and (ix) herein are collectively referred to herein as the "Bexhill Transactions".

[5] The transactions referenced at paragraph 28 (viii) and (ix) herein are the result of one petition that was "split" into two Orders, with the payments sold being divided between two assignees.

monthly payments of $46,569.59, increasing 5% annually, beginning on January

21, 2043 and continuing through and including February 21, 2044.[6]

xi.     By Order dated July 11, 2014 by Fairfax County Circuit Court, Terence sold

to Defendant Highpoint, monthly payments of $4,706.59 beginning June 21, 2014

through and including December 21, 2014 (the "Highpoint Transaction").


## FACTUAL ALLEGATIONS

### The SAF Transactions

29.     In or about 2012, Terrence responded to numerous solicitations for "cash now"

from various factoring companies. These solicitations led him to an individual by the name of

Rhett Wadsworth ("Rhett") who worked for SAF or an affiliate of SAF.

30.     Rhett pretended to befriend Terrence and told him that if he did business with him

he would get great deals and be taken care of forever.

31.     Rhett told Terrence that he would need to give the court the reasons why he wanted

to sell his structured settlement payments. Rhett encouraged Terrence to give him some ideas of

reasons, and he would take it from there.

32.     Defendant SAF gave Terrence this instruction because SAF knew that the

transaction was not in Terrence's best interest, based on Terrence's physical and mental condition

so SAF needed false reasons to persuade the court that it was.

---

[6] It appears that there is a typographical error in this Order at number one, fourth bullet point. This bullet point indicates that the fourteen annual payments increase 3% annually, however, none of Plaintiff's annual annuity payments provide for a 3% annual increase.

33.     Rhett told Terrence that it would be a bad idea for him to seek advice from an independent advisor such as an attorney. Rhett persuaded Terrence that he would get his money quickly if he just signed the paperwork without consulting a professional about it.

34.     Defendant SAF prepared the necessary paperwork to file transfer applications with the Portsmouth, Virginia Circuit Court seeking to purchase the payment streams set forth at number 28 (i), (ii), (iv), (v), (vi), and (x) above.

35.     Rhett made or caused to be made numerous cash advances to Terrence, which advances were promptly squandered. Rhett knew that Terrence was burning through cash at an alarming pace, yet he continued to tempt Terrence with easy money and he encouraged Terrence to live it up.

36.     Rhett knew that Terrence was easily manipulated – an easy mark for predatory settlement purchasing. The advances were done pursuant to contracts that were improper contracts of adhesion that forced Terrence to sell more of his future payments than he realized he was selling.

37.     From April 2012 through June 2012, to induce Terrence to transfer the payments set forth at number 28 (i), (ii), (iv), (v), (vi), and (x) above, Defendant SAF made no fewer than thirteen (13) cash advances to Terrence, totaling more than $110,000. After June 2012, Defendant SAF made another four (4) advances to Terrence totaling $10,500. Rhett initiated conversations about advances, asking Terrence if he needed more money. Terrence did not initiate these requests for advances but was simply told to call Rhett if he wanted anything.

38.     Defendant SAF told Terrence that he would only have to reimburse them for the advances out of the proceeds he was to receive from Defendant SAF by selling his periodic payment to Defendant SAF, putting him in significant debt to Defendant SAF.

11

39. Rhett knew that Terrence was not sophisticated and that Terrence did not read or understand the terms of the advances and the impact they had on his future periodic payments.

40. Rhett and Defendant SAF made or caused to be made numerous cash advances so they could increase the amount of profit they could extract from Terrence's sales of his future payments.

41. In connection with at least some of the advances, Defendant SAF sent a notary to Terrence's home in West Virginia to complete paperwork. At most times relevant to this action, Defendant SAF knew that Terrence resided in West Virginia.

42. On at least two occasions Rhett wired money to Terrence from his personal bank account, sending him approximately $4,000 in 2013.

43. These advances and the easy money Defendants SAF and Rhett offered are contrary to the "best practices" and standards of conduct adopted by the National Association of Settlement Purchasers ("NASP"), the industry trade association.

44. Defendant SAF/123 Lumpsum is listed as a member of NASP, and one of its principals serves as chairman and treasurer on the NASP board.

45. Defendant SAF knowingly and recklessly disregarded the NASP standards outlined below. In fact, the following is featured prominently on the NASP website (https://nasp-usa.com/members/criteria/):

**Standards of Conduct**
Business practices that reflect negatively on the secondary market, which are unfair or deceptive, or which attract criticism from courts, legislators, regulators, or participants in the primary market pose a significant threat to the continued viability of the secondary market. Companies, firms, entities, or individuals that engage in these practices are not welcome in NASP and will not be invited to join NASP or to continue their membership.

Specifically, Regular Members must:

    i.   Use their best efforts to comply with all applicable laws, rules, and regulations relative to the secondary market, including applicable federal tax laws and all applicable transfer statutes

    ii.   Adhere to NASP's Code of Ethics and the Consumer Bill of Rights

    iii.   Comply with the rules for use of the NASP Anti-Fraud Database

    iv.   Pay annual dues on time

    v.   Not take or advocate positions or legal theories relative to transfers of structured settlement payments, specifically including legal positions in court or in the general marketplace that conflict with or contradict NASP's positions

46. Defendant SAF knew that Terrence suffered from serious injuries and that he was both mentally and physically impaired.

47. Defendant SAF knew that Terrence could not survive without his monthly payments and did not have a steady job. Defendants knew that Terrence's structured settlement payments were his sole or primary source of income.

48. Defendant SAF knew that Terrence had a dependent child.

49. Defendant SAF also knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee, taking into account the welfare of the consumer's dependents (if any), under the Virginia Structured Settlement Protection Act, and the Internal Revenue Code ("IRC") § 5891.

50. Defendant SAF disregarded this standard and sought to purchase as much of Terrence's payments as they could without regard for his welfare, the welfare of his minor child or the standards set forth in the Virginia and West Virginia transfer acts and IRC § 5891.

51. Defendant SAF coached Terrence in order to get transfer petitions approved, including stating reasons for each transaction that they knew were false and misleading and in violation of the Virginia Structured Settlement Protection Act and IRC § 5891.

52. In total Defendant SAF purchased payments from Terrence under six (6) transfer orders issued in Portsmouth Circuit Court, Virginia. Defendant SAF knew that the impact of the

aforesaid transfer orders would be financially devastating to Terrence due to his physical and mental condition and his ongoing need for medical care and treatment.

53.     Defendant SAF knew that Terrence resided in West Virginia, yet Defendant SAF prepared transfer petitions using Terrence's parents' address in Herndon, Virginia and agents of Defendant SAF drove Terrence across state lines from West Virginia to Virginia to have documents notarized so that Defendant SAF could file transfer petitions in a Portsmouth, Virginia courthouse where Defendant SAF knew that no personal appearance by Terrence would be required and where transfer petitions were granted without inquiry into the soundness of the transfer petition.

54.     Defendant SAF and Rhett knew or should have known that Terrence was blowing though large amounts of cash at an alarming pace. More than $100,000 in advances and hundreds of thousands more were thrown at Terrence despite his inability to work and care for himself or his daughter.

55.     Raiding Terrence's annuity in this manner was contrary to the spirit and letter of the Virginia Structured Settlement Protection Act, NASP standards and best practices and IRC § 5891.

56.     From June, 2012 through June, 2013 Defendant SAF entered into five (5) transactions with Terrence under which Terrence sold all of his monthly periodic payments through 2025.

57.     If this were not enough, Defendant SAF went back to Terrence in 2014 and purchased his "life-contingent" monthly and annual payments as far into the future as 2044. Terrence may never see another payment from his structured settlement annuity again and unless these transactions are unwound by order of this Court, he may have forever lost the ability to care

14

for himself and his dependent child or qualify for life insurance for the benefit of his dependent
child.

## The Bexhill Transactions

58.     Upon information and belief, Defendant Bexhill located Terrence through its
agents, believed to be Client First Settlement Funding ("Client First") after searching court records
of his prior sale to Defendant SAF.

59.     Defendant Bexhill or its agents therefore knew that Terrence had already sold off
large portions of his structured settlement annuity to Defendant SAF, Defendant Blazingstar, and
Defendant Jay Gee.

60.     Defendant Bexhill, through its agents, took further steps to forum shop. For
example, a Client First employee named Alex traveled to Terrence's home in West Virginia,
picked him up, and drove him to Virginia to sign papers for the Court. Specifically, Alex took
Terrence to a UPS Store in Winchester, Virginia, and had that store's notary notarize the papers.

61.     Even though Defendant Bexhill, through its agent, Client First sent documents to
Terrence in West Virginia, Alex told Terrence that the papers needed to be signed in Virginia.
Alex told Terrence that the sooner they finalized the documents, the sooner Terrence would get
his money.

62.     According to Terrence, Alex told him that Defendant Bexhill, and its agent, Client
First were affiliated with Wells Fargo, a nationally recognized banking institution. Alex told
Terrence that he could invest the money he received from doing this transfer with Wells Fargo.
Alex told Terrence it would be crazy to pass up this deal.

63.     Alex convinced Terrence that Wells Fargo would double his money if he did the
proposed deal with Defendant Bexhill and its agent, Client First. In order to induce Terrence to do

the deal with Bexhill and Client First, Alex accompanied Terrence to strip clubs, flew him to Florida and encouraged him to spend money recklessly. Alex took Terrence grocery shopping, to the movies and out to dinner at restaurants. Alex encouraged Terrence to spend even more lavish sums of money on women and gambling so that Terrence would "need" to sell even more of his structured settlement annuity payments to pay his debts, which would qualify Alex to earn additional commissions.

64.     Alex told Terrence that Client First was a great company and had an A+ rating. Terrence believed that Defendant Bexhill was affiliated with Client First.

65.     Alex told Terrence that it would be a bad idea for him to seek advice from an independent advisor such as an attorney. Alex said that Terrence would get his money quickly if he just signed the paperwork without independent professional advice.

66.     Alex never told Terrence that his income from transactions with Defendant Bexhill would be taxable. Alex simply told Terrence that his money would double by working with him and Wells Fargo.

67.     Defendant Bexhill or its agents knew or should have known that Terrence had already squandered large portions of his structured settlement payments in prior transactions.

68.     Upon information and belief Defendant Bexhill and/or Defendant Bexhill's agent, was aware of Terrence's physical condition and limitations.

69.     This did not stop Defendant Bexhill from purchasing an extremely large payment stream from Terrence. The aggregate amount of payments sold beginning in 2026 and going through 2038 was $1,951,748.66. For this, Terrence received merely $200,037.50.

70.     Upon information and belief, Defendant Bexhill and/or its agent earned a significant profit by purchasing close to $2,000,000 in future payments for just over $200,000.

16

71.     Defendant Bexhill knowingly filed transfer petitions in Virginia while Terrence resided in West Virginia.

72.     Terrence was specifically instructed to list an address in Virginia by Defendant Bexhill and/or Defendant Bexhill's agent, Client First, to avoid scrutiny by the Virginia courts.

73.     Defendant Bexhill knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee, taking into account the welfare of the payee's dependents under the Virginia Structured Settlement Protection Acts and IRC §5891.

### The Blazingstar, Jay Gee and Highpoint Transactions

74.     Upon information and belief, Defendants Blazingstar, Jay Gee, and Highpoint located Terrence after searching court records of his prior sales to Defendant SAF.

75.     Defendants Blazingstar, Jay Gee, and Highpoint therefore knew that Terrence had already sold off large portions of his structured settlement annuity to Defendant SAF.

76.     Defendants Blazingstar, Jay Gee and Highpoint knew that Terrence had already squandered large portions of his structured settlement payments in prior transactions.

77.     Upon information and belief Defendants Blazingstar, Jay Gee, and Highpoint was aware of Terrence's physical condition and limitations.

78.     This did not stop Defendants Blazingstar, Jay Gee, and Highpoint from purchasing the last of Terrence's "guaranteed" monthly payments and many "life contingent" payments owed to Terrence under his structured settlement annuity.

79.     Defendants Blazingstar, Jay Gee, and Highpoint knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee, taking into account the welfare of the payee's dependents under the Virginia Structured Settlement Protection Act and IRC §5891.

80.     Defendant Highpoint filed yet another transfer petition in Fairfax County, Virginia (CL2014-14052) seeking to purchase yet more payments from Terrence. Counsel for Terrence made repeated requests to have Highpoint withdraw this petition and despite these many requests, the petition was not withdrawn until late November, 2014.

### The Taylors Are Financially Ruined

81.     As a result of these eleven transactions, Terrence has been rendered insolvent and unable to support himself or his dependent child. He was forcibly evicted from his home in West Virginia and now is being supported by his parents, Louise and Phillip, who are living on credit after exhausting their life savings caring for Terrence and his daughter. Terrence is uninsured, needs a new prosthesis and suffers from severe depression.  Unless some or all of the aforesaid transactions are unwound, he and his family are likely to become wards of the state.  Terrence sold off all of his guaranteed payments and many life contingent payments, and he may have permanently given up his ability to qualify for additional life insurance for the benefit of his minor child.

82.     Terrence no longer receives any periodic payments from the ███████████ █████████████ annuity that was purchased to provide periodic tax-free payments in accordance with the Settlement Agreement, which was incorporated by reference into the Dismissal Order of this very Court issued in 1989.  The Settlement Agreement specifically provides that ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████

**FIRST CAUSE OF ACTION**
**STATUTORY VIOLATIONS OF THE VIRGINIA STRUCTURED SETTLEMENT**
**PROTECTION ACT**
*(against Defendant SAF, Defendant Blazingstar, Defendant Jay Gee, Defendant Bexhill and*
*Defendant Highpoint, sometimes collectively referred to as "Transferee Defendants")*

83.     Section 59.1475 of the Code of Virginia sets forth the standards and preconditions for the sales of structured settlement payment rights.   Specifically, the Virginia Structured Settlement Protection Act § 59.1-476 provides that "No direct or indirect transfer of structured settlement payment rights shall be effective …unless the transfer has been authorized in advance in a final court order…based upon express findings by such court that: 1. The transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents; 2. The payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived such advice in writing; and 3. The transfer does not contravene any applicable statute or the order of any court or other government authority."

84.     In addition, Section 59.1477.1 of the Virginia Structured Settlement Protection Act states, in part,  that "Compliance with the requirements set forth in Section 59.1-475.1 and the fulfillment of the conditions set forth in Section 59.1-476 shall be solely the responsibility of the transferee in any transfer of structured settlement payment rights….".

85.     Defendant SAF, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed transfer applications seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court as follows:

    i.        CL12001117-00 (petition filed under seal)[7];

---

[7] A copy of the Order obtained from the Portsmouth Circuit Court shows case number "CL12-2718".  However, the Portsmouth Circuit Court indicated that this number is incorrect and that the correct number is "CL12001117". This could not be confirmed since the transfer petition was filed under seal.

ii.      CL12002128-00 (petition filed under seal);

iii.     CL13000645-00;

iv.     CL13001354-00 (petition filed under seal);

v.      CL13002032-00 (petition filed under seal); and

vi.     CL14000972-00.

86.    Defendant Blazingstar, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13000169-00.

87.    Defendant Jay Gee, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13002379-00.

88.    Defendant Bexhill, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13002770-00.

89.    Defendant Highpoint, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Fairfax Circuit Court in CL2014-07472.

90.    Upon information and belief, Transferee Defendants knowingly filed false and misleading petitions in the actions listed above.

91.    Upon information and belief, Transferee Defendants knowingly prepared, induced Terrence to sign, and filed false affidavits on behalf of Terrence, as Payee.

92.    Upon information and belief, Transferee Defendants stated in each petition filed a statement to the effect that the "transfer is in the best interests of the Transferor, Terrence Taylor,

taking into account his welfare and support" while knowing that Terrence had no source of income other than his structured settlement payments and that he had a minor child to support.

93.     Transferee Defendants knew or should have known that the Settlement Agreement entered into by Terrence, Louis and Phillip Taylor expressly provided ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

94.     The Settlement Agreement was expressly incorporated by reference into a Dismissal Order issued by this Court in or about December 1989.

95.     The petitions filed by Transferee Defendants in the aforesaid transfer applications violated the Virginia Structured Settlement Protection Act in that:

A.     The transfer applications filed by Transferee Defendants violated the anti-assignment language in the underlying Settlement Agreement and further failed to provide a copy of the Settlement Agreement to the respective courts;

B.     Each transfer application filed by Transferee Defendants was in direct contravention of an order of this Court, as set forth in the Dismissal Order attached hereto as Exhibit A, in that the Dismissal Order incorporates the terms of the Settlement Agreement ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

C.     Each transfer application filed stated that the transfer was in the "best interests" of Terrence when Transferee Defendants knew that Terrence had no source of

income other than his structured settlement payments and was unable to support himself or his dependent child without those payments.

        D.      Transferee Defendants failed to inform the Portsmouth Circuit Court, or the Fairfax Circuit Court, as applicable, of the prior order of this Court incorporating the terms of the Settlement ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

        E.      Transferee Defendants encouraged Terrence to forgo professional advice in contravention of the Virginia Structured Settlement Protection Act.

        96.     As a result of the violations of the Virginia Structured Settlement Protection Act as aforesaid, the orders of the Portsmouth and Fairfax Circuit Courts set forth at number 28 herein should be declared void and of no further force and effect with all costs associated with restoring periodic payments to Terrence to be borne by the Transferee Defendants in accordance with Section 59.1-477.1 of the Virginia Structured Settlement Protection Act.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**
***(DEFENDANT SAF and DEFENDANT RHETT)***

        97.     All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

        98.     Defendant SAF is a member of NASP and an experienced participant in the secondary market for structured settlements.

99.     Defendants SAF and Rhett held themselves out as experts in the field and familiar with all relevant laws, practices and procedures for secondary market structured settlement payment transfers.

100.     Defendant SAF owed Terrence a duty of care with respect to its solicitation of him as a customer, and such duty includes compliance with applicable state and federal law.

101.     The Virginia Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above. In supplying potential customers with sales documentation packages, Defendant SAF was duty bound to provide potential customers like Terrence with materials that comply with the requirements of applicable state law and IRC §5891, including the requirement that the transaction be in the customer's best interest.

102.     Materially false and misleading information was provided to Terrence and was used by Defendant SAF to strip Terrence of his guaranteed periodic payments under his structured settlement annuity in violation of applicable law.

103.     By providing Terrence with document packages that were falsified, misleading, and inaccurate, Defendant SAF breached its duty to Terrence.

104.     By telling Terrence to do things that were not in his and his dependent daughter's best interest, Defendant SAF breached its duty to him.

105.     Defendant SAF knew or should have known that Terrence resided and was domiciled in West Virginia. Upon information and belief Defendant SAF sent agents to Terrence's home in West Virginia and upon further information and belief concealed his residence from the Portsmouth, Virginia Circuit Court and knowingly prepared and filed falsified documents to avoid scrutiny and compliance with the Virginia Structured Settlement Protection Acts and IRC §5891.

106.    By directing transactions to a "friendly court" to avoid scrutiny and compliance with the Virginia Structured Settlement Protection Act, Defendants SAF and Rhett put Terrence in harm's way in violation of the Virginia Structured Settlement Protection Act and IRC § 5891.

107.    In addition, from approximately April 2012 through August 2013, Defendant SAF made approximately 25 cash advances to Terrence totaling more than $163,000. The amount and frequency of these advances were not in line with industry standards or NASP best practices.

108.    These advances were predatory and irresponsible, and obligated Terrence to sell his payments to Defendant SAF so he could pay back the advances. Defendant SAF got Terrence addicted to easy money, induced him to spend lavishly on gambling and women and encouraged him to sell more in future payments than reasonably appropriate so they could extract as much profit as possible at Terrence's and Terrence's family's expense.

109.    These advances and the subsequent "raiding" of Terrence's structured settlement annuity were part of a predatory pattern of activity wholly inconsistent with NASP's stated standards and practices.

110.    Defendant SAF and Rhett's representations that Terrence would always have payments coming to him under his structured settlement annuity were false.

111.    Terrence reasonably relied upon Defendant SAF's representations to his detriment.

112.    As a result of the aforesaid breaches of the duty of care in violation of the Virginia Structured Settlement Protection Act, Terrence has been rendered insolvent. He has been and will be damaged as a result of Defendant's breaches of duty, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

24

113.    Accordingly, Defendant SAF should be required to pay damages to Plaintiff for negligence in an amount believed to be in excess of $5,000,000.00 plus punitive damages, attorneys' fees and the costs associated with this action.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### *(Defendant Bexhill)*

114.    All of the allegations set forth in this Complaint are re-alleged and incorporated by reference herein..

115.    Defendant Bexhill and its agents, Client First, owed Terrence a duty of care with respect to their solicitation of him as a customer, and such duty included their obligation to supply document packages that were in compliance with applicable state and federal law.

116.    Defendant Bexhill by and through their agents, Client First, at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

117.    Upon information and belief, Defendant Bexhill's agent, Client First Settlement Funding is a member of NASP.

118.    The Virginia Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above. In supplying potential customers they solicit with sales documentation packages, As transferee under this Act, Defendant Bexhill was duty-bound to provide customers like Terrence with materials that complied with the requirements of applicable state law and IRC § 5891. Transferees are also duty-bound not to enter into transactions that are not in the customer's best interest or that do not take into account the welfare and support of his dependent.

119.    Upon information and belief, Defendant Bexhill knew or should have known about Terrence's prior transactions and his physical and mental state.

25

120.    Given Terrence's injuries and his physical and mental condition and limitations, Defendant Bexhill knew or should have known that the transactions it completed with him were not in Terrence's best interest and would not promote the welfare or support of his minor daughter.

121.    Upon further information and belief, Defendant Bexhill knew or should have known that Terrence resided and was domiciled in West Virginia.

122.    Upon information and belief Defendant Bexhill, by and through its agent, Client First, sent agents to Terrence's home in West Virginia, and upon further information and belief concealed his residence from the Portsmouth, Virginia court and knowingly falsified documents to avoid scrutiny and compliance with the Virginia Structured Settlement Protection Act and IRC § 5891.

123.    A Client First representative named "Alex" visited Terrence in his home and drove him to Virginia, to a UPS store in Winchester, so the document package could be notarized in Virginia.

124.    By providing Terrence with document packages that were falsified, misleading, and/or inaccurate, Defendant Bexhill breached its duty to Terrence.

125.    By persuading Terrence to do things that were not in his and his dependent daughter's best interest, Defendant Bexhill breached its duty to him.

126.    Terrence was misled by Defendant Bexhill into believing that he was only selling a portion of his payments and that he would always have a portion of the periodic payments available to cover basic living expenses.

127.    Terrence was further misled by Defendant Bexhill's agent, Client First into believing that his sale proceeds would be reinvested by Wells Fargo, a nationally recognized banking institution and that he would make more from their investments than he would by simply

leaving his structured settlement annuity in place. Client First represented to Terrence that he would do better by selling tax free payments and converting them into taxable, fee heavy investments with Wells Fargo affiliates.

128.    Upon information and belief, Defendant Bexhill, or its agent, flipped one or more of Terrence's transactions to investors at a substantial profit.

129.    Upon further information and belief, the more payments Defendant Bexhill, or its agent, convinced Terrence to sell, and the longer the payments went out into the future, the more money it pocketed at Terrence's expense.

130.    With knowledge of Terrence's prior sales and with knowledge of his physical and mental state, Defendant Bexhill, or its agent, orchestrated a series of transactions that were not in Terrence's best interest and that did not promote the welfare and support of his dependent daughter.

131.    Terrence has been rendered insolvent as a result of the aforesaid breaches of the duty of care owed to him. Terrence has been and will be damaged as a result of Defendant's breaches of this duty, including the loss of his structured settlement payments, and the incurring of liability associated with his need for ongoing medical care and living expenses, plus liability for attorney fees and expenses associated with this action.

132.    Accordingly, Defendant Bexhill should be required to pay damages to Plaintiff for negligence in an amount believed to be in excess of $5,000,000.00 plus punitive damages, attorneys' fees and the costs associated with this action.

## FOURTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
### (against Defendants SAF and Rhett)

133.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

134.    At all times relevant to this action, Defendants SAF and Rhett represented that they were reputable settlement purchasers willing to offer Terrence cash for his future payments in accordance with the law, specifically, IRC § 5891 and the Virginia Structured Settlement Protection Act.

135.    Defendants SAF and Rhett knew that a pre-condition to applying for and obtaining a qualified court order within the meaning of IRC § 5891 was procuring an affidavit from Terrence setting forth his intentions with respect to the payments, his dependents, his other sources of income, and his residence.  Defendants SAF and Rhett deliberately prepared and filed falsified documents and affirmatively coached Terrence on how to submit false affidavits so they could profit by brokering his annuity payments to third party purchasers.

136.    Defendants SAF and Rhett knew that a court was only supposed to approve a transfer if it found such transfer was in Terrence's best interest and furthered the support and welfare of his dependent daughter.

137.    Defendants SAF and Rhett also knew that their transactions were not in the best interests of Terrence or his dependent minor child.  Defendants SAF and Rhett knew that Terrence suffered from serious physical and mental disabilities and that Terrence required the use of a prosthetic limb and that his physical appearance and mental disabilities limited his ability to obtain gainful and permanent employment.

138.    Terrence made numerous phone calls to Defendant Rhett requesting advances that were contrary to the reasons Terrence gave on at least some of the petitions that Defendants SAF and Rhett prepared for filing with the Portsmouth Circuit Court. According to Terrence, he spoke with Rhett as much as several times a day in April, May and June of 2012 and made numerous requests for money. Defendant Rhett also called Terrence from time to time in April, May and June of 2012 asking Terrence if he needed more cash. Each time Terrence said that he wanted cash for any reason whatsoever, Defendant Rhett caused funds to be sent to Terrence's bank account by wire from Defendant SAF. Upon information and belief, each wire transfer was preceded by at least one phone call and was documented in some form of advance agreement believed to be in Defendant SAF's custody and control.

139.    Defendant Rhett told Terrence on numerous occasions in April and May of 2012 that if he ever needed money, all he had to do was "call Rhett".

140.    While many of the documents related to the aforesaid cash advances were lost when Terrence was forcibly evicted from his home in West Virginia in 2014, a review of Terrence's banking records reveals the following:

      i.      On April 27, 2012, Defendant SAF wired $5,000 to Terrence's bank account.

      ii.     On May 2, 2012 Defendant SAF wired $7,000 to Terrence's bank account.

      iii.    On May 14, 2012 Defendant SAF wired $3,000 to Terrence's bank account.

      iv.     On May 29, 2012 Defendant SAF wired $3,000 to Terrence's bank account.

      v.      On May 31, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

      vi.     On June 18, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

      vii.    On June 21, 2012 Defendant SAF wired $10,000 to Terrence's bank account.

      viii.   On June 22, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

29

ix.    On August 22, 2012 Defendant SAF wired $1,000 to Terrence's bank account

x.    On August 23, 2012 Defendant SAF wired $2,000 to Terrence's bank account.

xi.    On September 21, 2012 Defendant SAF wired $2,500 to Terrence's bank account.

xii.    On September 28, 2012 Defendant SAF wired $5,000 to Terrence's bank account.

xiii.    On February 7, 2013 Defendant SAF wired $2,500 to Terrence's bank account.

xiv.    On February 15, 2013 Defendant SAF wired $3,000 to Terrence's bank account.

xv.    On February 22, 2013 Defendant SAF wired $3,000 to Terrence's bank account.

xvi.    On March 11, 2013 Defendant SAF wired $20,000 to Terrence's bank account.

xvii.    On March 14, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xviii.    On March 29, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xix.    On April 10, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xx.    On April 24, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xxi.    On October 18, 2013 Defendant SAF wired $1,000 to Terrence's bank account.

xxii.    On November 14, 2013 Defendant SAF wired $1,500 to Terrence's bank account.

xxiii.    On November 22, 2013 Defendant SAF wired $1,000 to Terrence's bank account.

141.   Defendants SAF and Rhett specifically represented to Terrence that all of the aforesaid advances were being made in accordance with industry custom and practice and that they were all consistent with the petitions that were filed with the Portsmouth Court.

142.   In addition to the 23 advances specified above, there may have been other advances made to Terrence by affiliates of Defendant SAF and on or about August 23, 2013, Defendant Rhett appears to have wired $1,500.00 to Terrence's account and again on or about October 25, 2013 Rhett appears to have wired an additional $1,500.00 to Terrence's account. It appears that these advances were made by Rhett from his personal account.

143.   Defendants SAF and Rhett knew that Terrence was spending the funds he was advanced at a rapid pace and that he would not possibly be able to use the proceeds for the purposes set forth in the petitions that were filed with the various courts The petitions filed in the transactions set forth in paragraph 28 (i) (ii) (v) and (vi )were filed under seal and are not in Terrence's possession.

144.   Defendants SAF and Rhett knew that the aforesaid representations they made to Terrence were false and misleading and likely to deceive Terrence.

145.   Defendant SAF and Rhett knew that the false and misleading statements about the 23 advances would be relied upon by Terrence.

146.   Defendants SAF and Rhett misled Terrence into selling more of his payments than he reasonably required so they could "flip" deals to pre-arranged buyers at a significant profit. Defendant SAF made enormous profits by flipping deals to pre-arranged buyers and took advantage of Terrence's lack of sophistication in financial matters and mental state.

31

147.    In fact, Defendant SAF sought to flip as much of Terrence's annuity payments as they possibly could to third-party buyers or "assignees" so they could extract higher commissions and fees.

148.    In connection with the advances and with these transactions, Defendant SAF represented that they were acting as principals and purchasing payments for their own account. In fact, sales were pre-arranged and Defendant SAF at all times acted as brokers, pocketing large, undisclosed commissions based on a re-discounting of cash flows, resulting in millions of dollars in profiteering at Plaintiff Terrence Taylor's expense.

149.    Defendants SAF and Rhett engaged in a number of other specific acts and utterances to perpetuate and or cover-up these misrepresentations, including but not limited to the following: failing to disclose the terms and conditions of the twenty three or more cash advances made to Terrence and how they would impact on the transfer petitions; concealing that earnings on alleged investments would be fully subject to income tax whereas Terrence's structured settlement called for tax free treatment by Terrence for life;  telling Terrence that it was not in his interest to consult a professional, e.g. an attorney, to review the transactions; lying to Terrence about why he had to travel to Virginia to sign some documents that would be filed with the court; sending notaries and other representatives to Terrence's home in West Virginia (not Virginia) so they could obtain his signature on documents they could submit to court in Virginia where no personal appearance would be required; soliciting Terrence in West Virginia; phone calls, faxes, emails and text messages to Terrence in West Virginia; convincing Terrence NOT to file a petition in West Virginia because they knew it would be denied; and sending stored value cards or cash advance payments to Terrence in West Virginia.

150.    Defendants SAF and Rhett also did not inform Terrence that the more payments Terrence sold and longer out into the future the payments went the more profit they would make by rediscounting cash flows for their benefit and at Terrence's expense.  It is believed that Defendant SAF and Rhett collectively pocketed in excess of $500,000.00 by raiding Terrence's structured settlement annuity as described herein.

151.    Defendants SAF and Rhett knew that Terrence would rely and Defendants SAF and Rhett specifically intended for Terrence to rely on the aforesaid misrepresentations to his detriment.

152.    Terrence did rely on these misrepresentations to his detriment and to the detriment of Louise and Phillip and eventually to the detriment of his dependent daughter.

153.    As a result, Terrence now has no income, lives with his parents, cannot support himself or his dependent daughter, and is likely to become a ward of the state. Based on the size, frequency and tenor of the transactions, it was reasonably foreseeable that Plaintiff would be rendered insolvent and this was at all times known by Defendants SAF and Rhett.

154.    Defendants SAF and Rhett knowingly and willingly entered into the aforesaid transactions in clear violation of state and Federal law with the specific intent to defraud Terrence out of his periodic payments.

155.    Accordingly, Defendants SAF and Rhett should be required to pay damages for fraudulent misrepresentation in an amount believed to be in excess of five million dollars ($5,000,000) plus punitive damages, attorney fees, and the costs associated with this action.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### Va. Code Ann. § 59.1-196, et seq.
*(against Defendants SAF and Rhett)*

156.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

157.    All of the advances and petitions described in this Complaint constitute consumer transactions within the meaning of the Virginia Consumer Protection Act of 1977 , § 59.1-196 et seq. (the "Virginia Consumer Protection Act").

158.    By making the numerous misrepresentations elsewhere in this Complaint, and in omitting to communicate how each transfer was in the best interest of Terrence and his dependent daughter and in fact falsely stated to Terrence and to each court reviewing a transfer petition that the petition was in the best interest of the transferor and his dependents, Defendants SAF and Rhett used deception, made false promises and otherwise duped Terrence into selling off millions of dollars of future payments owed to him under his structured settlement annuity in transactions that were unquestionably NOT in Terrence's best interest as required by applicable law.

159.    Defendant SAF and Rhett made the aforesaid misrepresentations with the intent to deceive so they could profit handsomely at Terrence's expense.

160.    Terrence relied on Defendant SAF and Defendant Rhett's misrepresentations and suffered severely as a result.

161.    Accordingly, Terrence should be entitled to recover three times the amount of actual damages he suffered as a result of Defendants SAF and Rhett's conduct, plus reasonable attorneys' fees in accordance with the Virginia Consumer Protection Act.

## SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACT
### *(against all Transferee Defendants)*

162.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

163.    Transferee Defendants all hold themselves out as experts in the structured settlement secondary market.

164.    Transferee Defendants all knew about the periodic payments that were awarded to Terrence in connection with his structured settlement.

165.    Transferee Defendants all knew that the structured settlement payments were payable on account of serious personal injuries sustained by Terrence and that the payments were tax free to Terrence.

166.    Upon information and belief at all times relevant to this Complaint, Terrence's physical appearance was known to some or all of the Transferee Defendants.

167.    Upon information and belief at all times relevant to this Complaint, Terrence's mental state was known to some or all of the Transferee Defendants.

168.    Transferee Defendants knew that Terrence depended upon his payments for basic living expenses, medical expenses, and to care for his dependent child. Transferee Defendants knew or should have known that Terrence's structured settlement payments were his sole and exclusive source of income.

169.    Transferee Defendants knew that Terrence did not work.  For example, Transferee Defendants regularly met with and/or spoke with Terrence at home during business hours.

170. Transferee Defendants, as experts in the field, knew that a structured settlement annuity containing the periodic payments described above likely was due to severe injuries and likely was designed to cover future medical and living expenses.

171. Transferee Defendants knew or should have known that a Settlement Agreement existed with respect to Terrence's personal injuries.

172. Transferee Defendants knew or should have known that Louise was the guardian and next friend for Terrence under the Settlement Agreement and was identified as guardian in the annuity contract.

173. Transferee Defendants knew or should have known that Terrence would have to depend upon his parents for support if he did not have his periodic payments.

174. By raiding Terrence's periodic payments, Transferee Defendants tortiously interfered with the original settlement agreement signed by Louise as Terrence's guardian and by Phillip and Louise in their individual capacities.

175. Phillip and Louise are now spending their modest savings and incurring debt to pay the medical and living expenses that Terrence's structured settlement annuities were meant to cover.

176. As a result, Transferee Defendants should be required to pay Phillip and Louise damages for tortious interference in an amount to be determined at trial, the costs associated with Terrence's future care, and the costs associated with his daughter's support, plus attorney fees and the costs related to this action.

### SEVENTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY: LOUISE AND PHILLIP TAYLOR
#### *(against all Transferee Defendants)*

177.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

178.    Transferee Defendants are experienced participants in the secondary structured settlement industry.

179.    Plaintiffs Louise and Phillip Taylor, Terrence's parents, were parties to the settlement agreement that resulted in the periodic payments Defendants bought from Terrence.

180.    Louise and Phillip received a lump sum payment from the defendant in that personal injury case. They chose to reduce the size of that payment so that more money would go to Terrence instead of them. Their expectation was that the periodic payments from the settlement that went to Terrence would support him and any dependents throughout his lifetime, and that they would not have to support him financially.

181.    Because of the actions of Transferee Defendants in the instant case, Louise and Phillip are now supporting both Terrence and his dependent daughter.  Terrence has no income of his own since Transferee Defendants manipulated him into selling everything to them.

182.    Upon information and belief, Transferee Defendants knew that Louise and Phillip were parties to the action and agreement that sprang from Terrence's personal injuries.

183.    Upon information and belief, Transferee Defendants knew that Louise and Phillip were parties to the action and the settlement agreement that sprang from Terrence's injuries.

184.    Transferee Defendants deliberately took substantially all of Terrence's income.

185.    As a result, since late 2014 when Terrence appeared at their doorstep penniless and homeless, Louise and Phillip have been supporting Terrence and his dependent child, which is

37

exactly what they sought to avoid when they negotiated the Settlement Agreement with the original liable parties decades ago.

186.    Therefore, Transferee Defendants should be required to pay Phillip and Louise damages for tortious interference with an expectancy in an amount to be determined at trial, the costs associated with Terrence's future care, and the costs associated with the support of Terrence's daughter, plus attorney fees and the costs related to this action.

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:
   A.    General and compensatory damages according to proof and trial;

   B.    Punitive damages for fraud and fraudulent misrepresentation;

   C.    Rescission of all transactions set forth in paragraph 28 herein;

   D.    Restoration of Plaintiff Terrence Taylor's payments under his annuity contract;

   E.    Declarations that:

      i.    All transactions set forth in paragraph 28 herein are void;

      ii.    Defendants breached their duties to Plaintiff Terrence Taylor

      iii.    Defendants take all steps to rescind the transactions set forth in paragraph 28; and

      iv.    Defendants must indemnify Plaintiff for their losses, costs, fees and expenses, including attorneys' fees, and an order directing same.

      v.    Defendants tortiously interfered with the original settlement agreement;

   F.    Defendants shall be required to account for and disgorge all commissions, compensation, fees and other payments received in connection with the Transactions;

G.   Defendants shall be required to disgorge all profits received by Defendants or earned by Defendants as a result of their misconduct towards Plaintiff;

H.   Plaintiffs are entitled to an award of all reasonable attorneys' fees and the costs and expenses incurred in connection with this action; and

I.   Such other and further relief as the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: February 26, 2015                    Respectfully submitted,

Kathleen J.L. Holmes, VSB 35219
Ellen D. Marcus, VSB 44314
HOLMES COSTIN & MARCUS pllc
301 N. Fairfax Street, Suite 202
Alexandria, VA  22314
Tel: (703) 260-6401
Fax: (703) 439-1873
kholmes@hcmlawva.com
emarcus@hcmlawva.com


Edward Stone (pro hac vice forthcoming)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Tel: (203) 504-8425
Fax: (203) 348-8477
eddie@edwardstonelaw.com

*Attorneys for TERRENCE E. TAYLOR,,LOUISE W. TAYLOR and PHILLIP D. TAYLOR*