**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

TERRENCE E. TAYLOR,
LOUISE W. TAYLOR, and
PHILLIP D. TAYLOR,

                Plaintiffs,

      v.

STRUCTURED ASSET FUNDING, LLC
d/b/a 123 LUMP SUM a/k/a 123 LUMP SUM,
LLC; BLAZINGSTAR FUNDING, LLC;
JAY GEE, LLC; BEXHILL, LLC;
iSETTLEMENTS LLC d/b/a 123
LUMPSUM; HPF CAPITAL d/b/a
HIGHPOINT FUNDING and
RHETT WADSWORTH

                Defendants.

Civil Action No.: 1:15-cv-00271-TSE/TCB

JURY TRIAL DEMANDED

1

**AMENDED COMPLAINT**

Plaintiffs Terrence E. Taylor, Louise W. Taylor, and Phillip D. Taylor hereby complain and allege as follows with respect to Defendants Structured Asset Funding, LLC d/b/a 123 Lump Sum a/k/a 123 Lump Sum, LLC; Blazingstar Funding, LLC; Jay Gee LLC; Bexhill, LLC; HPF Capital d/b/a Highpoint Funding and Rhett Wadsworth.

Plaintiffs' allegations herein are made upon information and belief, except those allegations concerning Plaintiffs that are alleged upon personal knowledge. The facts are alleged in their totality and in the alternative. Certain of the facts supporting the allegations contained herein are known only to one or more of the Defendants, or are exclusively within the custody and control of certain Defendants or their agents. Further, in some instances the real identities of the actual entities or individuals acting on behalf of these entities are known only to certain Defendants. Plaintiffs believe that further substantial evidentiary support for some of the allegations in this Complaint will become available after a reasonable opportunity for discovery.

**NATURE OF ACTION**

This case at its core is about the systematic raiding of structured settlement funds through acts of fraud, misrepresentation and negligence that has left a seriously injured amputee burn victim without any means of supporting himself or his dependent child. This is an action to recover damages for statutory violations of the Virginia Structured Settlement Protection Act, Title 59.1, Chapter 41 ("Virginia Structured Settlement Protection Act"), Transfers of the Right to Receive Future Payments, West Virginia Code Statute R. Section 46A-6H ("West Virginia Structured Settlement Protection Act"), the West Virginia Consumer Credit and Protection Act, W. Va. Code

§§ 46A-6-104 and 102(7)(E) (the "West Virginia Consumer Protection Act") and common law instances of negligence, fraud, and misrepresentation, which, through a series of transactions, wrongfully stripped Plaintiff Terrence Taylor of his structured settlement annuity in violation of the Virginia Structured Settlement Protection Act and this Court's order (the "Dismissal Order") in the action styled *Terrence E. Taylor, a minor, by and through his mother and next friend, Louise W. Taylor, et. al., Plaintiffs v. DeLonghi, S.P.A., et al., Defendants (Civil Action No. 89-0971-A* (U.S.D.C., Eastern District of Virginia, Alexandria Division) which incorporated the terms of the settlement agreement entered into by Plaintiffs in resolution of their personal injury claims.

## PARTIES

1.      Plaintiff Terrence E. Taylor is an individual residing in his parents' home located in Manassas, Virginia.

2.      Plaintiff Louise W. Taylor is Terrence's natural mother residing in Manassas, Virginia.

3.      Plaintiff Phillip D. Taylor is Terrence's natural father residing in Manassas, Virginia.

4.      Defendant Structured Asset Funding, LLC d/b/a 123 LUMPSUM a/k/a 123 LUMPSUM, LLC ("SAF") is a Nevada Limited Liability Company, with offices at 1250 E. Hallandale Beach Blvd., Hallandale, Florida.

5.      Defendant Jay Gee, LLC ("Jay Gee") is a Wyoming Domestic Limited Liability Company with offices at 1621 Central Avenue, Cheyenne, Wyoming.

6.      Defendant Bexhill LLC ("Bexhill') is a Wisconsin Domestic Limited Liability Company, with offices located at 1213 N. Sherman Avenue, Madison, Wisconsin 53704.

7.     Defendant Blazingstar Funding LLC ("Blazingstar") is a Delaware limited liability company.  Upon information and belief, the company has a listed business address of 14225 Ventura Boulevard, Suite 100, Sherman Oaks, CA  91423.

8.     Defendant iSettlements LLC is a Nevada limited liability company with an address at 1250 East Hallandale Beach Blvd., Penthouse A, Hallandale, FL 33009.

9.     Defendants SAF and iSettlements, LLC, are sometimes collectively referred to as the "SAF Defendants".

10.     Defendant HPF Capital d/b/a Highpoint Funding LLC ("Highpoint") is a Florida limited liability company with an addresses at 20283 State Road 7, Suite 400, Boca Raton, FL 33498 and 18702 Shauna Manor Drive, Boca Raton, FL 33496.

11.     Defendant Rhett Wadsworth is an individual, who at all times relevant to this action was an employee of Structured Asset Funding LLC or an affiliate thereof, and is, upon information and belief, currently a resident of the State of Florida.


**JURISDICTION AND VENUE**

12.     Plaintiffs are all residents, domiciliaries, and citizens of the State of Virginia and, Defendants are all residents, domiciliaries, and citizens of states other than Virginia.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs and the Plaintiffs and Defendants are residents of different states.   Plaintiff has researched public records in the state of formation of all of the LLC Defendants and has not identified any member of any of the named Defendant LLC's who were residents of the State of Virginia as of the date of the filing of this Complaint.

To the extent that Plaintiff learns, through discovery or otherwise, that any member of any Defendant LLC was in fact a resident of the State of Virginia as of the date of the filing of this Complaint, this action will be voluntarily dismissed against such Defendant, LLC and its members.

13.     This Court has venue over this action pursuant to 28 U.S.C. § 1391(c)(1) and (2) in that Plaintiffs reside in this judicial district and Defendants are subject to the Court's jurisdiction as a substantial part of the acts, events or omissions giving rise to the claims alleged in this action occurred in this district.

**FACTUAL BACKGROUND**

14.     On or about April 6, 1988, Plaintiff Louise W. Taylor ("Louise") activated a defective heater in her master bedroom resulting in a horrific fire in the Taylor home that changed the Taylors' lives forever.

15.     As a result of this fire, Plaintiff Terrence E. Taylor ("Terrence") suffered severe and permanent injuries to his mind and body, including but not limited to third-degree burns (also referred to as a "full thickness burn") over 60% of his body, the loss of the fingers on his right hand, the toes on his left foot, and his right leg.  Terrence remains visibly scarred on his face, torso, and limbs and requires a prosthetic limb.

16.     Terrence suffered from severe post-traumatic stress disorder ("PTSD") and suffers from an ongoing dysthymic disorder, now known as Persistent Depressive Disorder, which translates into feelings of inadequacy, loss of self-esteem, decreased attention and concentration, and pessimism about the future.  His severe injuries were expected to trigger severe depressive episodes that were expected to be compounded by his need for future surgeries.  Even at an early

age it was predicted that social stigma would likely cause further difficulties and Terrence's vivid recollection of the multiple traumas of the past were likely to make his PTSD more acute.

17.     Due to the severity of Terrence's injuries, plaintiffs Louise and Phillip D. Taylor ("Phillip"), incurred significant medical and other expenses related to the care of their son.

18.     The Taylors filed suit in federal court in the Eastern District of Virginia, Alexandria Division, in 1989 seeking damages from the manufacturer of the defective heater.

19.     On or about December 19, 1989, the parties entered into a confidential Settlement Agreement (the "Settlement Agreement") which was approved by the court and expressly incorporated by reference into the Dismissal Order.

20.     Subsequent to the entry of the Dismissal Order, Louise, as guardian for Terrence, became the payee under a single premium annuity contract that delivered periodic tax free payments as provided under the Settlement Agreement.

21.     The Settlement Agreement expressly provides that the ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. (emphasis added).

22.     Plaintiffs Louise and Phillip agreed to accept the terms and conditions of the Settlement Agreement based at least in part upon misrepresentations that the ████████████████ ██████████████████████████████████████████ would cover the cost of Terrence's medical expenses and living expenses for the rest of his life.

6

23.     In fact, recognizing Terrence's need for future care and the difficulties he would experience later in life, Louise and Phillip agreed to take less money for themselves in order to provide more in tax-free periodic payments to Terrence.

24.     In 2009, Louise resigned as guardian for Terrence during her recovery from a serious automobile accident and payments under the annuity contract were delivered to Terrence directly.

25.     While Louise, as guardian for Terrence, received the payments under the annuity contract, no assignments or other transfers of any periodic payments were made.

26.     Sometime in 2012, Terrence moved from Herndon, Virginia to Martinsburg, West Virginia, where he resided from sometime in June of 2012 until approximately June 19, 2014. Terrence had no credit so he paid an entire year's rent on his apartment in Martinsburg, West Virginia, in advance. He was evicted from those premises on or about June, 19 2014 and moved back to Manassas, Virginia to live with his parents, Louise and Phillip Taylor.

27.     In 2012 structured settlement factoring companies began contacting Terrence about selling his periodic payments Terrence entered into many ill-advised and improvident agreements to sell his periodic payments and as many as eleven (11) suspect transfer orders were granted which resulted in Terrence selling off all of his "guaranteed" periodic payments at steep discounts to their present value. Terrence was even convinced to sell off many of the life contingent payments under his structured settlement annuity that are only payable to the extent Terrence remains alive on or after 2026.

28.     In just over 24 months, eleven (11) transfer orders were granted in the Commonwealth of Virginia which effectively divested Terrence of all of the financial security that

was carefully provided for, and designed to last for his entire lifetime, under the Settlement Agreement and Dismissal Order of this Court as agreed to and so-ordered in 1989. The eleven (11) transfer orders are as follows:

i.    By Order dated June 7, 2012 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, seven (7) monthly payments of $3,540.65 beginning June 21, 2012 through and including December 21, 2012 and one hundred fifty –six (156) monthly payments in the amount of $3,717.58 (increasing 5% annually) beginning January 21, 2013 through and including December 21, 2025.[1]

ii.    By Order dated September 27, 2012 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred fifty-six (156) monthly payments of $1,300 (increasing 5% annually)  beginning on January 21, 2013 through and including December 21, 2025.

iii.    By Order dated January 31, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Blazingstar, one hundred fifty-three (153) monthly payments of $1,275 (increasing 5% annually) beginning April 21, 2013 through and including December 21, 2025 (the "Blazingstar Transaction").

iv.    By Order dated March 11, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $2,000

---

[1] The transactions set forth in paragraph 28 (i), (ii), (iv), (v), (vi), and (x) herein are collectively referred to herein as the "SAF Transactions".

(increasing 5% annually) beginning January 21, 2015 through and including December 21, 2025.

v.   By Order dated April 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $2,000 increasing 5% annually beginning December 21, 2015 and ending on December 21, 2025.

vi.  By Order dated June 27, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant SAF, one hundred thirty-two (132) monthly payments of $941.91 (increasing 5% annually) beginning January 21, 2015 through and including December 21, 2025.

vii. By Order dated July 31, 2013 (as amended by the "Amended Order Approving Transfer of Structured Settlement Rights" dated August 19, 2013)[2] by Portsmouth Circuit Court, Terrence sold to Defendant Jay Gee, two hundred four (204) monthly payments of $17,000 increasing 5% annually beginning on January 21, 2026 through and including December 21, 2042 (the "Jay Gee Transaction").[3]

---

[2] The Amended Order appears to have been entered solely for the purpose of indicating that the annuity payments transferred thereunder were "life contingent". Payments under a structured settlement annuity that are payable whether the payee (or annuitant) is alive or deceased are often referred to as "guaranteed". They are also sometimes referred to as "certain" payments in that they are not contingent upon the life of the annuitant. If the annuitant is not living these payments would go to the named beneficiary or the annuitant's estate.

[3] Plaintiff attempted to stop this transfer by writing a letter to the Portsmouth Circuit Court on July 22, 2013. Apparently Plaintiff's letter was not received by Judge Dean W. Sword, Jr., Portsmouth Circuit Court until August 9, 2013, after the transfer had been approved; nonetheless, the Amended Order Approving Transfer was entered without addressing Plaintiff's objection.

viii.  By Order dated August 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Bexhill, with designated assignee Compass Settlements LLC, (a) 150 monthly payments of $1,659.08 (increasing 5% annually) beginning January 21, 2026 through and including June 21, 2038, and (b) 25 annual payments of $15,394.55 (increasing 4% annually) beginning on January 21, 2014 through and including January 21, 2038.[4]

ix.  By Order dated August 29, 2013 by Portsmouth Circuit Court, Terrence sold to Defendant Bexhill, with designated assignee WFB Corporate Trust, (a) 150 monthly payments of $1,659.08 (increasing 5% annually) beginning January 21, 2026 through and including June 21, 2038, and (b) 25 annual payments of $15,394.55 (increasing 4% annually) beginning on January 21, 2014 through and including January 21, 2038.[5]

x.  By Order dated April 17, 2014 by Portsmouth Circuit Court, Plaintiff sold to Defendant iSettlements, LLC six (6) monthly payments of $5,958.92 beginning July 21, 2038 through and including December 21, 2038; forty-eight (48) monthly payments beginning with the payment of $6,256.87 on January 21, 2039, increasing 5% annually, and ending with the payment on December 21, 2042 in the amount of $7,243.11; six (6) annual payments beginning with the payment on January 21,

---

[4] The transactions set forth at paragraph 28 (viii) and (ix) herein are collectively referred to herein as the "Bexhill Transactions".

[5] The transactions referenced at paragraph 28 (viii) and (ix) herein are the result of one petition that was "split" into two Orders, with the payments sold being divided between two assignees.

2039 in the amount of $82,078.71 increasing 4% annually, and ending with the payment on December 21, 2044 in the amount of $99,861.30; and fourteen (14) monthly payments of $46,569.59, increasing 5% annually, beginning on January 21, 2043 and continuing through and including February 21, 2044.[6]

xi. By Order dated July 11, 2014 by Fairfax County Circuit Court, Terence sold to Defendant Highpoint, monthly payments of $4,706.59 beginning June 21, 2014 through and including December 21, 2014 (the "Highpoint Transaction").

## FACTUAL ALLEGATIONS

### The SAF Transactions

29.     In or about 2012, Terrence responded to numerous solicitations for "cash now" from various factoring companies. These solicitations led him to an individual by the name of Rhett Wadsworth ("Rhett") who worked for SAF or an affiliate of SAF.

30.     Rhett pretended to befriend Terrence and told him that if he did business with him he would get great deals and be taken care of forever.

31.     Rhett told Terrence that he would need to give the court the reasons why he wanted to sell his structured settlement payments. Rhett encouraged Terrence to give him some ideas of reasons, and he would take it from there.

---

[6] It appears that there is a typographical error in this Order at number one, fourth bullet point. This bullet point indicates that the fourteen annual payments increase 3% annually, however, none of Plaintiff's annual annuity payments provide for a 3% annual increase.

32.     Defendant SAF gave Terrence this instruction because SAF knew that the transaction was not in Terrence's best interest, based on Terrence's physical and mental condition so SAF needed false reasons to persuade the court that it was.

33.     Rhett told Terrence that it would be a bad idea for him to seek advice from an independent advisor such as an attorney. Rhett persuaded Terrence that he would get his money more quickly if he just signed the paperwork without consulting a professional about it.

34.     Defendant SAF prepared the necessary paperwork to file transfer applications with the Portsmouth, Virginia Circuit Court seeking to purchase the payment streams set forth at number 28 (i), (ii), (iv), (v), (vi), and (x) above.

35.     Rhett made or caused to be made numerous cash advances to Terrence, which advances were promptly squandered. Rhett knew that Terrence was burning through cash at an alarming pace, yet he continued to tempt Terrence with easy money and he encouraged Terrence to live it up.

36.     Rhett even made arrangements to fly Terrence to Florida where he took him to even more strip clubs and bought him clothing and expensive meals.

37.     Rhett knew that Terrence was easily manipulated – an easy mark for predatory settlement purchasing.  The advances were done pursuant to contracts that were improper contracts of adhesion that forced Terrence to sell more of his future payments than he realized he was selling.

38.     From April 2012 through June 2012, to induce Terrence to transfer the payments set forth at number 28 (i), (ii), (iv), (v), (vi), and (x) above, Defendant SAF made no fewer than thirteen (13) cash advances to Terrence, totaling more than $110,000. After June 2012, Defendant SAF made another four (4) advances to Terrence totaling $10,500. Rhett initiated conversations

about advances, asking Terrence if he needed or wanted more money or if he had run out of advance money. Terrence did not initiate these requests for advances but was simply told to call Rhett if he wanted anything.

39.     Defendant SAF told Terrence that he would only have to reimburse them for the advances out of the proceeds he was to receive from Defendant SAF by selling his periodic payment to Defendant SAF, putting him in significant debt to Defendant SAF.

40.     Rhett knew that Terrence was not sophisticated and that Terrence did not read or understand the terms of the advances and the impact they had on his future periodic payments.

41.     Rhett and Defendant SAF made or caused to be made numerous cash advances so they could increase the amount of profit they could extract from Terrence's sales of his future payments.

42.     In connection with at least some of the advances, Defendant SAF sent a notary to Terrence's home in West Virginia to complete paperwork. At most times relevant to this action, Defendant SAF knew that Terrence resided in West Virginia.

43.     On at least two occasions Rhett wired money to Terrence from his personal bank account, sending him approximately $4,000 in 2013.

44.     Rhett specifically called Terrence and told him that if he agreed to sign and return the paperwork quickly he would wire money out of his own account so Terrence could go out and have a good time.

45.     These predatory advances and the easy money Defendants SAF and Rhett flooded Terrence with are contrary to the "best practices" and standards of conduct adopted by the National Association of Settlement Purchasers ("NASP"), the industry trade association.

46.     In fact, these advances violated the West Virginia and Virginia Structured Settlement Protection Acts and Internal Revenue Code ("IRC") § 5891 as they constitute impermissible transfers without a Qualified Order as required by law.

47.     Defendant SAF/123 Lumpsum is listed as a member of NASP, and one of its principals serves as chairman and treasurer on the NASP board.

48.     Defendant SAF knowingly and recklessly disregarded the NASP standards outlined below.  In fact, the following is featured prominently on the NASP website (https://nasp-usa.com/members/criteria/):

**Standards of Conduct**
Business practices that reflect negatively on the secondary market, which are unfair or deceptive, or which attract criticism from courts, legislators, regulators, or participants in the primary market pose a significant threat to the continued viability of the secondary market. Companies, firms, entities, or individuals that engage in these practices are not welcome in NASP and will not be invited to join NASP or to continue their membership.

Specifically, Regular Members must:
    i.    Use their best efforts to comply with all applicable laws, rules, and regulations relative to the secondary market, including applicable federal tax laws and all applicable transfer statutes
    ii.   Adhere to NASP's Code of Ethics and the Consumer Bill of Rights
    iii.  Comply with the rules for use of the NASP Anti-Fraud Database
    iv.   Pay annual dues on time
    v.    Not take or advocate positions or legal theories relative to transfers of structured settlement payments, specifically including legal positions in court or in the general marketplace that conflict with or contradict NASP's positions.

49.     Defendant SAF knew that Terrence suffered from serious injuries and that he was both mentally and physically impaired.

50.     Defendant SAF knew that Terrence could not survive without his monthly payments and did not have a steady job.  Defendants knew that Terrence's structured settlement payments were his sole or primary source of income.

51.     Defendant SAF knew that Terrence had a dependent child.

52.     Defendant SAF also knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee, taking into account the welfare of the consumer's dependents (if any), under the Virginia Structured Settlement Protection Act, the West Virginia Structured Settlement Protection Act and IRC § 5891.

53.     Defendant SAF disregarded this standard and sought to purchase as much of Terrence's payments as they could without regard for his welfare, the welfare of his minor child or the standards set forth in the Virginia and West Virginia transfer acts and IRC § 5891.

54.     Defendant SAF coached Terrence in order to get transfer petitions approved, including stating  reasons for each transaction that they knew were false and misleading and in violation of the Virginia Structured Settlement Protection Act the West Virginia Structured Settlement Protection Act and IRC § 5891.

55.     In total Defendant SAF purchased payments from Terrence under six (6) transfer orders issued in Portsmouth Circuit Court, Virginia. Defendant SAF knew that the impact of the aforesaid transfer orders would be financially devastating to Terrence due to his physical and mental condition and his ongoing need for medical care and treatment.

56.     Defendant SAF knew that Terrence resided in West Virginia, yet Defendant SAF prepared transfer petitions using Terrence's parents' address in Herndon, Virginia so that Defendant SAF could file transfer petitions in a Portsmouth, Virginia courthouse where Defendant

SAF knew that no personal appearance by Terrence would be required and where transfer petitions were granted without inquiry into the soundness of the transfer petition. Portsmouth, Virginia close to 500 miles from Martinsburg, West Virginia. Terrence has never been to Portsmouth.

57. Defendant SAF and Rhett knew or should have known that Terrence was blowing though large amounts of cash at an alarming pace. More than $100,000 in advances and hundreds of thousands more were thrown at Terrence despite his inability to work and care for himself or his daughter.

58. Raiding Terrence's annuity in this manner was contrary to the spirit and letter of the Virginia Structured Settlement Protection Act, NASP standards and best practices and IRC § 5891.

59. From June, 2012 through June, 2013 Defendant SAF entered into five (5) transactions with Terrence under which Terrence sold all of his monthly periodic payments through 2025.

60. If this were not enough, Defendant SAF went back to Terrence in 2014 and purchased his "life-contingent" monthly and annual payments as far into the future as 2044. Terrence may never see another payment from his structured settlement annuity again and unless these transactions are unwound by order of this Court, he may have forever lost the ability to care for himself and his dependent child or qualify for life insurance for the benefit of his dependent child.

**The Bexhill Transactions**

61.     Upon information and belief, Defendant Bexhill located Terrence through its agents, believed to be Client First Settlement Funding ("Client First") after searching court records of his prior sale to Defendant SAF.

62.     Defendant Bexhill or its agents therefore knew that Terrence had already sold off large portions of his structured settlement annuity to Defendant SAF, Defendant Blazingstar, and Defendant Jay Gee.

63.     Defendant Bexhill, through its agents, took further steps to forum shop. For example, a Client First employee named Alex traveled to Terrence's home in West Virginia, picked him up, and drove him to Virginia to sign papers for the Court. Specifically, Alex took Terrence to a UPS Store in Winchester, Virginia, and had that store's notary notarize the papers.

64.     Even though Defendant Bexhill, through its agent, Client First sent documents to Terrence in West Virginia, Alex told Terrence that the papers needed to be signed in Virginia. Alex told Terrence that the sooner they finalized the documents, the sooner Terrence would get his money.

65.     According to Terrence, Alex told him that Defendant Bexhill, and its agent, Client First were affiliated with Wells Fargo, a nationally recognized banking institution. Alex told Terrence that he could invest the money he received from doing this transfer with Wells Fargo. Alex told Terrence it would be crazy to pass up this deal.

66.     Alex convinced Terrence that Wells Fargo would double his money if he did the proposed deal with Defendant Bexhill and its agent, Client First. In order to induce Terrence to do the deal with Bexhill and Client First, Alex accompanied Terrence to strip clubs and encouraged

him to spend money recklessly. Alex took Terrence grocery shopping, to the movies and out to dinner at restaurants. Alex encouraged Terrence to spend even more lavish sums of money on women and gambling so that Terrence would "need" to sell even more of his structured settlement annuity payments to pay his debts, which would qualify Alex to earn additional commissions.

67.     Alex told Terrence that Client First was a great company and had an A+ rating. Terrence believed that Defendant Bexhill was affiliated with Client First.

68.     Alex told Terrence that it would be a bad idea for him to seek advice from an independent advisor such as an attorney. Alex said that Terrence would get his money quickly if he just signed the paperwork without independent professional advice.

69.     Alex never told Terrence that his income from transactions with Defendant Bexhill would be taxable. Alex simply told Terrence that his money would double by working with him and Wells Fargo.

70.     Defendant Bexhill or its agents knew or should have known that Terrence had already squandered large portions of his structured settlement payments in prior transactions.

71.     Upon information and belief Defendant Bexhill and/or Defendant Bexhill's agent, was aware of Terrence's physical condition and limitations.

72.     This did not stop Defendant Bexhill from purchasing an extremely large payment stream from Terrence.  The aggregate amount of payments sold beginning in 2026 and going through 2038 was $1,951,748.66.  For this, Terrence received merely $200,037.50.

73.     Upon information and belief, Defendant Bexhill and/or its agent earned a significant profit by purchasing close to $2,000,000.00 in future payments for just over $200,000.00

74. Defendant Bexhill knowingly filed transfer petitions in Virginia while Terrence resided in West Virginia.

75. Terrence was specifically instructed to list an address in Virginia by Defendant Bexhill and/or Defendant Bexhill's agent, Client First, to avoid scrutiny by the Virginia courts.

76. Defendant Bexhill knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee, taking into account the welfare of the payee's dependents under the West Virginia and the Virginia Structured Settlement Protection Acts and IRC §5891.

**The Blazingstar, Jay Gee and Highpoint Transactions**

77. Upon information and belief, Defendants Blazingstar, Jay Gee, and Highpoint located Terrence after searching court records of his prior sales to Defendant SAF.

78. Defendants Blazingstar, Jay Gee, and Highpoint therefore knew that Terrence had already sold off large portions of his structured settlement annuity to Defendant SAF.

79. Defendants Blazingstar, Jay Gee and Highpoint knew that Terrence had already squandered large portions of his structured settlement payments in prior transactions.

80. Upon information and belief Defendants Blazingstar, Jay Gee, and Highpoint was aware of Terrence's physical condition and limitations.

81. This did not stop Defendants Blazingstar, Jay Gee, and Highpoint from purchasing the last of Terrence's "guaranteed" monthly payments and many "life contingent" payments owed to Terrence under his structured settlement annuity.

82. Defendants Blazingstar, Jay Gee, and Highpoint knew that the standard for consummating a structured settlement buy-out transaction was the "best interest" of the payee,

taking into account the welfare of the payee's dependents under the Virginia Structured Settlement Protection Act and IRC §5891.

83.     Defendant Highpoint filed yet another transfer petition in Fairfax County, Virginia (CL2014-14052) seeking to purchase yet more payments from Terrence. Counsel for Terrence made repeated requests to have Highpoint withdraw this petition and despite these many requests, the petition was not withdrawn until late November, 2014.

**The Taylors Are Financially Ruined**

84.     As a result of these eleven transactions, Terrence has been rendered insolvent and unable to support himself or his dependent child. He was forcibly evicted from his home in West Virginia and now is being supported by his parents, Louise and Phillip, who are living on credit after exhausting their life savings caring for Terrence and his daughter. Terrence is uninsured, needs a new prosthesis and suffers from severe depression.  Unless some or all of the aforesaid transactions are unwound, he and his family are likely to become wards of the state.  Terrence sold off all of his guaranteed payments and many life contingent payments, and he may have permanently given up his ability to qualify for additional life insurance for the benefit of his minor child.

85.     Terrence no longer receives any periodic payments from the ███████████ █████████████ annuity that was purchased to provide periodic tax-free payments in accordance with the Settlement Agreement, which was incorporated by reference into the Dismissal Order of this very Court issued in 1989.  The Settlement Agreement specifically provides that neither Terrence nor any other payee shall "████████████████████.

(emphasis added).


## FIRST CAUSE OF ACTION
## STATUTORY VIOLATIONS OF THE VIRGINIA STRUCTURED SETTLEMENT PROTECTION ACT
*(against Defendant SAF, Defendant Blazingstar, Defendant Jay Gee, Defendant Bexhill and Defendant Highpoint, sometimes collectively referred to as "Transferee Defendants")*

86.     Section 59.1-475 of the Code of Virginia sets forth the standards and preconditions for the sales of structured settlement payment rights.  Specifically, the Virginia Structured Settlement Protection Act § 59.1-476 provides that "No direct or indirect transfer of structured settlement payment rights shall be effective …unless the transfer has been authorized in advance in a final court order…based upon express findings by such court that: 1. The transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents; 2. The payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived such advice in writing; and 3. The transfer does not contravene any applicable statute or the order of any court or other government authority."

87.     In addition, Section 59.1-477.1 of the Virginia Structured Settlement Protection Act states, in part,  that "Compliance with the requirements set forth in Section 59.1-475.1 and the fulfillment of the conditions set forth in Section 59.1-476 shall be solely the responsibility of the transferee in any transfer of structured settlement payment rights….".

88.     Defendant SAF, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed transfer applications seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court as follows:

    i.      CL12001117-00 (petition filed under seal)[7];

    ii.     CL12002128-00 (petition filed under seal);

    iii.    CL13000645-00;

    iv.    CL13001354-00 (petition filed under seal);

    v.     CL13002032-00 (petition filed under seal); and

    vi.    CL14000972-00.

89.     Defendant Blazingstar, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13000169-00.

90.     Defendant Jay Gee, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13002379-00.

91.     Defendant Bexhill, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in CL13002770-00.

---

[7] A copy of the Order obtained from the Portsmouth Circuit Court shows case number "CL12-2718". However, the Portsmouth Circuit Court indicated that this number is incorrect and that the correct number is "CL12001117". This could not be confirmed since the transfer petition was filed under seal.

92.     Defendant Highpoint, as Transferee as defined in the Virginia Structured Settlement Protection Act, filed a transfer application seeking to purchase periodic payments from Terrence in Fairfax Circuit Court in CL2014-07472.

93.     Upon information and belief, Transferee Defendants knowingly filed false and misleading petitions in the actions listed above.

94.     Upon information and belief, Transferee Defendants knowingly prepared, induced Terrence to sign, and filed false affidavits on behalf of Terrence, as Payee.

95.     Upon information and belief, Transferee Defendants stated in each petition filed a statement to the effect that the "transfer is in the best interests of the Transferor, Terrence Taylor, taking into account his welfare and support" while knowing that Terrence had no source of income other than his structured settlement payments and that he had a minor child to support.

96.     Transferee Defendants knew or should have known that the Settlement Agreement entered into by Terrence, Louis and Phillip Taylor expressly provided that the " ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (emphasis added)

97.     The Settlement Agreement was expressly incorporated by reference into a Dismissal Order issued by this Court in or about December 1989.

98.     The petitions filed by Transferee Defendants in the aforesaid transfer applications violated the Virginia Structured Settlement Protection Act in that:

A.     The transfer applications filed by Transferee Defendants violated the anti – assignment language in the underlying Settlement Agreement and further failed to provide a copy of the Settlement Agreement to the respective courts;

B.     Each transfer application filed by Transferee Defendants was in direct contravention of an order of this Court, as set forth in the Dismissal Order attached hereto as Exhibit A, in that the Dismissal Order incorporates the terms of the Settlement Agreement which expressly provides that the ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ (emphasis added).

C.     Each transfer application filed stated that the transfer was in the "best interests" of Terrence when  Transferee Defendants knew that Terrence had no source of income other than his structured settlement payments and was unable to support himself or his dependent child without those payments.

D.     Transferee Defendants failed to inform the Portsmouth Circuit Court, or the Fairfax Circuit Court, as applicable, of the prior order of this Court incorporating the terms of the Settlement Agreement which expressly provides that the that the ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ (emphasis added).

E.     Transferee Defendants encouraged Terrence to forgo professional advice in contravention of the Virginia Structured Settlement Protection Act.

99.     As a result of the violations of the Virginia Structured Settlement Protection Act as aforesaid, the orders of the Portsmouth and Fairfax Circuit Courts set forth at number 28 herein should be declared void and of no further force and effect with all costs associated with restoring periodic payments to Terrence to be borne by the Transferee Defendants in accordance with Section 59.1-477.1 of the Virginia Structured Settlement Protection Act.


## SECOND CAUSE OF ACTION
## STATUTORY VIOLATIONS OF THE
## WEST VIRGINIA STRUCTURED SETTLEMENT PROTECTION ACT
### *(against Defendant SAF, Defendant Blazingstar, Defendant Jay Gee and Defendant Bexhill)*

100.     All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

101.     The West Virginia Structured Settlement Protection Act sets forth the standards and preconditions for the sales of structured settlement payment rights in West Virginia.  Specifically, the West Virginia Structured Settlement Protection Act provides that "After a hearing or upon its own motion, the court may approve the transfer if the court finds that: (1) The consumer has clearly demonstrated that (A) He or she, or his or her family is facing a financial hardship that the transfer would alleviate and that the transfer would not subject the consumer or the consumer's family to undue financial hardship in the future; or (B) the transfer is in the best interest of the consumer: Provided, That the judge shall inquire of the guardian ad litem and the transferee as to possible adverse tax consequence to the consumer and inform the consumer of the result of said inquiry".

102.     Defendant SAF, filed transfer applications seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in the Commonwealth of Virginia when Defendant SAF knew that Terrence resided in West Virginia.

103.     In fact, Defendant SAF through its agents met with Terrence in West Virginia, sent notaries to Terrence's home in West Virginia, took Terrence to strip clubs, restaurants and stores in West Virginia, drove rental cars in West Virginia and stayed at hotels in West Virginia.

104.     Defendant SAF knew that Terrence resided in West Virginia and was domiciled in West Virginia and used the mail and the wires to communicate with Terrence in West Virginia.

105.     Defendant SAF also knew that a transfer petition in West Virginia was likely to face more scrutiny than they would face in Portsmouth Circuit Court. More scrutiny would likely have forced compliance with the best interest standard and a review of the prior Order of this Court and Defendant SAF would not have been able to decimate Terrence's structured settlement annuity.

106.     Defendant Blazingstar filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in the Commonwealth of Virginia when Defendant Blazingstar knew that Terrence resided in West Virginia.

107.     Upon information and belief, Defendant Blazingstar discovered Terrence Taylor through "court scraping" records in Portsmouth Virginia.

108.     As a result, Defendant Blazingstar knew that Terrence had recently sold a significant amount of his structured settlement annuity to a competing funding company, Defendant SAF, and that the proposed agreement they had Terrence sign was not in his best interests as required by law.

109. Defendant Blazingstar's transfer documents were notarized in West Virginia by a West Virginia notary where Terrence resided and Defendant Blazingstar used the mail and wires to communicate with Terrence in West Virginia.

110. Defendant Blazingstar pressured Terrence into signing falsified documents which they caused to be filed in Portsmouth Circuit Court where they knew with reasonable certainty a personal appearance would not be required; no independent review of the petition would be conducted to see if it met the best interest standard; and there would be no review of the prior transfers Terrence had done with other funding companies.

111. Defendant Jay Gee filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in the Commonwealth of Virginia when Defendant Jay Gee knew that Terrence resided in West Virginia.

112. In fact, Defendant Jay Gee had Terrence's documents notarized in West Virginia and sent representatives to West Virginia and used the mail and the wires to communicate with Terrence in West Virginia

113. Defendant Bexhill filed a transfer application seeking to purchase periodic payments from Terrence in Portsmouth Circuit Court in the Commonwealth of Virginia when agents of Bexhill knew that Terrence resided in West Virginia.

114. In fact, Bexhill representatives "partied" extensively with Terrence in West Virginia, frequented local strip clubs in West Virginia and took Terrence to casinos, restaurants and stores in West Virginia.

115. Upon information and belief, Defendants SAF, Blazingstar, Jay Gee and Bexhill all knowingly filed false and misleading petitions in Portsmouth Circuit Court.

116.     Upon information and belief, Defendants SAF, Blazingstar, Jay Gee and Bexhill all knowingly solicited Terrence in West Virginia with the specific intent of inducing Terrence into signing documents that were contrived, misleading, deceptive and in violation of the West Virginia Structured Settlement Protection Act and the West Virginia Consumer Protection Act.

117.     Terrence, as a result of his condition and mental state, did not fully understand the consequences of his actions.  He received so many calls and so many solicitations from Defendants SAF, Blazingstar, Jay Gee and Bexhill that he at times agreed to things that were not rational just to appease and please certain Defendants who held themselves out as Terrence's friends.

118.     The fact that Terrence was an easy mark was not lost on Defendants SAF, Blazingstar, Jay Gee and Bexhill.  On the contrary, Defendants SAF, Blazingstar, Jay Gee and Bexhill systematically hounded and exploited Terrence for their own benefit and violated the West Virginia Structured Settlement Protection Act in the process.

119.     Terrence was easily convinced that by signing packages of documents forced upon him through high pressure sales tactics that he would get great deals, become friends with flashy funding company representatives and improve his life.

120.     Upon information and belief, Defendants SAF, Blazingstar, Jay Gee and Bexhill, as transferees in the petitions they filed in Portsmouth Circuit Court, each filed a statement to the effect that the "transfer is in the best interests of the Transferor, Terrence Taylor, taking into account his welfare and support" while knowing that Terrence had no source of income other than his structured settlement payments and that he had a minor child to support.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### *(DEFENDANT SAF)*

121.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

122.    Defendant SAF is a member of NASP and an experienced participant in the secondary market for structured settlements.

123.    Defendants SAF and Rhett held themselves out as experts in the field and familiar with all relevant laws, practices and procedures for secondary market structured settlement payment transfers.

124.    Defendant SAF owed Terrence a contractual duty of good faith and fair dealing in each purchase transaction, and such duty included their obligation to supply document packages that were in compliance with applicable state and federal law.

.

125.    The Virginia Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above.  In supplying potential customers with sales documentation packages, Defendant SAF was duty bound to provide potential customers like Terrence with materials that comply with the requirements of applicable state law and IRC §5891, including the requirement that the transaction be in the customer's best interest.

126.     Materially false and misleading information was provided to Terrence and was used by Defendant SAF to strip Terrence of his guaranteed periodic payments under his structured settlement annuity in violation of applicable law.

127.     By providing Terrence with document packages that were falsified, misleading, and inaccurate, Defendant SAF breached its duty to Terrence.

128.     By telling Terrence to do things that were not in his and his dependent daughter's best interest, Defendant SAF breached its duty to him.

129.     Defendant SAF knew or should have known that Terrence resided and was domiciled in West Virginia.  Upon information and belief Defendant SAF sent agents to Terrence's home in West Virginia and upon further information and belief concealed his residence from the Portsmouth, Virginia Circuit Court and knowingly prepared and filed falsified documents to avoid compliance with the Virginia Structured Settlement Protection Acts and IRC §5891.

130.     By directing transactions to a "friendly court" to avoid scrutiny and compliance with the Virginia Structured Settlement Protection Act, Defendants SAF and Rhett put Terrence in harm's way in violation of the Virginia Structured Settlement Protection Act and IRC § 5891.

131.     In addition, from approximately April 2012 through August 2013, Defendant SAF made approximately 25 cash advances to Terrence totaling more than $163,000. The amount and frequency of these advances were not in line with industry standards or NASP best practices.

132.     These advances were predatory and irresponsible, and obligated Terrence to sell his payments to Defendant SAF so he could pay back the advances. Defendant SAF got Terrence addicted to easy money, induced him to spend lavishly on gambling and women and encouraged

him to sell more in future payments than reasonably appropriate so they could extract as much profit as possible at Terrence's and Terrence's family's expense.

133.    These advances and the subsequent "raiding" of Terrence's structured settlement annuity were part of a predatory pattern of activity wholly inconsistent with NASP's stated standards and practices.

134.    Defendant SAF and Rhett's misrepresentations that Terrence would always have payments coming to him under his structured settlement annuity were false.

135.    Terrence reasonably relied upon Defendant SAF's misrepresentations to his detriment.

136.    As a result of the aforesaid breaches in violation of the Virginia Structured Settlement Protection Act which induced the courts to approve transfers without proper support statutory jurisdiction or factual support, Terrence has been rendered insolvent. He has been and will be damaged as a result of Defendant's breaches of duty, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

137.    Accordingly, Defendant SAF should be required to pay damages to Plaintiff for breach of contract including breaching the implied covenant of good faith and fair dealing in an amount to be determined at trial, plus reasonable attorneys' fees and the costs associated with this action.

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT
### *(Defendant Bexhill)*

138.    All of the allegations set forth in this Complaint are re-alleged and incorporated by reference herein.

139.    Defendant Bexhill and its agents, Client First, owed Terrence a contractual duty of good faith and fair dealing to in each purchase transaction, and such duty included their obligation to supply document packages that were in compliance with applicable state and federal law.

140.    Defendant Bexhill by and through their agents, Client First, at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

141.    Upon information and belief, Defendant Bexhill's agent, Client First Settlement Funding is a member of NASP.

142.    The Virginia Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above. In supplying potential customers they solicit with sales documentation packages, As transferee under this Act, Defendant Bexhill was  duty-bound to provide customers like Terrence with materials that complied with the requirements of applicable state law and IRC § 5891.  Transferees are also duty-bound not to enter into transactions that are not in the customer's best interest or that do not take into account the welfare and support of his dependent.

143.    Upon information and belief, Defendant Bexhill knew or should have known about Terrence's prior transactions and his physical and mental state.

144.     Given Terrence's injuries and his physical and mental condition and limitations, Defendant Bexhill knew or should have known that the transactions it completed with him were not in Terrence's best interest and would not promote the welfare or support of his minor daughter.

145.     Upon further information and belief, Defendant Bexhill knew or should have known that Terrence resided and was domiciled in West Virginia.

146.     Upon information and belief Defendant Bexhill, by and through its agent, Client First, sent agents to Terrence's home in West Virginia, and upon further information and belief concealed his residence from the Portsmouth, Virginia court and knowingly falsified documents to avoid scrutiny and compliance with the Virginia Structured Settlement Protection Act and IRC § 5891.

147.     A Client First representative named "Alex" visited Terrence in his home and drove him to Virginia, to a UPS store in Winchester, so the document package could be notarized in Virginia.

148.     By providing Terrence with document packages that were falsified, misleading, and/or inaccurate, Defendant Bexhill breached its duty to Terrence.

149.     By persuading Terrence to do things that were not in his and his dependent daughter's best interest, Defendant Bexhill breached its duty to him.

150.     Terrence was misled by Defendant Bexhill into believing that he was only selling a portion of his payments and that he would always have a portion of the periodic payments available to cover basic living expenses.

151.     Terrence was further misled by Defendant Bexhill's agent, Client First into believing that his sale proceeds would be reinvested by Wells Fargo, a nationally recognized

banking institution and that he would make more from their investments than he would by simply leaving his structured settlement annuity in place. Client First represented to Terrence that he would do better by selling tax free payments and converting them into taxable, fee heavy investments with Wells Fargo affiliates.

152. Upon information and belief, Defendant Bexhill, or its agent, flipped one or more of Terrence's transactions to investors at a substantial profit.

153. Upon further information and belief, the more payments Defendant Bexhill, or its agent, convinced Terrence to sell, and the longer the payments went out into the future, the more money it pocketed at Terrence's expense.

154. With knowledge of Terrence's prior sales and with knowledge of his physical and mental state, Defendant Bexhill, or its agent, orchestrated a series of transactions that were not in Terrence's best interest and that did not promote the welfare and support of his dependent daughter.

155. Terrence has been rendered insolvent as a result of the aforesaid breaches of the duty of care owed to him which induced the courts to approve transfers without proper support statutory jurisdiction or factual support. Terrence has been and will be damaged as a result of Defendant's breaches of this duty, including the loss of his structured settlement payments, and the incurring of liability associated with his need for ongoing medical care and living expenses, plus liability for attorney fees and expenses associated with this action.

156. Accordingly, Defendant Bexhill should be required to pay damages to Plaintiff for breach of contract including breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial plus reasonable attorneys' fees and the costs associated with this action.

## FIFTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
### *(against Defendants SAF and Rhett)*

157.    All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

158.    At all times relevant to this action, Defendants SAF and Rhett represented that they were reputable settlement purchasers willing to offer Terrence cash for his future payments in accordance with the law, specifically, IRC § 5891 and the Virginia Structured Settlement Protection Act.

159.    Defendants SAF and Rhett knew that a pre-condition to applying for and obtaining a qualified court order within the meaning of IRC § 5891 was procuring an affidavit from Terrence setting forth his intentions with respect to the payments, his dependents, his other sources of income, and his residence.  Defendants SAF and Rhett deliberately prepared and filed falsified documents and affirmatively coached Terrence on how to submit false affidavits so they could profit by brokering his annuity payments to third party purchasers.

160.    Defendants SAF and Rhett knew that a court was only supposed to approve a transfer if it found such transfer was in Terrence's best interest and furthered the support and welfare of his dependent daughter.

161.    Defendants SAF and Rhett also knew that their transactions were not in the best interests of Terrence or his dependent minor child.  Defendants SAF and Rhett knew that Terrence suffered from serious physical and mental disabilities and that Terrence required the use of a

prosthetic limb and that his physical appearance and mental disabilities limited his ability to obtain gainful and permanent employment.

162.     Terrence made numerous phone calls to Defendant Rhett requesting advances that were contrary to the reasons Terrence gave on at least some of the petitions that Defendants SAF and Rhett prepared for filing with the Portsmouth Circuit Court.  According to Terrence, he spoke with Rhett as much as several times a day in April, May and June of 2012 and made numerous requests for money. Defendant Rhett also called Terrence from time to time in April, May and June of 2012 asking Terrence if he needed more cash.  Each time Terrence said that he wanted cash for any reason whatsoever, Defendant Rhett caused funds to be sent to Terrence's bank account by wire from Defendant SAF. Upon information and belief, each wire transfer was preceded by at least one phone call and was documented in some form of advance agreement believed to be in Defendant SAF's custody and control.

163.     Defendant Rhett told Terrence on numerous occasions in April and May of 2012 that if he ever needed money, all he had to do was "call Rhett".

164.     While many of the documents and proof related to the aforesaid telephonic communications and cash advances were lost when Terrence was forcibly evicted from his home in West Virginia in 2014, Plaintiffs believe that Defendants SAF and Rhett are in possession of documents and/or electronic records that further support the specific acts of fraud alleged herein. With a reasonable opportunity to conduct discovery, the specifically enumerated details outlining the fraud set forth below will be supplemented. The support for the allegations set forth below include Terrence's banking records.

i.    On April 25, 2012 and April 26, 2012 Rhett spoke with Terrence on the phone about an advance.

ii.    On April 26, 2012, a Notary Public by the name of April Burten appeared at Terrence's home located at 101 O'Flanery Court, Martinsburg West Virginia. Ms. Burten ("Burten") specifically stated to Terrence that she "talked to Rhett and had some documents for Terrence to sign."

iii.    On April 26, 2012 Terrence was instructed by Burten to sign documents related to a proposed cash advance so she could notarize his signature.

iv.    On April 26, 2012 Terrence signed a document presented to him by Burten and Burten notarized his signature.  Terrence did not read the document carefully nor were the contents explained to him. Terrence did not maintain a copy of this document but believes that Defendants SAF and Rhett may have maintained copies.

v.    On April 27, 2012, Defendant SAF wired $5,000 to Terrence's bank account.

vi.    On April 27, 2012, Defendant Rhett exchanged telephonic communications with Terrence related to the advance.  Rhett specifically told Terrence that he could spend the advance money any way he liked and that he would not have to repay the advance because it would be taken out of the proceeds of the pending transaction that Rhett intended to file in Portsmouth Virginia.

vii.    On May 1, 2012 Defendant Rhett asked Terrence if he had "run out of the advance money yet?"

viii. On May 1, 2012 Burten called Terrence and told him that she had spoken to Rhett and that she had documents for him to sign. Burten returned to Terrence's home in West Virginia that same day, told Terrence she had spoken to Rhett and handed him documents to sign. Burten notarized Terrence's signature in West Virginia.

ix. On May 2, 2012 Defendant SAF wired $7,000 to Terrence's bank account.

x. On May 2, 2012 Defendant Rhett and Terrence exchanged telephonic communications regarding the advance.

xi. On May 13, 2012 Rhett exchanged telephonic communications with Terrence wherein Rhett specifically asked Terrence if he had "run out of advance money again."

xii. On May 13, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign. Once again Burten handed documents to Terrence and instructed him to sign. Burten then notarized Terrence's signature.

xiii. On May 14, 2012 Defendant SAF wired $3,000 to Terrence's bank account.

xiv. On May 28, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign. Once again Burten handed documents to Terrence and instructed him to sign. Burten then notarized Terrence's signature.

xv. On May 29, 2012 Defendant SAF wired $3,000 to Terrence's bank account.

xvi.      On May 30, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again, Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xvii.     On May 31, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

xviii.    On June 5, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again, Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xix.      On June 6, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

xx.      On June 17, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xxi.      On June 18, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

xxii.     On June 20, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xxiii.    On June 21, 2012 Defendant SAF wired $10,000 to Terrence's bank account.

xxiv.    On June 22, 2012 Defendant SAF wired $20,000 to Terrence's bank account.

xxv.     On June 22, 2012 a company called Genex Strategies, Inc. wired $3,540.65 to Terrence's bank account. The wire notation clearly states "8755608, SAF payment." Terrence never spoke with anyone from Genex Strategies, Inc.

xxvi.     On August 21, 2012, less than three months after causing more than $300,000 to be sent to Terrence's account, Rhett and Terrence exchanged telephonic communications about Terrence getting more money from SAF.

xxvii.     On August 21, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign. Once again Burten handed documents to Terrence and instructed him to sign. Burten then notarized Terrence's signature.

xxviii.     On August 22, 2012 Defendant SAF wired $1,000 to Terrence's bank account.

xxix.     On August 22, 2012 Rhett and Terrence exchanged telephonic communications about the advance.

xxx.     On August 23, 2012 Defendant SAF wired $2,000 to Terrence's bank account.

xxxi.     On September 20, 2012 Rhett asked Terrence if he wanted more advance money. Terrence said yes and on September 20, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign. Once again Burten handed documents to Terrence and instructed him to sign. Burten then notarized Terrence's signature.

xxxii.     On September 21, 2012 Defendant SAF wired $2,500 to Terrence's bank account.

xxxiii.    On September 21, 2012 Rhett and Terrence exchanged telephonic communications about the advance.

xxxiv.    On September 27, 2012 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xxxv.    On September 28, 2012 Defendant SAF wired $5,000 to Terrence's bank account.

xxxvi.    On February 6, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xxxvii.    On February 7, 2013 Defendant SAF wired $2,500 to Terrence's bank account.

xxxviii.    On February 14, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xxxix.    On February 15, 2013 Defendant SAF wired $3,000 to Terrence's bank account.

xl.    On February 21, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to

sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xli.     On February 22, 2013 Defendant SAF wired $3,000 to Terrence's bank account.

xlii.    On March 10, 2013 Burten called Terrence and then showed up at Terrence's home in West Virginia. Burten stated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.   Burten then notarized Terrence's signature.

xliii.   On March 11, 2013 Defendant SAF wired $20,000 to Terrence's bank account.

xliv.    On March 13, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xlv.     On March 14, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xlvi.    On March 28, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xlvii.   On March 29, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

xlviii.  On April 9, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to

sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

xlix.    On April 10, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

l.    On April 23, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.   Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

li.    On April 24, 2013 Defendant SAF wired $5,000 to Terrence's bank account.

lii.    On October 17, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

liii.    On October 18, 2013 Defendant SAF wired $1,000 to Terrence's bank account.

liv.    On November 13, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to sign.  Once again Burten handed documents to Terrence and instructed him to sign.  Burten then notarized Terrence's signature.

lv.    On November 14, 2013 Defendant SAF wired $1,500 to Terrence's bank account.

lvi.    On November 21, 2013 Burten showed up at Terrence's home in West Virginia and repeated that she had spoken with Rhett and had documents for Terrence to

sign. Once again Burten handed documents to Terrence and instructed him to sign. Burten then notarized Terrence's signature.

lvii.    On November 22, 2013 Defendant SAF wired $1,000 to Terrence's bank account.

165.    Defendants SAF and Rhett specifically represented to Terrence that all of the aforesaid advances were being made in accordance with industry custom and practice and that they were all consistent with the petitions that were filed with the Portsmouth Court.

166.    In fact, the 13 advances that were made from April 2012 through June 2012 totaling more than $110,000.00 were way out of line with industry practices. In essence, each advance was really a disguised unsecured personal loan. SAF would not have made this many advances unless it was certain that the petition they filed in Portsmouth would be granted.

167.    In addition to the predatory cash advances set forth above, Rhett also made a number of materially misleading statements to Terrence that Terrence relied upon to his detriment.

168.    For example, Rhett specifically told Terrence that SAF was the best company in the business, offered Terrence the best rates and that Rhett would never take advantage of Terrence due to their friendship.

169.    Rhett specifically told Terrence that the advances were not loans but that they would simply be backed out of the transaction when the deal was completed.

170.    Rhett also told Terrence not to speak with any other companies and even sent Terrence a prepaid cell phone by Federal Express. Rhett specifically told Terrence to use the new

phone so other funding companies would stop calling him. Records of the dates of these communications are believed to be in Rhett and SAF's possession.

171.   In addition to the advances specified above, there may have been other advances made to Terrence by affiliates of Defendant SAF and on or about August 23, 2013, Defendant Rhett appears to have wired $1,500.00 to Terrence's account and again on or about October 25, 2013 Rhett appears to have wired an additional $1,500.00 to Terrence's account. It appears that these advances were made by Rhett from his personal account.

172.   According to Terrence, on August 22nd and August 23rd, 2012 Rhett specifically told Terrence that if he signed and returned the documents Rhett had sent to him, Rhett would send Terrence money that day from his personal account. Rhett told Terrence that he needed Terrence to sign the documents that day because Rhett was afraid that another factoring company would "poach" his deal and he would lose out on Terrence's business.

173.   Rhett also specifically told Terrence that he could spend the advance money any way he liked with no restrictions and without regard to the reasons set forth in the petitions that were filed in the Portsmouth court. Rhett told Terrence that the advances were being made to help him out even though Rhett knew that this was not true.

174.   Defendants SAF and Rhett knew that Terrence was spending the funds he was advanced at a rapid pace and that he would not possibly be able to use the proceeds for the purposes set forth in the petitions that were filed with the Portsmouth court. The petitions filed in the transactions set forth in paragraph 28 (i) (ii) (v) and (vi) were filed under seal and are not in Terrence's possession.

175.     Defendants SAF and Rhett knew that the aforesaid misrepresentations they made to Terrence were false and misleading and likely to deceive Terrence.

176.     Rhett made the aforesaid misrepresentations and the predatory advances so they could force Terrence into selling more of his future payments than he reasonably required so they could realize a large profit and lock Terrence in for follow on transactions.

177.     Defendant SAF and Rhett knew that the false and misleading statements about the 24 advances would be relied upon by Terrence and that Terrence would spend the advance money quickly and need to sell even more future payments.

178.     Defendants SAF and Rhett misled Terrence into selling more of his payments than he reasonably required so they could "flip" deals to pre-arranged buyers at a significant profit. Defendant SAF made enormous profits by flipping deals to pre-arranged buyers and took advantage of Terrence's lack of sophistication in financial matters and his diminished capacity and mental state.

179.     In fact, Defendant SAF sought to flip as much of Terrence's annuity payments as they possibly could to third-party buyers or "assignees" so they could extract higher commissions and fees.

180.     In connection with the advances and with these transactions, Defendant SAF represented that they were acting as principals and purchasing payments for their own account.  In fact, sales were pre-arranged and Defendant SAF at all times acted as brokers, pocketing large, undisclosed commissions based on a re-discounting of cash flows, resulting in millions of dollars in profiteering at Plaintiff Terrence Taylor's expense.

181.     Defendants SAF and Rhett engaged in a number of other specific acts and utterances to perpetuate and or cover-up these misrepresentations, including but not limited to the following: failing to disclose the terms and conditions of the twenty four or more cash advances made to Terrence and how they would impact on the transfer petitions; concealing that earnings on alleged investments would be fully subject to income tax whereas Terrence's structured settlement called for tax free treatment by Terrence for life;  telling Terrence that it was not in his interest to consult a professional, e.g. an attorney, to review the transactions; lying to Terrence about why he had to travel to Virginia to sign some documents that would be filed with the court; sending notaries and other representatives to Terrence's home in West Virginia (not Virginia) so they could obtain his signature on documents they could submit to court in Virginia where no personal appearance would be required; soliciting Terrence in West Virginia; phone calls, faxes, emails and text messages to Terrence in West Virginia; convincing Terrence NOT to file a petition in West Virginia because they knew it would be denied; and sending stored value cards or cash advance payments to Terrence in West Virginia.

182.     Defendants SAF and Rhett also did not inform Terrence that the more payments Terrence sold and longer out into the future the payments went the more profit they would make by rediscounting cash flows for their benefit and at Terrence's expense.  It is believed that Defendant SAF and Rhett collectively pocketed in excess of $500,000.00 by raiding Terrence's structured settlement annuity as described herein.

183.     Rhett's statements to Terrence about SAF offering the best rates was not true.  The higher the discount rate Rhett and SAF were able to obtain, the more money they would make.

184.     Rhett's statement to Terrence that he was sending him a phone to protect him from unwanted callers was deceitful.  Rhett did not want other funding companies to offer Terrence more money and force Rhett and SAF to match a competitive offer or lose the deal.  It was less expensive to induce Terrence into sticking with SAF by sending him gift cards and top secret phones than it would have been to compete with other funding companies.  Rhett used the above deceptive, misleading and false representations to dupe Terrence into selling off all of his periodic payments so he and SAF could earn outsized profits at Terrence's expense.

185.     Terrence naively believed that Rhett was his friend; that SAF was giving him the best rates for his future payments; and that Terrence could rely on Rhett because Rhett would never "take advantage of their friendship".

186.     Defendants SAF and Rhett knew that Terrence would rely and Defendants SAF and Rhett specifically intended for Terrence to rely on the aforesaid misrepresentations to his detriment.

187.     Terrence did rely on these misrepresentations to his detriment and to the detriment of Louise and Phillip and eventually to the detriment of his dependent daughter.

188.     As a result, Terrence now has no income, lives with his parents, cannot support himself or his dependent daughter, and is likely to become a ward of the state. Based on the size, frequency and tenor of the transactions, it was reasonably foreseeable that Plaintiff would be rendered insolvent and this was at all times known by Defendants SAF and Rhett.

189.     Defendants SAF and Rhett knowingly and willingly entered into the aforesaid transactions in clear violation of state and Federal law with the specific intent to defraud Terrence out of his periodic payments.

190.     Accordingly, Defendants SAF and Rhett should be required to pay damages for fraudulent misrepresentation in an amount believed to be in excess of five million dollars ($5,000,000) plus punitive damages, attorney fees, and the costs associated with this action.


## SIXTH CAUSE OF ACTION
## ACTUAL FRAUD
### (*against SAF, Rhett, Bexhill and Jay Gee*)


191.     All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

192.     This is an action by Plaintiffs to recover monies improperly obtained by SAF, Bexhill and Jay Gee as a result of fraud.

193.     As identified in this Amended Complaint, Defendants SAF and Bexhill made numerous misrepresentations to Terrence about the benefits he would obtain by selling off his periodic payments to them.

194.     Defendant Jay Gee made similar misrepresentations to Terrence resulting in Terrence's sale of a significant number of life contingent payments for a small upfront payment. Terrence specifically recalls one Mark Sophocles calling Terrence on a regular basis until SAF somehow took over under circumstance which are known to Defendants but not to Terrence. At one point, Sophocles told Terrence Jay Gee would get him the most money and "if you stick with us we will get you a car".

195.     Life contingent structured settlement payments cease upon Terrence's death.

196.     In order to lock in the outsized profits that SAF, Bexhill and Jay Gee sought to obtain, those defendants either sold off or brokered the life contingent payments to a third party or acquired one or more life insurance policies on the life of Terrence.

197.     Terrence believes that life insurance was taken out on his life by one or more of the Defendants herein but he does not have a copy of the policy or policies nor does he know the date the applications for insurance were signed, the effective dates of any of the policies the amount of premium paid or to be paid to keep the policies in force, the type of insurance obtained and the identity of the beneficiaries of the life insurance policies.  Terrence believes that the policy or policies are in the possession of one or more of SAF, Jay Gee or Bexhill.

198.     SAF, Jay Gee or Bexhill created a significant moral hazard in that some third party unknown to Terrence has a significant financial incentive in Terrence's early demise.

199.     Since all of the documents related to this moral hazard are in the possession of either SAF, Jay Gee, Bexhill or an agent or assignee of one of those Defendants, Plaintiffs are unable to identify the specific dates and times of the misrepresentations that were made to Terrence about the life insurance policy or policies.  However, Terrence was never informed about the consequences of the sale of his life contingent payments or the fact that a third party would financially benefit from his death or the fact that his ability to obtain life insurance for his minor Daughter may have been permanently compromised.

200.     Based on the previous sales of his periodic payments all of which were known or should have been known by Defendants SAF, Bexhill and Jay Gee, and the number and amount of life contingent payments those Defendants purchased, it is highly likely that Terrence did not

meet the net worth requirements for the amount of life insurance obtained on his life by Defendants SAF, Bexhill, Jay Gee or any one of them.

201.     Since many of the Petitions filed in Portsmouth Circuit Court were filed under seal, Plaintiffs cannot obtain readily obtain copies of these documents, all of which are in the possession, custody and control of one or more Defendants.  Since Terrence was forcibly evicted from his home in West Virginia on or about (insert date) he does not have any records of the Transactions.

202.     Notwithstanding the foregoing, Terrence does specifically recall the following: Sometime in October or November 2012, Rhett sent Terrence an insurance application for him to complete.  Rhett also told Terrence that Terrence needed to get medical records for the insurance. Rhett also sent Terrence a stored value card that said 123 Lump Sum on it.  The card contained $250 in value.  Rhett told Terrence to use to card to go and get his medical records from Virginia. Terrence does not drive so he convinced his cousin to drive him to Virginia to get the records. Terrence took the records to a place called "Going Postal" and had the records faxed to Rhett. Rhett specifically told Terrence that in order "to get the 408", Terrence needed to initial each page of the insurance document and sign it at the end and return it to Rhett.  Rhett also told Terrence that the insurance would be paid for by SAF and that Terrence had "nothing to worry about", "once the insurance is all set your deal gets funded".

203.     With respect to the Bexhill transactions, Terrence specifically recalls the following: Alex called Terrence sometime on or about July to August, 2013 introduce himself and his company called Client First.  Alex told Terrence that Client First had a good deal going on and they could help people make lots of money by working with Wells Fargo.  Alex told Terrence that he would be crazy not to do this deal and that he (Terrence) "would be set for life once you do

this". Alex travelled to West Virginia where he proceeded to wine and dine Terrence and party with him in local strip clubs. According to Terrence, Alex retrieved large amounts of cash from an ATM located at a Sheets service station in Martinsburg and paid cash to strippers and bartenders. Alex remained in West Virginia for approximately three days. He stayed in the Holiday Inn in Martinsburg and he personally drove Terrence across state lines into Virginia to have documents notarized. Alex told Terrence that it would look bad to have documents notarized in West Virginia. Alex also asked Terrence for his doctor's name so he could get Terrence's medical records. Alex told Terrence that they already had insurance in place on his deal so Terrence did not have to bother with another long insurance application and wait a long time for his money.

204.    The misrepresentations made to Terrence as outlined above and elsewhere in this Amended Complaint were material and false.

205.    Defendants SAF, Jay Gee and Bexhill knew, at all times relevant to this Amended Complaint that the representations identified in this Complaint were false or, at a minimum, made the aforesaid representations recklessly as positive assertions without knowledge of their truth.

206.    Defendants made the false and material misrepresentations identified in this Amended Complaint with the intent to mislead Terrence into selling off his future and the future of his dependent child.

207.    Defendants made the false and material misrepresentations identified in this Amended Complaint with the intent to mislead Terrence knowing full well that Terrence would rely on the misrepresentations to his detriment. Defendants benefited by getting Terrence to sell

off significant life contingent payments with a mortality hedge on Terrence's life that was never properly disclosed. Defendants did this so they could profit handsomely at Terrence's expense.

208.     Terrence, unaware of the false and misleading nature of the Defendants' misrepresentations, actually, justifiably, and detrimentally relied on Defendants' misrepresentations when selling off his guaranteed periodic payments and more specifically his life contingent payments.

209.     As a proximate and foreseeable result of Defendants' fraud as more fully set forth in the allegations incorporated herein, Terrence suffered substantial harm including the loss of his guaranteed and life contingent structured settlement payments and his insurability. The extent of Terrence's actual damages from this fraudulent conduct are not yet known but will be proven at trial. Actual damages are believed to be not less than five million dollars, plus punitive damages for fraud which are appropriate to punish Defendants for their improper conduct and deter others from preying upon unsuspecting and naïve injury victims.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**Va. Code Ann. § 59.1-196, et seq.**
*(against Defendants SAF, Rhett, Bexhill, Jay Gee, Blazingstar)*

210.     All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

211.     All of the advances, advance agreements, unsecured consumer loans, purchase and sale agreements, insurance applications, insurance policies and structured settlement transfer petitions described in this Complaint constitute consumer transactions within the meaning of the

Virginia Consumer Protection Act of 1977 § 59.1-196 et seq. (the "Virginia Consumer Protection Act").

212. Among other things, in falsely stating that SAF would give Terrence the most money and that he (Rhett) would never "take advantage of their friendship", Rhett and SAF used deception in connection with a consumer transaction to induce Terrence to sell off more of his structured settlement payments in violation of the Virginia Consumer Protection Act.

213. Among other things, in falsely stating that Terrence would "double his money" by working with Bexhill's agent Client First, and Wells Fargo, Bexhill used deception in connection with a consumer transaction to induce Terrence to sell off more of his structured settlement payments in violation of the Virginia Consumer Protection Act.

214. Among other things, in falsely stating that they (Jay Gee) would do great things for Terrence and "get him a car", Jay Gee used deception in connection with a consumer transaction to induce Terrence to sell off more of his life contingent structured settlement payments in violation of the Virginia Consumer Protection Act.

215. Among other things, in falsely stating that Blazingstar's agent known as "Woodbridge" had an A-plus rating and that he (Robert Bascardi) had Terrence's best interest in mind when doing the deal, Blazingstar used deception in connection with a consumer transaction to induce Terrence to sell off more of his structured settlement payments in violation of the Virginia Consumer Protection Act.

216. By making the specific allegations described above and the numerous other misrepresentations described elsewhere in this Complaint [specifically, as to SAF at 38, 88, 102-104,115; as to Blazingstar at 89, 104, 109,110, 115; as to Jay Gee at 90, 111, 112, 115; as to Bexhill

at 67,69, 74-76, 91, 113-115], and in omitting to communicate how each transfer was in the best interest of Terrence and his dependent daughter and in fact falsely stating to Terrence and to each court reviewing each transfer petition that the petition was in the best interest of the transferor and his dependents, Transferee Defendants used deception, made false promises and otherwise duped Terrence into selling off millions of dollars of future payments owed to him under his structured settlement annuity in transactions that were unquestionably NOT in Terrence's best interest as required by applicable law.

217.    Transferee Defendants and their agents made the aforesaid misrepresentations with the intent to deceive so they could profit handsomely at Terrence's expense.

218.    By making the false and misleading statements described herein, Transferee Defendants used deception in connection with a consumer transaction to induce Terrence to sell off all of his guaranteed and many of his life contingent structured settlement payment rights in violation of Va. Code § 59.1-200(14).

219.    Accordingly, Terrence should be entitled to recover three times the amount of actual damages he suffered as a result of the Transferee Defendants willful conduct, plus reasonable attorneys' fees in accordance with the Virginia Consumer Protection Act.

### EIGHTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT
*(against all Transferee Defendants)*

220.    All of the allegations set forth in this Amended Complaint are re-alleged and incorporated by reference herein.

221.    Transferee Defendants all hold themselves out as experts in the structured settlement secondary market.

222.     Transferee Defendants all knew about the periodic payments that were awarded to Terrence in connection with his structured settlement.

223.     Transferee Defendants all knew that the structured settlement payments were payable on account of serious personal injuries sustained by Terrence and that the payments were tax free to Terrence.

224.     Upon information and belief at all times relevant to this Complaint, Terrence's physical appearance was known to some or all of the Transferee Defendants.

225.     Upon information and belief at all times relevant to this Complaint, Terrence's mental state was known to some or all of the Transferee Defendants.

226.     Transferee Defendants knew that Terrence depended upon his payments for basic living expenses, medical expenses, and to care for his dependent child. Transferee Defendants knew or should have known that Terrence's structured settlement payments were his sole and exclusive source of income.

227.     Transferee Defendants knew that Terrence did not work.  For example, Transferee Defendants regularly met with and/or spoke with Terrence at home during business hours.

228.     Transferee Defendants, as experts in the field, knew that a structured settlement annuity containing the periodic payments described above likely was due to severe injuries and likely was designed to cover future medical and living expenses.

229.     Transferee Defendants knew or should have known that a Settlement Agreement existed with respect to Terrence's personal injuries.

230.     Transferee Defendants knew or should have known that Louise was the guardian and next friend for Terrence under the Settlement Agreement and was identified as guardian in the annuity contract.

231.     Transferee Defendants knew or should have known that Terrence would have to depend upon his parents for support if he did not have his periodic payments.

232.     By raiding Terrence's periodic payments, Transferee Defendants tortiously interfered with the original settlement agreement signed by Louise as Terrence's guardian and by Phillip and Louise in their individual capacities.

233.     Phillip and Louise are now spending their modest savings and incurring debt to pay the medical and living expenses that Terrence's structured settlement annuities were meant to cover.

234.     As a result, Transferee Defendants should be required to pay Phillip and Louise damages for tortious interference in an amount to be determined at trial, the costs associated with Terrence's future care, and the costs associated with his daughter's support, plus attorney fees and the costs related to this action.

## NINTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY: LOUISE AND PHILLIP TAYLOR
### *(against all Transferee Defendants)*

235.     All of the allegations set forth above in this Complaint are re-alleged and incorporated by reference herein.

236.     Transferee Defendants are experienced participants in the secondary structured settlement industry.

237.     Plaintiffs Louise and Phillip Taylor, Terrence's parents, were parties to the settlement agreement that resulted in the periodic payments Defendants bought from Terrence.

238.     Louise and Phillip received a lump sum payment from the defendant in that personal injury case.  They chose to reduce the size of that payment so that more money would go to Terrence instead of them.  Their expectation was that the periodic payments from the settlement that went to Terrence would support him and any dependents throughout his lifetime, and that they would not have to support him financially.

239.     Because of the actions of Transferee Defendants in the instant case, Louise and Phillip are now supporting both Terrence and his dependent daughter.  Terrence has no income of his own since Transferee Defendants manipulated him into selling everything to them.

240.     Upon information and belief, Transferee Defendants knew that Louise and Phillip were parties to the action and agreement that sprang from Terrence's personal injuries.

241.     Upon information and belief, Transferee Defendants knew that Louise and Phillip were parties to the action and the settlement agreement that sprang from Terrence's injuries.

242.     Transferee Defendants deliberately took substantially all of Terrence's income.

243.     As a result, since late 2014 when Terrence appeared at their doorstep penniless and homeless, Louise and Phillip have been supporting Terrence and his dependent child, which is exactly what they sought to avoid when they negotiated the Settlement Agreement with the original liable parties decades ago.

244.     Therefore, Transferee Defendants should be required to pay Phillip and Louise damages for tortious interference with an expectancy in an amount to be determined at trial, the

costs associated with Terrence's future care, and the costs associated with the support of Terrence's daughter, plus attorney fees and the costs related to this action.

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

A.  General and compensatory damages according to proof and trial;

B.  Punitive damages for fraud and fraudulent misrepresentation;

C.  Rescission of all transactions set forth in paragraph 28 herein;

D.  Restoration of Plaintiff Terrence Taylor's payments under his annuity contract;

E.  Replacement of all or part of the periodic payments lost by the transactions by Defendants.

F.  Treble damages for willful violations of West Virginia's Consumer Credit and Protection Act, W.Va. Code §§ 46-A-6-101 et seq.

G.  Declarations that:

    i.  All transactions set forth in paragraph 28 herein are void;

    ii.  Defendants breached their duties to Plaintiff Terrence Taylor;

    iii.  Defendants take all steps to rescind the transactions set forth in paragraph 28;

    iv.  Defendants must indemnify Plaintiff for their losses, costs, fees and expenses, including attorneys' fees, and an order directing same;

    vi.  Defendants tortiously interfered with the original settlement agreement;

vii.   Defendants shall be required to account for and disgorge all commissions, compensation, fees and other payments received in connection with the Transactions;

viii.   Defendants shall be required to disgorge all profits received by Defendants or earned by Defendants as a result of their misconduct towards Plaintiff;

ix.   Defendants shall be required to replace all or part of the periodic payments that were allegedly sold in connection with the Transactions;

x.   Plaintiffs are entitled to an award of all reasonable attorneys' fees and the costs and expenses incurred in connection with this action; and

xi.   Such other and further relief as the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: April 17, 2015                         Respectfully submitted,

_____

Kathleen J.L. Holmes, VSB 35219
Ellen D. Marcus, VSB 44314
HOLMES COSTIN & MARCUS pllc
301 N. Fairfax Street, Suite 202
Alexandria, VA  22314
Tel: (703) 260-6401
Fax: (703) 439-1873
kholmes@hcmlawva.com
emarcus@hcmlawva.com

Edward Stone (*pro hac vice*)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Tel: (203) 504-8425
Fax: (203) 348-8477
eddie@edwardstonelaw.com

*Attorneys for TERRENCE E. TAYLOR, LOUISE W. TAYLOR and PHILLIP D. TAYLOR*