## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| TERRENCE E. TAYLOR,<br>LOUISE W. TAYLOR, and<br>PHILLIP D. TAYLOR,<br><br>                       Plaintiffs,<br><br>         v.<br><br>STRUCTURED ASSET FUNDING, LLC<br>d/b/a 123 LUMP SUM a/k/a 123 LUMP<br>SUM, LLC; BLAZINGSTAR FUNDING,<br>LLC; JAY GEE, LLC; BEXHILL, LLC;<br>iSETTLEMENTS LLC d/b/a 123<br>LUMPSUM; HPF CAPITAL d/b/a<br>HIGHPOINT FUNDING and<br>RHETT WADSWORTH<br><br>                      Defendants. | Civil Action No. 1:15cv271-TSE-TCB |

## PLAINTIFFS TERRENCE TAYLOR, LOUISE TAYLOR AND PHILLIP TAYLOR MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RHETT WADSWORTH'S MOTION TO DISMISS

Defendant Rhett Wadsworth's ("Wadsworth") motion to dismiss the Amended Complaint should be denied. Contrary to his assertions in his motion to dismiss, Wadsworth had significant contacts with the Commonwealth of Virginia through the six transfer petitions that he documented or caused to be documented and sent for filing in Portsmouth, Virginia. In each of the six petitions, Wadsworth prepared or caused agents to prepare various documents including disclosure forms, "Structured Settlement Annuity Sale and Assignment Agreements", waivers of independent professional advice and various affidavits that required Terrence Taylor's signature or initials. All of the aforesaid documents specifically contemplated filing structured settlement transfer petitions

1

in Portsmouth Circuit Court in Portsmouth, Virginia. While Wadsworth might not have been physically present in the Commonwealth of Virginia, he most certainly transacted business in the Commonwealth through his agents and had sufficient contacts for the Commonwealth of Virginia to assert jurisdiction over him.

Defendant Wadsworth concedes in his Motion to Dismiss that he had numerous contacts with Terrence in West Virginia directly related to the transfer agreements and petitions that were filed in Portsmouth Circuit Court in the Commonwealth of Virginia, but contends that he should not be forced to defend this action in Virginia because all of his contacts with Terrence occurred in West Virginia or Florida.

Defendant Wadsworth completely misses the mark. His concessions not only establish that the orders obtained in Portsmouth Virginia were not "qualified orders" within the meaning of Internal Revenue Code Section 5891 ("I.R.C. § 5891") as described in more detail below, but also that his activities were directed at the forum state, directly impacted the forum state and give rise to personal jurisdiction under the Virginia long arm statute consistent with the constitutional due process standards outlined by the United States Supreme Court in *Int'l Shoe Co. v. Washington* *326* U.S. 310, 316 (1945). What could be a more "purposeful availment" of a forum state than forum or judge shopping in the forum state?

## STATEMENT OF MATERIAL FACTS

In April, 1988, Plaintiff Terrence Taylor's mother, Louise Taylor, turned on a defective space heater in her master bedroom which resulted in a horrific fire that changed the Taylor's life forever. Plaintiff Terrence Taylor ("Terrence"), at the age of six, suffered severe burns over 60% of his body and ultimately lost the fingers on his right hand, the toes on his left foot, and his right leg. He wears a prosthetic leg and despite many reconstructive surgeries, to this day, Terrence

remains visibly scarred on his face, torso and limbs. Terrence suffers from post-traumatic stress disorder ("PTSD") and from an ongoing dysthymic disorder, now known as Persistent Depressive Disorder, which translates into feelings of inadequacy, loss of self-esteem, decreased attention and concentration, and pessimism about the future. Even at an early age, it was predicted that social stigma would likely cause further difficulties and Terrence's vivid recollection of the trauma of his past was likely to make his PTSD more acute.

In December 1989, the Taylors settled their personal injury action - *Terrence E. Taylor, a minor, by and through his mother and next friend, Louise W. Taylor, et al., Plaintiffs v. DeLonghi, S.P.A., et al., Defendants,* Civil Action No. 89-0971-A (E.D. Va., Alexandria Division), and the parties entered into a confidential settlement agreement (the "Settlement Agreement") which was approved by this court, and expressly incorporated by reference into a final dismissal order of this court (the "Dismissal Order"). The Settlement Agreement was carefully crafted to provide inalienable payments under a structured settlement annuity provided by the New York Life Insurance Company so that Terrence would have sufficient income for life to pay for his living expenses and the medical care he was certain to need throughout his life. The Settlement Agreement expressly provided that the "███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████" (emphasis added). Until 2009, Louise served as Terrence's guardian, and, as guardian, the payments under the annuity contract were delivered to her and she provided for Terrence.

Louise Taylor was clearly identified as Terrence's guardian on the structured settlement annuity contract. In 2009, during her recovery from a serious automobile accident, Louise resigned

as guardian and the payments under the annuity contract were delivered to Terrence directly. For a few years things were fine. Louise recuperated from her injuries and in 2012 Terrence moved from Herndon, Virginia to Martinsburg, West Virginia. Terrence had no credit, so he paid an entire year's rent up front. No sooner had Terrence moved out of his parents' home, when he fell prey to the strong-arm tactics of Defendants SAF and Wadsworth who were actively seeking to purchase his future periodic payment stream for pennies on the dollar. Terrence does not deny that he succumbed to the hard sell tactics of Defendant SAF and became interested in selling some of his payments back in 2012. He spoke frequently with Defendant Wadsworth who encouraged him to sell his future for "cash now." Unfortunately, the *modus operandi* of the Defendants in this case is to "befriend" individuals with large structured settlements and work to purchase each and every payment owed to these individuals under their structured settlement annuities without regard for the actual need of the seller and without regard for the "best interest" standard required under state and federal law. While this is contrary to the purpose, spirit and intent of I.R.C. § 5891 and the Virginia and West Virginia Structured Settlement Protection Acts[1], it is how the Defendants in this case operated.

While it was not until May 1, 2012 that Defendant SAF filed its first petition in Portsmouth Circuit Court seeking to purchase almost $700,000 of Terrence's structured settlement annuity payments, before that petition was "approved" on June 7, 2012, Defendant SAF made the following "advances" to Terrence: SAF advanced $5,000 to Terrence on April 27, 2012, then sent

---

[1] Enacted as part of the Victims of Terrorism Tax Relief Act of 2001, I.R.C. § 5891 created a framework for the sale of structured settlement payment rights, imposing a stiff excise tax on any party not complying with § 5891. Subsequent to the enactment of § 5891, forty-eight states have passed what are known as "structured settlement protection acts". A factoring company may only purchase structured settlement payment rights by obtaining a qualified order consistent with I.R.C. § 5891.

him $7,000 on May 2, 2012, and $3,000 on May 14, 2012, and another $3,000 on May 29, 2012, then a whopping $20,000 on May 31, 2012, and another $20,000 on June 6, 2012. In making these advances, which totaled $58,000[2] before any transaction had been "approved", getting Terrence "hooked" on spending large sums of cash, and preying upon an insecure young man searching to fit in to society, Defendant SAF was able to "insure" their ability to lock in future deals with Terrence so they could raid his protected, tax free, guaranteed periodic payments. Defendant SAF trapped Terrence in a fiscal "death spiral" that did not stop until every last payment due to Terrence under his structured settlement agreement was taken away from him. These pre-petition advances are not only predatory, some courts have found them to constitute unlawful settlement transfers in that they effectively transfer structured settlement payment rights without a qualified order.

From the date of "approval" of the first of Defendant SAF's six transfer petitions, until the date Genex Strategies, Inc. (Defendant's "assignee" in the first transfer petition) wired what remained of the original purchase price to Terrence, Defendant SAF wired an additional $50,000 in "advances" to Terrence as follows:

- $20,000 on June 18, 2012

- $10,000 on June 21, 2012

- $20,000 on June 22, 2012

The predatory advances described herein were not only akin to giving crack cocaine to a drug addict, they are the equivalent of a bartender knowingly serving a visibly intoxicated patron more alcohol and then happily pocketing his tips as the patron drives away putting both driver and innocent parties in harm's way. Defendants SAF and Wadsworth knew with certainty that

---

[2] Standard advances in the structured settlement industry are $500 - $1,500 per transaction. Advancing $58,000 before approval of transaction is far beyond the norm. (Amended Complaint ¶¶ 165 -166).

Terrence would not be using the proceeds of this first transaction in accordance with whatever "reason" was given to the Portsmouth Circuit Court as a justification for selling. Defendants also knew they had landed a big fish – one they were not going to let get away.

As the Amended Complaint sets forth in detail, Defendant SAF made numerous "advances" totaling hundreds of thousands of dollars to Terrence, some of which came directly from Defendant Wadsworth who was systematically taking control over Terrence's structured settlement annuity. Defendant Wadsworth encouraged Terrence to spend recklessly and on a fully paid trip to Florida, all in the name of "be-friending" Terrence so that he could raid his structured settlement annuity which had been carefully set up to provide Terrence and his family with an income for life and the necessary funds to pay for his on-going medical care and treatment as needed. This improper raiding of Terrence's protected payments – payments that were specifically protected by an order of this Court - is what this case is really about.

While Defendant Wadsworth went to great lengths to direct all of the documents to the Commonwealth of Virginia, he failed to comply with this Court's Dismissal Order which made compliance with Internal Revenue Code Section 5891 and the Virginia State Structured Settlement Protection Act impossible. This Court is exceptionally well suited to resolve the pending dispute as Plaintiffs allege that the failure to comply with an Order of this Court was fatal and that the resulting state court orders are a nullity as a matter of law. Simply stated, neither Terrence Taylor nor *any other payee* under the Structured Settlement Agreement that was incorporated into the Dismissal Order of this Court had the **power** to do what was done in this case. Defendant Wadsworth's interference with this Court's prior order is most properly before this Court and Wadsworth's repeated violation of that Order, among other acts in Virginia, most certainly subjects

him to jurisdiction under the Virginia Long-Arm Statute consistent with Federal Due Process requirements.

## ARGUMENT

1. **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT RHETT WADSWORTH**

Determining whether a defendant is subject to personal jurisdiction requires a two-step analysis under Virginia law. First, the court must conclude that jurisdiction is authorized by the state's long-arm statute, Va. Code §8.01-328.1; and second, that an exercise of personal jurisdiction is consistent with due process. *Mitrano v. Hawes,* 377 F.3d 402, 406 (4th Cir. 2004); *FBR Capital Mkts. & Co. v. Short*, 2009 U.S. Dist. LEXIS 94558, 2009 WL 3254458 (E.D. Va. Oct. 9, 2009). In practice, however, there is just one step, because Virginia's long-arm statute extends personal jurisdiction to the full extent permitted by due process. *Id. See also, Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

"[T]he burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Combs v. Bakker*, 886 F. 2d 673, 676 (4th Cir. 1989). In addition, "the court must construe all relevant pleading allegations in the context most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id*.

Inquiry then turns to the three-part test articulated by the Fourth Circuit to determine whether specific jurisdiction exists. First, the extent to which the defendant purposefully availed himself of the privilege of conducting activities in Virginia; second, whether the plaintiffs' claims arise out of those activities; and third, whether the exercise of personal jurisdiction would be constitutionally reasonable. *Consulting Eng'rs. Corp.*, 561 F.3d at 278; *ALS Scan, Inc. v.*

*Digital Serv. Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002); *Reynolds Foil, Inc. v. Pai,* 2010 U.S. Dist. LEXIS 28473, 2010 WL 1225620 (E.D. Va. Mar. 25, 2010).

Due process requires that Wadsworth has established "certain minimum contacts with [Virginia] such that the maintenance of [this] suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington 326* U.S. 310, 316 (1945). The "minimum contacts" requirement is satisfied if Wadsworth has purposefully availed himself of the privilege of conducting activities in the Commonwealth of Virginia and if the Plaintiffs' claims in this case arise out of those activities directed at Virginia. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985); *Mitrano,* 377 F.3d at 407. "This 'purposeful availment' requirement ensures that a defendant will not be hailed into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts…or of the unilateral activity of another party or a third person." *Burger King,* 471 U.S. at 475 (internal quotations and citations omitted). "Put differently, the test protects the defendant from having to defend himself in a forum where he should not have anticipated being sued." *Production Group Int'l, Inc. v. Goldman,* 337 F. Supp. 2d 788, 797 (E.D. Va. 2004). *See also Burger King,* 471 U.S. at 474; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1979); *Mitrano,* 377 F.3d at 407.

As the Supreme Court has instructed, "where the defendant 'deliberately' has engaged in significant activities within a State or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Burger King*, 471 U.S. 475-76 (citations omitted). Therefore, "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 476.

The Fourth Circuit has considered the following nonexclusive factors in determining whether a defendant has purposefully availed himself of the privilege of conducting activities in

the forum state - whether the defendant maintained offices or agents in the forum state; whether the defendant owns property in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality, and extent of the parties' communications about the business being transacted; and whether the performance of contractual duties was to occur within the forum state. *Consulting Engineers Corp. v. Geometric Ltd.,* 561 F.3d 273, 278 (4th Cir. 2009).

Wadsworth's extensive involvement with the structured settlement transfer petitions and supporting documents filed in Portsmouth Circuit Court gave him ample notice that he could be sued here and more than satisfies the test for personal jurisdiction. As set forth in the Amended Complaint, Wadsworth worked with Terrence extensively to document the transfer petitions for filing in the Commonwealth of Virginia. (Am. Complt. ¶¶ 29 – 44). It is an uncontroverted fact that each of the petitions filed by Defendant SAF was filed in the Commonwealth of Virginia. (Am. Complt. ¶ 28 (i) (ii) (iv) (v) (vi), and (x)). All of Wadsworth's phone conversations, text messages, faxes and other communications with Terrence were for the purpose of filing transfer petitions in the Commonwealth of Virginia. (Am. Complt. ¶ 181).

"When a claim is 'based on a contract which had substantial connections with that State,' then the Plaintiff's claims can be said to arise out of connections with that forum." *Reynolds,* 2010 U.S. Dist. LEXIS 28473 (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223 (1957)); *FBR Capital Markets,* 2009 U.S. Dist. LEXIS 94558, 2009 WL 3254458 (E.D. Va. Oct. 9, 2009).

Furthermore, the damages suffered by Terrence resulted from Wadsworth's actions which took Terrence into the Commonwealth of Virginia from his home state of West Virginia for the purpose of circumventing the West Virginia Structured Settlement Protection Act and compliance with I.R.C. § 5891. (Am. Complt. ¶ 26, 42, 164, 181). *See Calder v. Jones,* 465 U.S. 783, 789-90 (1984) (personal jurisdiction existed in state in which brunt of harm was suffered).

In support of his motion to dismiss for lack of personal jurisdiction, Wadsworth focuses on certain of his employment activities that occurred outside Virginia. This argument misses the mark. "The focus of the 'minimum contacts' analysis is not *which* contacts with the forum are absent, nor *where* the contacts predominate, but only '*whether* enough minimum contacts [with the forum] exist [such] that the district court's assumption of specific jurisdiction does not offend due process." *Production Group Int'l, Inc. v. Goldman,* 337 F. Supp. 2d at 798 (quoting *English & Smith v. Metzger,* 901 F. 2d 36, 39 (4ᵗʰ Cir. 1990)) (emphasis in *Goldman*).

Moreover, the fact that Wadsworth did most of his business in Virginia through agents does not negate the reasonable expectation that Plaintiffs would sue him in Virginia to recover damages for his improper "raiding" of Terrence's structured settlement annuity and for his willful violations of the Virginia and West Virginia consumer protection statutes, among other causes of action, as described in greater detail in the Amended Complaint.

Wadsworth negotiated and had documented no fewer than six transfer agreements, all of which were attached to the six transfer petitions filed in Portsmouth Circuit Court from May, 2012 to March, 2014. In fact, Wadsworth specifically told Terrence on a number of occasions that he had to purposefully avail himself of the Commonwealth of Virginia in order to get Terrence money because West Virginia judges were unlikely to approve the sale of Terrence's structured settlement payment rights. (Am. Complt. ¶ 56, 105.) All of the cash "advances" described herein were made

to induce Terrence to sign documents that were intended for filing in Virginia. (Am. Complt. ¶¶ 162- 181). Wadsworth also told Terrence to just sign the documents and that he (Wadsworth) would take care of getting everything documented in Virginia. (Am. Complt. ¶ 33). Wadsworth knew that Terrence resided in West Virginia yet he had prepared transfer petitions prepared for filing in Portsmouth Virginia approximately 500 miles from Terrence's home, where Wadsworth knew that no personal appearance by Terrence would be required and where Wadsworth knew the transfer petitions would be granted without inquiry into the soundness of the petitions themselves. (Am. Complt. ¶56.) Wadsworth now suggests to this Court that he should not be subject to this Court' jurisdiction because he did not personally come to Virginia to handle the transactions.

There is no question that Wadsworth knew that transfer petitions were being filed in Portsmouth, Virginia and that those petitions, if granted, would result in Wadsworth and Defendant SAF profiting at the expense of Terrence and his family. By directing Terrence to Portsmouth Virginia, by preparing, presenting and/or causing documents choosing Virginia law to be filed with the Portsmouth Circuit Court in the Commonwealth of Virginia and by sending or causing the aforesaid documents obtained in Virginia to be sent from Virginia to other states Wadsworth established minimum contacts with the Commonwealth of Virginia consistent with this state's long-arm statute, Va. Code §8.01-328.1 and federal due process. In fact, the Virginia Long-Arm Statute specifically provides for a Virginia court to exercise personal jurisdiction over a person, who acts through an agent. Va. Code Ann. § 8.01-328.1 A. Accordingly, since Wadsworth's activities systematically and continually availed himself of the privilege of conducting business activities within Virginia and since Wadsworth established sufficient minimum contacts with Virginia, this Court may exercise specific jurisdiction over him.

Once minimum contacts have been established with the form state the contacts should be assessed in light of other factors to determine whether the assertion of personal jurisdiction comports with notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington 326* U.S. 310, 316 (1945); *Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004). The activities that Wadsworth engaged in with respect to Terrence as set forth in the Amended Complaint clearly demonstrate that this Court retaining jurisdiction over Wadsworth comports with basic notions of fair play and substantial justice. In addition, when a defendant like Wadsworth purposefully directs activities toward a forum state yet tries to defeat personal jurisdiction by arguing the exercise of jurisdiction violates traditional notions of fair play and substantial justice, it is that defendant (not plaintiff) who bears the burden of presenting a "compelling case that the presence of some other condition would render jurisdiction unreasonable." *See Burger King*, 471 U.S. at 478. Defendants have not and cannot meet this burden.

2.  **THE *ROOKER-FELDMAN* DOCTRINE AND THE DOCTRINE OF *RES JUDICATA* DO NOT DIVEST THIS COURT OF ITS SUBJECT MATTER JURISDICTION**

For the reasons set forth in Plaintiffs' Memorandum of Law in support of their Opposition to Defendants Structured Asset Funding, LLC, d/b/a 123 Lump Sum a/k/a 123 Lump Sum, LLC; iSettlements LLC d/b/a 123 Lumpsum's motion to dismiss and Defendant Blazingstar Funding, LLC's motion to dismiss filed contemporaneously herewith, both of which are expressly incorporated by reference herein, neither the *Rooker-Feldman* doctrine nor the doctrine of *res judicata* is applicable in this case and should not bar this Court's exercise of jurisdiction in this case.

3.     **PLAINTIFF'S AMENDED COMPLAINT SHOULD NOT BE DISMISSED UNDER FEDERAL RULE OF CIVIL PROCEDURE 12 (b) (6).**

The U.S. Supreme Court has set forth a two pronged test for courts to use in deciding a motion to dismiss under Federal Rule of Civil Procedure 12 (b) (6). First, the court must identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, where a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556-557 (2007) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal* at 678. Courts considering a Rule 12 (b) (6) dismissal should only focus on the legal sufficiency of the complaint, accept the well pled facts as true and view them in the light most favorable to the plaintiff. *Cook v. Howard*, 2012 WL 3634451 (4th Cir. Aug 24, 2012).

As described below, the Amended Complaint contains sufficient detail and information that goes to the "who, what, where, when and how" of the various causes of action, including those sounding in fraud to withstand any 12 (b) (6) challenge. This is especially true in this case given that most of the documents needed to fully substantiate Plaintiffs' claims are in Defendants' possession. "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585,

594 (8th Cir. 2009). Even without discovery, Plaintiffs have met their burden and Defendant Wadsworth's motion to dismiss should be denied in all respects.

## A. **Plaintiffs State a Viable Claim for Fraud Against Wadsworth under Virginia Law**

In his Memorandum in Support of his Motion to Dismiss the Amended Complaint, Defendant Wadsworth claims that Plaintiffs do not allege fraud against Mr. Wadsworth under Virginia law. ECF Doc. 56 at p. 12. Wadsworth notes that to make out a claim for fraudulent misrepresentation, plaintiffs need to show (i) false representation of a material fact; (ii) made intentionally, in the case of actual fraud, or negligently, in the case of constructive fraud; (iii) reliance on that false representation to their detriment; (iv) resulting in damage. *Caperton v. A.T. Massey Coal Co.*, 285 Va. 537, 553 (2013). Wadsworth also notes that under Rule 9(b) of the Federal Rules of Civil Procedure, fraud must be stated with particularity. He is correct about the applicable standards and Plaintiffs' Amended Complaint meets out more than significant detail to withstand Wadsworth's cursory challenge.

For example, the Amended Complaint details at least eight specific incidences of Wadsworth sending documents and a Notary Public by the name of April Burten to Terrence's home in West Virginia so Terrence could sign some type of "advance agreement" before the very first transfer petition was approved by Judge Dean Sword in Portsmouth Circuit Court noting that on the following specific dates: April 26, 2012, May 1, 2012, May 13, 2012, May 28, 2012, May 30, 2012, June 5, 2012, June 17, 2012, June 20, 2012 "advance agreements" were provided to Terrence by Ms. Burten. She instructed Terrence to sign, told Terrence that she had been sent to Terrence by Defendant Wadsworth and that she was there to just notarize Terrence's signature. In addition, Plaintiffs identified regular telephone conversations between Defendant Wadsworth and Terrence related specifically to advances from April 2012 through June 2012, detailing no fewer

than twenty-six (26) telephone conversations, thirteen (13) advances and as much as $110,000.00 being wired to Terrence before the first transfer petition was ever approved. (Am. Complt. ¶ 166). Plaintiff Terrence Taylor has been unable to locate these "advance agreements" because they were lost when he was forcibly evicted from his home in West Virginia in 2014. (Am. Complt. at ¶ 164). However, Plaintiffs have asked for these documents in pending discovery requests of Defendant SAF, Wadsworth's employer. Plaintiffs also note that these "advances" were all highly suspect, predatory and contrary to state and federal law. In fact, some courts have held that payments made in advance of a qualified order are not recoverable. *CNA Structured Settlements, Inc. v. Rapid Settlements, Ltd.*, 2007 WL 811983 (N.Y. Sup. Ct. Mar. 15, 2007);   *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809, 2008 U.S. Dist. LEXIS 25641 (S.D. Tex. 2008), *aff'd.*, 567 F.3d 754, 2009 U.S. App. LEXIS 10164 (5th Cir. Tex. 2009). Because Terrence does not have any of the "advance agreements", certain allegations in the Amended Complaint are based on information and belief.  The source of Plaintiffs information comes from Terrence's bank records, Terrence's recollection of conversations with Defendant Wadsworth and Ms. Burten, counsel's investigation of this case and counsel's general experience in the structured settlement factoring business.

Federal Rule of Civil Procedure 9 (b) subjects fraud claims to a heightened pleading standard that is easily met in this case.  Detailed circumstances surrounding the allegations of fraud are clearly spelled out in the Amended Complaint including the time, place and contents of the false representations, the identity of the person making the representation and what he obtained thereby.  (Am. Complt. ¶ ¶ 29 – 60, 157 – 190, 197 - 199, 202, 207 – 209.) Plaintiff's allegations which must be accepted as true, and in the light most favorable to Plaintiffs, allow the court to draw the reasonable inference that Defendant Wadsworth is liable for the misconduct alleged.

*Bennett v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 54725, 2012 WL 1354546 (E.D. Va. Apr. 18, 2012); s*ee also Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

The advances also demonstrate that Wadsworth knew in advance that the petitions that he specifically directed for filing in Portsmouth Circuit Court would be approved without fail – without any inquiry whatsoever into whether or not the petitions violated state or federal law. The amount and the frequency of the pre-transfer petition "advances" cuts right to the heart of Defendant Wadsworth's fraud. Wadsworth falsely represented what the advances were for, Wadsworth failed to explain to Terrence how the advances would be "repaid" and Wadsworth encouraged Terrence to squander the advance money so Terrence would need to come back for more until his structured settlement was completely dissipated (Am. Complt. ¶¶ 173, 174, 176).

Defendant Wadsworth even made advances to Terrence from his own back account. (Am. Complt. ¶¶ 43, 44. 171). As noted in the Amended Complaint, Wadsworth specifically stated to Terrence on August 22nd and 23rd, 2012: "if you sign these documents today I will send you money from my own account". (Am. Complt. ¶ ¶ 171, 172). Wadsworth also specifically told Terrence that these advances were being made to "help him out" which Wadsworth knew was false. (Am. Complt. ¶ 173). It is highly unusual for a structured settlement factoring company representative to make personal advances to a "client" yet a review of Terrence's banking records show that the following amounts appear to have been wired to his account by Defendant Wadsworth: August 29, 2012: $7,000.00; December 20, 2012: $1,000.00; August 23, 2013: $2,500.00.; October 25, 2013: $1,500.00. It is also inconceivable that Defendant SAF would have advanced so much money to Terrence unless Defendant SAF and Wadsworth both knew that the advances were not "at risk".

Defendant Wadsworth also told Terrence that SAF offered the best rates and that he should refrain from speaking to other competing funding companies so Wadsworth could help him out. Wadsworth even sent Terrence a phone by Federal Express and told him to stop using his other phone so Wadsworth could isolate Terrence from other funding companies. (Am. Complt. ¶¶ 168, 170). Wadsworth specifically told Terrence that he would "never take advantage of their friendship". (Am. Complt. ¶ 185). Not only did Defendant Wadsworth take advantage of Terrence, it is also specifically alleged in the Amended Complaint that Wadsworth procured a life insurance policy on the life of Terrence, payable not to Terrence's relatives or minor child but to a third party assignee whose identity remains unknown to Terrence. (Am. Complt. ¶ 197, 199). This speculating on Terrence's life for monetary gain is not only contrary to public policy and potentially actionable in its own right, but it also shows a complete and total lack of regard for Terrence, his dependent child and the "best interest" standard required by Section 5891 of the Internal Revenue Code. Not only did Defendant Wadsworth encourage Terrence to sell off more of his future payments than would have been prudent, he also duped Terrence into giving up his insurability. In order to cover the cost of Terrence traveling into Virginia to retrieve medical records, Wadsworth sent Terrence a stored value card and instructed him to sign and initial insurance documents so he could get more money – as though the insurance policy was for Terrence's benefit. It was not. (Am. Complt. ¶ 202).

Defendant Wadsworth knew that Terrence had serious injuries, few friends and diminished capacity. Defendant Wadsworth also knew that he could control and manipulate Terrence and get him to sign anything he wanted. He pretended to be Terrence's friend until all of Terrence's structured settlement payments were gone. Then he stopped being Terrence's friend, stopped taking Terrence's calls and Terrence could no longer call him and get money.

**B.**    **Plaintiffs State a Viable Claim for Fraudulent Misrepresentation against Wadsworth under Virginia Law.**

In addition to the fraudulent conduct detailed above, The Amended Complaint clearly demonstrates that Defendant Wadsworth knew that a precondition to obtaining a court order was procuring affidavits from Terrence setting forth his intended use of the sales proceeds, his dependents, his other sources of income and his residence. (Am. Complt. ¶ 159.)  As Wadsworth made or caused to be made advance after advance to Terrence he did so knowing that the affidavits he prepared for Terrence's signature, which affidavits were en route to Portsmouth Circuit Court were false and misleading.  (Am. Complt. ¶¶ 159 - 165.)  Prior to the first transfer petition being granted in June of 2012, Wadsworth had arranged for more than $100,000.00 to be transferred to Terrence and Wadsworth knew that Terrence had blown through all of the advance money making it impossible for Terrence to use the proceeds of the transfer for its stated purpose.  (Am. Complt. ¶ 174.)

The following statements made by Wadsworth were false and/or misleading when made: "[I] would never take advantage of [you] due to [our] friendship" (Am. Complt. ¶ 168). If Terrence needed money "all he had to do was 'call Rhett'". (Am. Complt. ¶ 163).  SAF has "the best rates" in the business.  (Am. Complt. ¶ 168.) Wadsworth told Terrence that "the insurance would be paid for by SAF and that Terrence had 'nothing to worry about'".  (Am. Complt. ¶ 202.)  "If [you] do business with me, you will get great deals and be taken care of forever".  (Am. Complt. ¶ 30.)

**C.  Plaintiffs State a Viable Claim under the Virginia Consumer Protection Act.**

All of the advances, advance agreements, unsecured consumer loans, purchase and sale agreements, insurance applications, insurance policies and structured settlement transfer petitions and supporting documents described in the Amended Complaint constitute consumer transactions within the meaning of the Virginia Consumer Protection Act of 1977 § 59.1-196 et seq. (the

18

"Virginia Consumer Protection Act"). In Virginia, "consumer transactions" include: "the advertisement, sale, lease or offering for sale or lease, of goods or services to be used primarily for personal, family or household purposes. Va. Code Ann. § 59.1-198. "Goods" is broadly defined for maximum reach and includes "all real, personal or mixed property, tangible or intangible. "Services" includes but shall not be limited to work (i) performed in the business or occupation of the supplier or (ii) performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction. Most notably, the Virginia Consumer Protection Act regulates all "suppliers" of goods in Virginia and a supplier includes anyone who sells, leases, advertises, solicits or engages in consumer transactions. *Id.*

By pretending to be Terrence's friend and confidant and by using falsehoods and misrepresentations to get Terrence to sell off more and more of his future payments than authorized by state or federal law, Defendant Wadsworth used deception in connection with consumer transactions in violation of the Virginia Consumer Protection Act.

Among other things, Wadsworth made repeated unsecured consumer loans to Terrence without a lending license. Wadsworth never disclosed the rates or other costs associated with the numerous advances he made to lock Terrence in as a customer and cause Terrence to become severely indebted to Defendant SAF. Wadsworth never disclosed to Terrence that he was giving up an asset (his insurability) as opposed to acquiring an asset (a paid up life insurance policy) so Wadsworth could profit handsomely at Terrence's expense and a third party could benefit from Terrence's early demise. And most importantly, Defendant Wadsworth used deception in a variety of consumer transactions to divest Terrence of a lifetime of guaranteed structured settlement

payments in violation of Section 5891 of the Internal Revenue Code and in direct contravention of this Court's Dismissal Order.

## **CONCLUSION**

For all of the foregoing reasons, plaintiff respectfully requests that the Court deny Defendant Wadsworth's Motion to Dismiss and require him to answer the amended complaint.

Dated:  May 19, 2015                    Respectfully submitted,

Kathleen J.L. Holmes, VSB 35219
Ellen D. Marcus, VSB 44314
HOLMES COSTIN & MARCUS pllc
301 N. Fairfax Street, Suite 202
Alexandria, VA  22314
Tel: (703) 260-6401
Fax: (703) 439-1873
kholmes@hcmlawva.com
emarcus@hcmlawva.com

Edward Stone (*pro hac vice*)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, CT 06830
Tel: (203) 504-8425
Fax: (203) 348-8477
eddie@edwardstonelaw.com

*Attorneys for TERRENCE E. TAYLOR, LOUISE W. TAYLOR and PHILLIP D. TAYLOR*

**Certificate of Service**

      I hereby certify that on May 19, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| | |
|---|---|
| Brandon Elledge<br>Brandon.Elledge@hklaw.com<br>Kelly Krystyniak<br>Kelly.Krystyniak@hklaw.com<br>Holland & Knight<br>800 17th Street NW, Suite 1100<br>Washington, DC 20006 | Craig Franco<br>Craig.Franco@ofplaw.com<br>Margaret Marks<br>Margaret.Marks@oflaw.com<br>Odin Feldman Pittleman PC<br>1775 Wiehle Avenue, Suite 400<br>Reston, VA 20190 |
| | Lauren Tallent Rogers<br>Ltrogers@kaufcan.com<br>William Edgar Spivey<br>wespivey@kaufcan.com<br>Kaufman & Canoles, P.C.<br>150 W. Main Street, Suite 2100<br>Norfolk, VA 23510 |

/s/_____
Kathleen J.L. Holmes (VA Bar No. 35219)
Ellen D. Marcus (VA Bar No. 44314)
HOLMES COSTIN & MARCUS PLLC
301 N. Fairfax Street, Suite 202
Alexandria, Virginia 22314
Telephone: (703) 260-6401
Fax: (703) 439-1873
emarcus@hcmlawva.com
kholmes@hcmlawva.com