IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TERRENCE E. TAYLOR, et al.,            )
                                       )
                      Plaintiffs,      )
                                       )
v.                                     ) CIVIL ACTION
                                       )
STRUCTURED ASSET FUNDING, LLC, et al., ) 1:15-cv-271
                                       )
                      Defendants.      )
_____)


REPORTER'S TRANSCRIPT

<u>MOTION HEARING</u>

Friday, June 5, 2015

---


<u>BEFORE</u>:        THE HONORABLE T.S. ELLIS, III
                Presiding


<u>APPEARANCES</u>:   Kathleen Holmes
                Holmes Costin & Marcus PLLC
                301 N Fairfax St., Suite 202
                Alexandria, VA 22314

                EDWARD STONE, ESQ.
                Edward Stone Law
                175 W. Putnam Ave., 2nd Floor
                Greenwich, CT

                    For the Plaintiffs


                       ---


            MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                 Official Court Reporter
            USDC, Eastern District of Virginia
                   Alexandria Division

APPEARANCES (Continued)


          BRANDON H. ELLEDGE, ESQ.
          CORY W. EICHHORN, ESQ.
          Holland & Knight LLP
          1600 Tysons Blvd., Suite 700
          McLean, VA 22102

          For Defendants Structured Asset Funding,
          iSettlements

          WILLIAM EDGAR SPIVEY, ESQ.
          Kaufman & Canoles PC
          150 W Main St., PO Box 3037
          Norfolk, VA 23510

          For Defendant Blazingstar Funding

          CRAIG J. FRANCO, ESQ.
          Odin Feldman & Pittleman PC
          1775 Wiehle Avenue, Suite 400
          Reston, VA 20190

          For Defendant Rhett Wadsworth


                         ---

INDEX

ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS          6

ARGUMENT BY THE PLAINTIFFS                        13

ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS          27

ARGUMENT BY THE PLAINTIFFS                        32

ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS          34

ARGUMENT BY DEFENDANT BLAZINGSTAR                 35

ARGUMENT BY THE PLAINTIFFS                        36

ARGUMENT BY DEFENDANT BLAZINGSTAR                 37

COURT QUESTIONS / PRELIMINARY RULING              38

(Submissions requested)

(Court recessed)

---

<u>PROCEEDINGS</u>

1
2
3              (Court called to order.)
4              THE CLERK:  Terrence E. Taylor, et al.,
5     versus Structured Asset Funding, LLC, et al., Civil Case
6     Number 1:15-cv-271.
7              THE COURT:  All right.  Who is here on
8     behalf of the plaintiffs?
9              ATTORNEY HOLMES:  Good morning, your Honor.
10    Kathleen Holmes.  And may I introduce to the Court
11    Mr. Edward Stone.  Your Honor has admitted Mr. Stone pro
12    hac vice for this matter.
13              I would supplement to his application by way
14    of introduction that Mr. Stone's career in the law has
15    focused on the structured settlement industry, including
16    serving as general counsel for J.G. Wentworth and
17    practicing and participating in the development of the
18    model structured settlement acts which bear upon this
19    case.
20              Your Honor, with permission of the Court,
21    Mr. Stone will address plaintiff's argument.
22              THE COURT:  All right.  He will address
23    what?
24              ATTORNEY STONE:  Plaintiffs' argument, your
25    Honor.  He will present --

1          THE COURT:  Oh, plaintiffs' arguments.

2     Thank you.

3          And for the defendant, Structured Asset

4     Funding and iSettlements, LLC?

5          ATTORNEY ELLEDGE:  Good morning, your Honor.

6     Brandon Elledge of Holland & Knight on behalf of those

7     two defendant entities.  With me today is my partner,

8     Cory Eichhorn.  Mr. Eichhorn also has been admitted to

9     this proceeding pro hac vice.

10          He will be, with your Honor's permission,

11     presenting argument on behalf of those two defendants

12     today.  And he similarly has an extensive background in

13     the settlement -- structured settlement industry.

14          THE COURT:  Mr. Eichhorn, how do you spell

15     your last name?

16          ATTORNEY EICHHORN:  Good morning, your

17     Honor.  E-i-c- two h's - o-r-n.

18          THE COURT:  Two H's.

19          ATTORNEY EICHHORN:  Two h's.  It always gets

20     you.

21          THE COURT:  All right.  And who is here --

22     thank you.

23          Who is here for Blazingstar Funding, LLC?

24          ATTORNEY SPIVEY:  Your Honor, Ed Spivey from

25     Kaufman and Canoles here for Blazingstar.

1           THE COURT:  All right.  It's not William

2   Spivey.

3           ATTORNEY SPIVEY:  That is my first name.  I

4   go by my middle name, which is Edgar.  So I go by Ed.

5           THE COURT:  Any relation to Joseph Spivey?

6           ATTORNEY SPIVEY:  No, your Honor.  I have

7   been asked that question a goodly number of times.  I am

8   not related.

9           THE COURT:  All right.  Thank you.

10          And who is here on behalf of Rhett

11  Wadsworth?

12          ATTORNEY FRANCO:  Good morning, your Honor.

13  Craig Franco on behalf of Rhett Wadsworth.

14          THE COURT:  All right.  Good morning to you.

15          I am reasonably generally familiar with the

16  facts, but let's begin with Mr. Eichhorn, who is the

17  movant, the major movant in this matter, and I'll hear

18  from you to begin with.

19      ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS

20          ATTORNEY EICHHORN:  May it please the Court.

21  Good morning, your Honor.

22          We are here today on a Rule 12(b)(1) and

23  12(b)(6) motion to dismiss.  We move to dismiss the

24  complaint on a number of different grounds.

25          At the outset, we move to dismiss the case

based on the Rooker Feldman Doctrine, which this Court
is familiar with, a doctrine that was decided by a
United States Supreme -- two United States Supreme Court
cases, Rooker and Feldman, years ago and has been
interpreted a number of times by the United States
Supreme Court since then.

THE COURT:  I am fairly familiar with it.
Just tell me why you think it applies in this case.  It
would only apply to Count 1, wouldn't it?

ATTORNEY EICHHORN:  The argument would apply
in --

THE COURT:  It would only apply to Count 1
because there's only a Virginia court order.  There are
no West Virginia court orders.

ATTORNEY EICHHORN:  Well, your Honor, the
Structured Settlement Protection Act for Virginia
requires a court order to be entered in order for a
structured settlement assignment transfers to be
approved.  So for any structured settlement assignment
to be approved, a Virginia state court needs to enter an
order.  And that was done here.

THE COURT:  And that's Count 1.

ATTORNEY EICHHORN:  That's Count 1.  But all
of the counts relate to the underlying state court order
that --

1          THE COURT:  I know, but you can't -- why

2     would Rooker Feldman operate at all with respect to the

3     West Virginia Count 2, which is the West Virginia

4     statute?  I don't see any application by the West

5     Virginia statute at all.  Do you?

6          ATTORNEY EICHHORN:  Well, I think what, the

7     relief that they are seeking -- and it's difficult to

8     tell based on the complaint, your Honor, but when you go

9     back and look at the relief, paragraph 99 of the amended

10    complaint, which is part of the Count 1, alleges that

11    the court orders that were entered by the Virginia

12    courts should be voided.  That is the relief that they

13    are seeking.  They then incorporate that claim for

14    relief in every subsequent count, realleging and

15    adopting that count.

16          THE COURT:  All right.

17          ATTORNEY EICHHORN:  So in every count they

18    are seeking to set aside the Virginia State Court order.

19          THE COURT:  All right.  Go on with your

20    argument.

21          ATTORNEY EICHHORN:  So, your Honor, Rooker

22    Feldman applies here for a number of different reasons.

23          First of all, Mr. Taylor was, within the

24    meaning of the Rooker Feldman Doctrine, a state court

25    loser.  The structured settlement process in Virginia is

highly regulated. There is a Structured Settlement
Protection Act in place. The courts in the Circuit
Court follow that Structured Settlement Protection Act,
entered orders indicating that the structured
settlements were in the best interest of Mr. Taylor,
that he was advised of his right to have independent
legal advice in the case or waive that right; and also
that the underlying transfer did not violate an order or
a federal or state statute.

So within the meaning of the Rooker Feldman
Doctrine, Mr. Taylor is a state court loser because he
consented to the relief. He filed affidavits indicating
that the transactions were in his best interest. He
executed contracts indicating that underlying contracts
were in his best interest.

So for that reason he should be deemed a
state court loser under the first element of Rooker
Feldman.

There is only one District Court opinion
that has addressed the issue. We cited that in our
papers, the Capela decision, a United States District
Court decision out of the Southern District of New York,
that found that under similar circumstances, where a
structured settlement seller was attempting to attack
orders entered, that that seller, as a federal

1    plaintiff, was a state court loser.

2                   In addition, your Honor, the second element

3    of the Rooker Feldman is met.  The plaintiff complains

4    of the injuries caused by the state court judgment.

5                   When you take a look at the amended

6    complaint, as I indicated, paragraph 99 asks this Court

7    to void the underlying state court orders, clearly

8    complaining of injuries caused by the state court.

9                   In additional paragraphs in the complaint he

10   asks for the underlying structured settlement

11   transactions to be rescinded and restored.  The only way

12   that that can happen is for the state court orders to be

13   reversed.

14                  The purpose of Rooker Feldman is not for

15   this Court to revisit, reinterpret, reexamine what the

16   underlying state courts did, so the second element is

17   met under Rooker Feldman.

18                  The third element is that the state court

19   judgment became final before the proceedings in the

20   federal court were commenced.  I don't think there is a

21   dispute as to that here.

22                  There were seven state court orders entered

23   relative to Defendant Structured Asset Funding and

24   iSettlements, LLC.  Those orders were entered prior to

25   this action being commenced earlier this year.  From

1    2012 through 2014 those orders were entered.  So the

2    third element is met under Rooker Feldman.

3             And the fourth element, again which is

4    closely tied to the second element, is that the

5    plaintiffs have invited this Court to review and reject

6    the state court judgments, which again in paragraph 99

7    they ask this Court to void the state court orders.

8             In paragraph 244 they seek declarations that

9    all transaction are void, and asking the Court to take

10   all steps to rescind the transactions, and also ask the

11   Court to restore the periodic payments back to

12   Mr. Taylor.  Again, the only way that can happen is if

13   this Court reverses the underlying state court orders.

14            Under Fourth Circuit precedent, Wilner

15   versus Fray, and also Smalley versus Shapiro and Burson,

16   LLP, this falls within the ambit of the Rooker Feldman

17   Doctrine.

18            It's clearly a case where a state court

19   loser is attempting to revisit and have this Court sit

20   in appellate review over the state court judgment.

21            Again, the Structured Settlement Protection

22   Act that's in place here in Virginia and in place in a

23   number of other different states provides that -- the

24   rights of Mr. Taylor to object at the hearing to approve

25   the structure settlement transactions.  Mr. Taylor did

1  not object in this case.

2  Permitting the case to go forward would in

3  essence hold that the state court wrongly decided the

4  issue, which under Rooker Feldman a federal court is

5  prohibited from doing.

6  THE COURT:  All right.  I am going to take

7  each of these issues one at a time.

8  ATTORNEY EICHHORN:  Sure.

9  THE COURT:  Under Count 2, I still don't

10  understand why Rooker Feldman has anything to do with

11  Count 2, because there is no state court judgment

12  relating to the West Virginia Structured Settlement

13  Protection Act, is there?

14  ATTORNEY EICHHORN:  Judge, there is not a

15  West Virginia structured settlement transfer order that

16  was entered in this case.  There --

17  THE COURT:  Right.  So why would Rooker

18  Feldman -- there may be another reason why that claim

19  fails to state a claim.  But why would Rooker Feldman

20  apply to that count, where there is no state court

21  judgment?

22  ATTORNEY EICHHORN:  Well, in essence, your

23  Honor, this cause of action seeks to set aside the

24  Virginia State Court transfer.

25  THE COURT:  Right.  That's Rooker Feldman,

1    in your view.

2              ATTORNEY EICHHORN:  That's Rooker Feldman,

3    in my view.

4              THE COURT:  Well, why does Rooker Feldman

5    have anything to do with an allegation that it violated

6    the West Virginia Settlement Protection Act?  Why isn't

7    that just --

8              ATTORNEY EICHHORN:  Well, my understanding

9    of that count, your Honor, is that the relief for that

10   counted is setting aside, rescinding, voiding the

11   underlying Virginia court orders.

12             THE COURT:  Yes.

13             ATTORNEY EICHHORN:  If that's not what --

14             THE COURT:  That is what -- oh, you mean the

15   Count 2 --

16             ATTORNEY EICHHORN:  Count 2.

17             THE COURT:  -- to set aside Count --

18             ATTORNEY EICHHORN:  Yes.

19             THE COURT:  I see.  All right.  I understand

20   that, then.

21             Let me hear from, it's Mr. Stone on the

22   Rooker Feldman issue.

23                  ARGUMENT BY THE PLAINTIFFS

24             ATTORNEY STONE:  Thank you, your Honor.  May

25   it please the Court.  My name is Edward Stone.  I am

1    here on behalf of the Taylors, Terrence Taylor, Louise

2    Taylor and Phillip Taylor.

3         I will confine these remarks to the Rooker

4    Feldman issue, as you requested.  In our view -- as you

5    might imagine, I differ from Mr. Eichhorn's view -- this

6    case is really about the defendants interfering with an

7    order of this Court.

8         This Court issued a dismissal order in 1989,

9    when Terrence Taylor settled his personal injury case.

10   Incorporated in that dismissal order is very, very

11   specific language with respect to what Terrence Taylor

12   and any other payee has the power to do.

13        That language states that he -- that Terence

14   Taylor nor any payee has the power for transfer, assign,

15   encumber, commute or do anything with respect to the

16   periodic payment.  That order was violated in every

17   single application made.

18        With respect to --

19        THE COURT:  Which count relates to a

20   violation of this Court's order?

21        ATTORNEY HOLMES:  Count -- every one of

22   them.  Count 1 --

23        THE COURT:  Where in Count 1 do you say that

24   there is a violation of this Court's order?

25        ATTORNEY STONE:  Okay.  So, give me one

second, your Honor.

THE COURT:  The argument you are now making is that when this Court approved the periodic payments originally, it said, in effect, no one can ever change this.

ATTORNEY STONE:  It said that nobody has the power -- that's correct -- to transfer the periodic payment.  The settlement agreement --

THE COURT:  Now I asked you, where does it say that that's what you are suing on, or that you are seeking a, I guess, an order to show cause why the -- actually, the person who violated the order is your client.

ATTORNEY STONE:  And my client lacked the power to violate that order, your Honor.

THE COURT:  All right.  Well, where do you say that?

ATTORNEY STONE:  In paragraph 19 --

THE COURT:  All right.  Read me paragraph 19.

ATTORNEY STONE:  It says, "The parties entered into a confidential settlement agreement, which was approved by the court and is expressly incorporated by reference into the dismissal order."

And then in paragraph 21, it says that --

1          THE COURT:  Well, that doesn't say it

2  violated this Court's order.  That's what I asked you

3  for.

4          Where does it say in your complaint that you

5  are suing because your client violated -- never had the

6  power and violated this Court's order in agreeing to a

7  sale of his periodic payments?

8          ATTORNEY STONE:  It says in paragraph 96 as

9  well, and it's alleged throughout the complaint --

10         THE COURT:  Don't give me this "as well"

11  stuff.  You haven't said it at all yet.

12         ATTORNEY STONE:  Paragraph 96, "Transferee

13  defendants knew or should have known that the settlement

14  agreement entered into by Terrence, Louise and Phillip

15  Taylor expressly provided that they lacked the power to

16  assign the payments."

17         That's in paragraph 96.  It was redacted in

18  the original version --

19         THE COURT:  Now was that shown, was the

20  order shown to the judge in the state court?

21         ATTORNEY STONE:  Terrence Taylor did not

22  participate in the state court action.

23         THE COURT:  I didn't ask you that.

24         ATTORNEY STONE:  To my knowledge, no, your

25  Honor.

1          THE COURT:  How do you know?

2          ATTORNEY STONE:  The petitions that I did

3    review --

4          THE COURT:  Why isn't your answer, "I don't

5    know"?

6          ATTORNEY STONE:  I don't know, your Honor.

7          THE COURT:  All right.  Not to your

8    knowledge it wasn't, because then you suppose you had

9    knowledge.

10          Have you looked at the record to see whether

11    that order was presented to the state court?

12          ATTORNEY STONE:  Your Honor, a number of the

13    orders that were --

14          THE COURT:  I'm sorry.  Would you answer my

15    question?  Have you looked at the record in the state

16    court to determine whether the state court judge saw or

17    was given that order?

18          ATTORNEY STONE:  The records that I looked

19    at, the ones --

20          THE COURT:  I'm sorry.  Can you give me a

21    yes or a no, and then you may explain.

22          ATTORNEY STONE:  Yes, your Honor.

23          THE COURT:  You did look at the record.

24          ATTORNEY STONE:  I looked at the records

25    that were not sealed by the Portsmouth State Court at

defendants' request, your Honor.

THE COURT: All right.

ATTORNEY STONE: The defendant requested that those orders be sealed. I was unable to look at the sealed orders. There were orders that I did look at, and those orders did not attach the settlement agreement, nor did they reference the dismissal order of this Court, your Honor.

THE COURT: All right.

ATTORNEY STONE: I apologize for not answering your question.

THE COURT: All right. Go on.

ATTORNEY STONE: Okay. So Rooker Feldman -- so what we are talking about in this case is about the harm that occurred to Terrence Taylor by virtue of the defendants' action. That harm predated the entry of the first order.

Starting about two months before an order was even entered, defendants were systematically making cash advances to Mr. Taylor on an almost daily basis. In fact, before the first --

THE COURT: Well, how did that change anything?

ATTORNEY STONE: Because under the Structured Settlement Protection Act and under the

1  Internal Revenue Code Section 5891, the only way to

2  transfer --

3        THE COURT:  Well, the point -- you are

4  missing the point entirely.  They gave him money because

5  they were trying to induce him to enter into this thing.

6        ATTORNEY STONE:  Correct.

7        THE COURT:  But he didn't sign anything.  He

8  didn't give up anything.  They were just giving him

9  money.  He could have said, "I quit, and I am not going

10  to take or give up my payments," and he would have had

11  that money in his pocket.

12        ATTORNEY STONE:  I have not reviewed the

13  advance agreements.  I believe what I understand from --

14        THE COURT:  You haven't reviewed the advance

15  agreements?

16        ATTORNEY STONE:  My client does not have any

17  records, your Honor.  Those documents are solely in the

18  possession of the defendants.  The only records I have

19  been able to review are the ones I have been able to get

20  from the courts, bank regards that I got from my client,

21  and other records that were maintained by my client that

22  were not abandoned when he was forcibly evicted from his

23  home --

24        THE COURT:  Is there any claim that your

25  client is not mentally competent?  Does he need a

1   guardian ad litem?

2          ATTORNEY STONE:  I would submit, your Honor,

3   that --

4          THE COURT:  I'm sorry.  Does he need a

5   guardian ad litem?

6          ATTORNEY STONE:  I don't believe he needs a

7   guardian ad litem, per se, but he certainly could use

8   help.  He has gotten help.  He is seeking counseling,

9   and he is working on rehabilitating himself, your Honor.

10   That's what we have been doing --

11         THE COURT:  Rehabilitating himself from

12   what?

13         ATTORNEY STONE:  Terrence Taylor engaged in

14   a number of transactions, your Honor.  He shouldn't have

15   done it.

16         THE COURT:  I understand that.  What is he

17   rehabilitating --

18         ATTORNEY STONE:  He is trying to find a way

19   to find useful employment, to get himself educated --

20         THE COURT:  Is he a drug abuser?

21         ATTORNEY STONE:  No, he is not, your Honor.

22         THE COURT:  Well, what is he seeking

23   rehabilitation for?

24         ATTORNEY STONE:  Not rehabilitation, your

25   Honor.  He is trying to get his life back on track.

THE COURT:  All right.

ATTORNEY STONE:  He went through a period of time, over two years, where he engaged in 11 transactions that decimated a settlement that was designed to protect him for his lifetime.

THE COURT:  All right.  Now tell me again, succinctly --

ATTORNEY STONE:  Yes, your Honor.

THE COURT:  -- why you think this isn't a case in which under, at least for Count 1, that you are not seeking that I overturn a state judge order.

ATTORNEY STONE:  So, we submit, your Honor, that he is not a state court loser.  He didn't participate in the actions in federal court -- in state court, your Honor.

He was given documents to sign.  He had notaries sent to his home, and then that paperwork was taken 500 miles away to a courthouse in Portsmouth.  He never appeared as a plaintiff.  He never appeared as a defendant, and he never appeared as a witness in those actions.

THE COURT:  Wouldn't he have to appear as a petitioner?

ATTORNEY STONE:  In this particular court that was chosen by defendant, a personal appearance was

1    not required.

2              THE COURT:  Right.  But he had the

3    opportunity to be there, and he had to be a named party.

4              ATTORNEY STONE:  He was not a named party,

5    your Honor.  Under the Structured Settlement Protection

6    Act, it's In Re Structured Asset Funding, LLC, or In Re

7    1, 2, 3 Lump Sum.

8              The paperwork and the documentations were

9    prepared by defendants.  They were delivered to Terrence

10   Taylor in his home in West Virginia by defendants.  They

11   were taken by a notary, who went to his home in West

12   Virginia, to a courthouse in Portsmouth, Virginia, 500

13   miles away.  They were handed to the judge in

14   Portsmouth, and the judge signed an order.

15             And that's how it happened, your Honor.  He

16   did not ever appear in Portsmouth.  In fact --

17             THE COURT:  All right.  Number one, you say

18   he is not -- I don't have a lot of time --

19             ATTORNEY STONE:  I'm sorry.

20             THE COURT:  -- so be succinct.

21             ATTORNEY STONE:  Okay.

22             THE COURT:  Number one, you say he said

23   didn't participate and so he is not a loser.  What else?

24             ATTORNEY STONE:  That the injuries were

25   caused by defendants' conduct.  All of those advances

started this whole process, and they occurred well in

advance.  And we should be entitled to discovery to see

what consequences they came with.

I believe that there may have been high

interest rates attached to those advances that were not

disclosed to Terrence.  He was just told:  Call

Defendant Rhett and you can get money.

We don't have to review or overturn those

judgments --

THE COURT:  I thought you said the payments

were inducements, not loans.

ATTORNEY STONE:  I don't know what they

were, your Honor.  Typically, when an advance is made,

there is some paperwork that is filed.

What I know from interviews with my client

is he was handed some documents, it was several pages

long.  He was told to sign it, "and you'll get your

money."  He signed it, and then wire transfers were

made.

I was able to review his bank records only.

I have not reviewed the advance agreements, your Honor.

They are not in my client's position.

And the injuries that we allege, even in

Count 1, were not caused solely by the state court

order.  The injuries, I submit, were caused when they

started making these predatory advances, systematic

advances, almost on a daily basis, and calling him and

saying, "Do you need more money?  Do you need more

money?"

THE COURT:  Why don't you go to Portsmouth

and address this with the Portsmouth Court?

ATTORNEY STONE:  The first thing that we

did, your Honor, which we just --

THE COURT:  I'm sorry.

ATTORNEY STONE:  Yes.

THE COURT:  I asked a question.  I expect a

direct answer.  Why didn't you go to Portsmouth and

address this issue with the Portsmouth Court that

entered the order?

ATTORNEY STONE:  We first wanted to unseal

the order in this court.  The original settlement

agreement was filed under seal in this court, and just

this week we had it unsealed.

THE COURT:  All right.  Why -- that doesn't

answer my question.  Why don't you go to the Portsmouth

court and tell the Portsmouth court why its order should

be -- why the order was somehow fraudulently obtained?

ATTORNEY STONE:  We he can do that, your

Honor, but Terrence Taylor doesn't drive.  And to take

him 500 miles to the Portsmouth court, we felt that the

1    only --

2              THE COURT:  How many miles is it from here?

3              ATTORNEY STONE:  I think it's about, over

4    300 miles from here, about 400 miles.

5              THE COURT:  Yes.  And you drive.

6              ATTORNEY STONE:  I do, your Honor.  It would

7    be a long drive from Stamford, Connecticut, but I do

8    drive, sometimes too fast, I confess.

9              But the injuries were not caused solely by

10   that order, your Honor.  And we've alleged in that count

11   and in other counts what caused the injuries.  And we

12   believe that this court is the appropriate forum to

13   enforce its own order, that was disregarded by the

14   defendants.

15             The defendants have an obligation under

16   Section 5891 of the Internal Revenue Code to file

17   petitions where the seller is domiciled.  At the time,

18   he was domiciled in West Virginia.  That's where he

19   resided and that's where he intended to remain.

20             THE COURT:  What else do you have on Rooker

21   Feldman?

22             ATTORNEY STONE:  We don't have to overturn

23   the court orders to afford a remedy to my client.

24             THE COURT:  Really?

25             ATTORNEY STONE:  Any number of ways that it

can be done.  The defendants or any one of them could be
ordered to pay damages for their bad conduct.  They
could be held accountable for their conduct.

THE COURT:  And that isn't an overturning of
that order?  Because the order authorized it.

ATTORNEY STONE:  It doesn't have to be
overturned to say that the defendants violated the
statute.

THE COURT:  All right.  That argument
doesn't move me.

ATTORNEY STONE:  The defendants --

THE COURT:  It clearly -- it clearly
requires a rejection of that order.  The order
authorized it.  And if you say -- what you are saying is
the order should not have been entered.

ATTORNEY STONE:  Your Honor, what I am
saying the order is void.  All of the orders --

THE COURT:  All right.  If it's void, then
you don't get out of Rooker Feldman on that ground.

ATTORNEY STONE:  But the harm that it --

THE COURT:  Because then you are asking this
Court to sit in judgment of that order.

What else do you have under Rooker Feldman?

ATTORNEY STONE:  I think the Court can
enforce its own order, and I believe that if -- all of

the state court orders were obtained after the dismissal
order, as well, that was issued in this Court.

That's all I have on Rooker Feldman, your
Honor.

THE COURT:  All right.

ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS

THE COURT:  Let me ask Mr. Eichhorn.

Mr. Eichhorn, why aren't these orders
entered by the Virginia Court in violation of this
Court's settlement order, in which this Court,
accordingly -- according to Mr. Stone said that these
periodic payments could not in any way be changed?

ATTORNEY EICHHORN:  Judge, the settlement
agreement was sealed by the Court as part of the
dismissal order.  It was not attached.  It was sealed,
recently unsealed.  I have haven't seen the dismissal --
the settlement agreement.

And Mr. Taylor provided to the Portsmouth
court affidavits indicating that he could not find the
settlement agreement.  In every one of these cases the
clients made sure to obtain the settlement agreement.
And if they cannot obtain the settlement agreement they
obtained an affidavit from the seller indicating that
they cannot locate the settlement agreement.

THE COURT:  So the Portsmouth court did not

```
 1    receive the order of this Court.

 2              ATTORNEY EICHHORN:  That's my understanding,

 3    your Honor, that the Portsmouth court --

 4              THE COURT:  Instead, it received only an

 5    affidavit from Mr. Taylor saying, "I can't find it."

 6              ATTORNEY EICHHORN:  Correct.  In addition to

 7    his waiver of --

 8              THE COURT:  All right.  It has been unsealed

 9    now.

10              ATTORNEY EICHHORN:  Correct.

11              THE COURT:  And you have seen it.

12              ATTORNEY EICHHORN:  I haven't not seen it

13    yet, your Honor.  It was recently, about a week ago,

14    unsealed.  I haven't seen it.

15              THE COURT:  Why haven't you seen it if it's

16    been unsealed?

17              ATTORNEY HOLMES:  Your Honor, may I address

18    the Court on that point?

19              I received a phone call yesterday from

20    Mrs. Walker in the Clerk's Office.  They are looking for

21    it in the vault and have not located it.

22              THE COURT:  Oh, I see.  It has been unsealed

23    but hasn't been located.

24              ATTORNEY HOLMES:  Correct, your Honor.

25              THE COURT:  How about the defendants.  Don't
```

they have the copy of it?

No, the defendants wouldn't.  Who was the original defendant.

ATTORNEY EICHHORN:  Delonghi -- a coffee -- manufacturer a coffee makers.

THE COURT:  All right.  They will have a copy.

ATTORNEY HOLMES:  Your Honor, again if I may?

THE COURT:  Yes.  You have asked and they don't find it.

ATTORNEY HOLMES:  Correct, your Honor.

THE COURT:  So how do I know that that order has been violated?  I don't, do I?

ATTORNEY EICHHORN:  No, you don't, your Honor.  Neither do I.

THE COURT:  All right.

Respond to Mr. Stone's arguments that your, that his client is not a state court loser.  He didn't participate, he wasn't there, and he is not a named party.

ATTORNEY EICHHORN:  Your Honor, the way the Structured Settlement Protection Act works is that the seller is an interested party.  So there is a petition filed by the structured settlement entity seeking to

1    have the payments assigned, and Mr. Taylor is named as

2    an interested party.

3              So he is given notice of the proceedings.

4    He is given a right to object under the Structured

5    Settlement Protection Act.  He files affidavits in court

6    from him.  He is given copies of all the materials, and

7    did have a right to object under the Structured

8    Settlement Protection Act.

9              THE COURT:  So he really isn't a loser --

10   this is sort of a novel Rooker Feldman case.  He is not

11   a loser; he is just a participant --

12             ATTORNEY EICHHORN:  He is a participant,

13   your Honor --

14             THE COURT:  -- who is now complaining about

15   that judgment.

16             ATTORNEY EICHHORN:  Correct.  From my

17   perspective, your Honor, it's very similar to an agreed

18   order being entered.  He consented to the relief that

19   was agreed to and approved by the Court.

20             Rooker Feldman has been applied in the

21   context of agreed orders.  Courts have found that those

22   agreeing to orders --

23             THE COURT:  In this circuit?

24             ATTORNEY EICHHORN:  I am not sure if in this

25   circuit.  We cited in our papers, I think there were

1    some District Court decisions.  I would have to check to

2    see if it was in this circuit, your Honor.

3          THE COURT:  All right.  Go on.  What other

4    responses do you have to Rooker Feldman?

5          ATTORNEY EICHHORN:  At the end of the day,

6    your Honor, Mr. Stone's argument didn't change the fact

7    that they are seeking to overturn the state court orders

8    and the state court pronouncements.

9          When you look carefully at the amended

10    complaint and look to see the relief they are

11    requesting, particularly in paragraph 99, 244 and the

12    prayer for relief, where they seek voiding the

13    transactions, at the end of the day the only way that

14    can happen is for this Court to reverse the state court

15    judgments, and therefore Rooker Feldman should apply.

16          THE COURT:  Now what is your understanding

17    of what Count 2 alleges?

18          ATTORNEY EICHHORN:  My understanding, your

19    Honor, is that Count 2 alleges a so-called violation of

20    the West Virginia Structured Settlement Protection Act.

21    It incorporates into that count paragraph 99, that asks

22    for this Court to void the Portsmouth and Fairfax

23    Circuit Court orders that were entered.  And my

24    understanding is that the relief that the plaintiffs are

25    seeking in Count 2 is the same as Count 1, that they

1   want this Court to void the state court orders.

2          THE COURT:  All right.  Thank you.  Let me

3   ask Mr. Stone one more question on this.

4              ARGUMENT BY THE PLAINTIFFS

5          THE COURT:  Mr. Stone, I don't see what role

6   the West Virginia Structured Settlement Protection Act

7   has to do or has to play in this case.  Can you clarify

8   that for me?

9          ATTORNEY STONE:  Yes, your Honor.  When

10   Congress passed Section 5891 of the Internal Revenue

11   Code, it set the backdrop for Structured Settlement

12   Protection Acts across the country.

13          And in that section, there is a requirement

14   that, number one, the seller proceed with an application

15   in his state of domicile.  And I am alleging that in

16   that count, that defendants deliberately avoided going

17   to his state of domicile, coached him on why he should

18   go to the particular court in Portsmouth, Virginia,

19   because they knew that the West Virginia court would not

20   granted the relief requested.

21          THE COURT:  Why not?

22          ATTORNEY STONE:  Because they knew from

23   their experience in the structured settlement market,

24   your Honor, that they require --

25          THE COURT:  Who is they?

1          ATTORNEY STONE:  The Defendants SAF,

2  Blazingstar and Rhett Wadsworth, who are here today --

3          THE COURT:  They knew what?

4          ATTORNEY STONE:  They knew that the West

5  Virginia Court was not going to approve a request to

6  sell those payments.

7          THE COURT:  How did they know that?

8          ATTORNEY STONE:  They knew that from their

9  experience.  And we have submitted in the complaint,

10  based on Terrence Taylor's knowledge, he was told early

11  on:  We can't get this done in West Virginia.  You have

12  to go to Virginia.  Here is the paperwork and that's

13  where you go.

14          And that triggers liability also under 5891

15  of the Internal Revenue Code, which is very important,

16  which also states that you have to --

17          THE COURT:  Well, there is no relief under

18  the West Virginia Settlement Protection Act.  There

19  is -- are you claiming, then, relief in Count 2 under

20  some other act, IRS?

21          ATTORNEY STONE:  No, not under the IRS, your

22  Honor.  But the West Virginia Structured Settlement

23  Protection Act is actually incorporated into the West

24  Virginia Consumer Protection Act.  It is part and parcel

25  of the same act.  And a violation of the West Virginia

1    Structured Settlement Protection Act would trigger a

2    violation under the West Virginia Consumer Protection

3    Act, your Honor, and that is exactly what we are

4    alleging.

5            THE COURT:  All right.

6            Do you have a response to that now,

7    Mr. Eichhorn?

8       ARGUMENT BY DEFENDANTS SAF, iSETTLEMENTS

9           ATTORNEY EICHHORN:  Again, your Honor,

10   Count 2, the relief that he is seeking -- and his

11   argument hasn't changed -- to set aside the underlying

12   state court orders.  Rooker Feldman would apply there.

13          Your Honor raised the question, you know,

14   with him -- with Mr. Stone, rather, what relief is he

15   seeking?

16          And he was, you know, unable to articulate

17   the relief that he is seeking, which is at the end of

18   the day reversing the state court orders that were

19   entered.

20            THE COURT:  All right.

21           Do any of the other defendants' counsel wish

22   to address the Rooker Feldman issue?

23           ATTORNEY SPIVEY:  Your Honor, I would like

24   to make one quick point.

25            THE COURT:  All right.  Come to the podium,

1   and for the court reporter identify yourself and your

2   client, please.

3            ARGUMENT BY DEFENDANT BLAZINGSTAR

4            ATTORNEY SPIVEY:  Yes, sir, your Honor.  Ed

5   Spivey for Blazingstar.

6            And I understand the Court doesn't have much

7   time.  I'm going to make this very brief --

8            THE COURT:  Well, what I am going to do is I

9   am going to finish the Rooker Feldman argument.  Then I

10  am going to hear a pretrial.  I am going to have lunch,

11  and then we are going to come back and I am going to

12  finish the argument in this case.

13           ATTORNEY SPIVEY:  Your Honor, with regard to

14  the Court's question, the question you started with and

15  have reiterated a few times, I would like to point the

16  Court to the Fourth Circuit's decision in Divani in

17  2006.  And in that decision, the Fourth Circuit said,

18  "It is important to note that the Rooker Feldman

19  Doctrine applies even if the state court loser did not

20  argue to the state court the basis of recovery that he

21  asserts in the federal district court.  A claim seeking

22  redress for an injury caused by the state court decision

23  itself, even if the basis of the claim was not asserted

24  to the state court, asks the federal district court to

25  conduct an appellate review of the state court

decision."

I believe, your Honor, under that holding the theories regarding the West Virginia act, the other theories, they are all seeking to overturn the -- or they are getting at the injury that is allegedly caused by the Portsmouth Circuit Court order.

And so, your Honor, I think that the focus per the Fourth Circuit is on the injury. The injury here is allegedly caused because of the Portsmouth Circuit Court orders and, therefore, the theories of recovery that spring from it all source back to that injury and covered by Rooker Feldman.

THE COURT: Any more other defendant wish to say anything on Rooker Feldman?

ATTORNEY FRANCO: No, your Honor.

THE COURT: All right.

ATTORNEY STONE: Your Honor?

THE COURT: Yes.

ARGUMENT BY THE PLAINTIFFS

ATTORNEY STONE: If I may, and I will be brief. I would just argue --

THE COURT: Yes, you will be.

ATTORNEY STONE: -- in those cases, those were circumstances where people appeared as parties. That's all I will say, your Honor.

1          THE COURT:  All right.  I'll give you the

2   last chance.  They weren't parties there, he is

3   saying -- or here.  They were in those cases; they

4   weren't here, or this, Taylor was not here.

5          ARGUMENT BY DEFENDANT BLAZINGSTAR

6          ATTORNEY SPIVEY:  Not only did Mr. Taylor

7   submit documents which were used in furtherance of

8   seeking that Portsmouth Circuit Court order, he was

9   given notice of the proceeding; he had absolute right to

10  participate.

11        THE COURT:  All right.  By statute.

12        ATTORNEY SPIVEY:  Yes, your Honor.

13        THE COURT:  And so you are saying the fact

14  that he didn't elect to exercise that right doesn't

15  change the Rooker Feldman analysis.

16        ATTORNEY SPIVEY:  Right.

17        THE COURT:  All right.  Now, I am going to

18  take a recess in this matter.  We will reconvene in this

19  matter at 1:00 o'clock, and we will -- actually, make it

20  ten minutes after 1:00.  That should give you enough

21  time to have some lunch downstairs.  And then we will

22  reconvene, I will hear further argument on this.

23        Thank you.

24        (Court recessed at 12:40 p.m.)

25

1          (Court called to order.)

2          COURT QUESTIONS / PRELIMINARY RULING

3          THE COURT:  What I am going to do is to ask

4     a couple of specific questions, I'll get specific

5     answers, and I am going to tell you what my thinking is

6     on this, and I am going to give you an opportunity, a

7     short one, brief one, to file something in response,

8     telling me why you think what I am thinking is wrong.

9     And you may succeed.

10          But I have now determined that the

11    settlement agreement, by the way, or the original one,

12    the Clerk's Office still hasn't found it.

13          I have also looked again at the -- one of

14    the Portsmouth orders.

15          I am curious, who is the circuit court

16    judge?  Somebody, you said it was Sword, but this

17    signature doesn't look like Sword.  Who was the circuit

18    court judge?  Does anybody know?

19          ATTORNEY SPIVEY:  Your Honor, the one that I

20    saw is signed by Judge Hawk, and the other is by Judge

21    Sword.

22          THE COURT:  Judge who?

23          ATTORNEY SPIVEY:  Hawk.

24          THE COURT:  And the other?

25          ATTORNEY SPIVEY:  Sword.

             THE COURT:  Look at this one.  Tell me --
now, you stay there.  The court security officer will
bring it to you.

             And show it to all counsel, if you want.

             I am just curious.  It's not important to
what I am going to say.

             ATTORNEY SPIVEY:  Your Honor, it's my
understanding that is Judge Sword.

             THE COURT:  S-w-o-r-d?

             ATTORNEY SPIVEY:  Yes, sir.

             THE COURT:  And you all agree, that's who it
is?

             ATTORNEY HOLMES:  Yes, your Honor.

             THE COURT:  Next time you see her or him --
I don't know which it is -- you can say that at least
one person has found the signature inscrutable,
unrecognizable as Sword.

             All right.  Let me ask these questions
quickly.

             I think maybe I'll save the time.  I have
thought about this, given it some consideration.

             And let me run through the facts, first of
all.  This is a case in which the plaintiff, Terrence
Taylor, and the other plaintiffs are challenged the
transfer of his interest in deferred payment annuity, a

structured settlement, to defendants in exchange for
lump sum payments.

The defendants seek to dismiss it on a
number of bases, first Rooker Feldman, and failure to
state a claim for some of the claims, that I'll get
into.

And also, Wadsworth moves to dismiss also
on -- is it Wadsworth?  Yes, who moves to dismiss on
personal jurisdiction grounds in addition to the others.

Rooker Feldman would be, Mr. Stone -- or no,
I'm sorry.  Mr. Eichhorn, a Rooker Feldman claim would
be a 12(b)(1) claim, wouldn't it, a claim under a lack
of jurisdiction?

ATTORNEY EICHHORN:  Correct, your Honor.

THE COURT:  All right.  Now there is also
12(b)(6) and also a 12(b)(2) with respect to the
personal jurisdiction.

Now I understand that the cases arises out
of the transfer of Plaintiff Taylor's interest in
structured settlement annuity payments over his
lifetime.  In 1988, Taylor, who was then I guess a
child, suffered serious injuries when a defective heater
caused a fire in the home in which he lived.

He suffered third degree burns over
60 percent of his body, and will lost fingers on his

right hand, toes on his left foot, and the entirety of
his right leg.  And as a result of that incident he
suffered from PTSD and other permanent afflictions, and
persistent depressive disorder.

A suit was filed in this district seeking
damages, and the parties ultimately entered into a
confidential settlement agreement, which was approved by
the Court.  And that's the order no one can find.

It's, of course, necessary that we find it.
For one thing, I would like to know whether I signed it.
I was here in 1989.  I was sitting in 1989.

As my clerks will tell you, I rarely sign
orders of this sort without a full hearing and that sort
of thing.  But we'll see.

There were -- at that time there was Judge
Bryan, Albert Bryan, junior, Judge Cacheris, Judge
Hilton and I were the only judges here.

The settlement took the form of a single
premium annuity contract that would periodic tax-free
payments to plaintiff, Terrence Taylor, through his
guardian, Louise Taylor.  That's the structured
settlement.  In effect, it's a series of payments over a
period of time.

And the settlement agreement stated that,
"Periodic payments cannot be accelerated, deferred,

1 increased or decreased by the plaintiff or any payee,

2 shall the plaintiff or any payee have the power to sell,

3 mortgage, encumber or anticipate the periodic payments

4 or any" -- apparently -- "part thereof by assignment or

5 otherwise."

6       Now, I don't know who got that provision.

7 If it's under -- if it was under seal and they can't

8 find it, where in the world did that come from?

9       Yes.

10       ATTORNEY STONE:  I believe that we will be

11 able to, either from the original defendant in the case,

12 through a search their archives, or a search of this

13 Court's archives --

14       THE COURT:  All right.  Let me stop you

15 right there.  You purport to put a quote in there.  You

16 don't have the document from which you quote.

17       ATTORNEY STONE:  I received an unsigned copy

18 from the original attorney in the case, who represented

19 to me and will give testimony to this Court, if you

20 allow me, your Honor, that that was the language --

21       THE COURT:  All right.  Well, why don't you

22 put a footnote to that, explaining that?

23       ATTORNEY STONE:  I will, your Honor.

24       THE COURT:  Because otherwise, it looks

25 strange.

1          ATTORNEY STONE:  I understand, your Honor.

2     I was hopeful that when the sealing order was granted,

3     we would get the document itself.

4          THE COURT:  You mean when lifting of the

5     seal.

6          ATTORNEY STONE:  When the seal order was

7     lifted, yes.

8          THE COURT:  All right.

9          Now, plaintiffs also allege that Louise and

10    Phillip Taylor agreed to the terms of the settlement

11    agreement, agreed to take less money for themselves, on

12    the understanding that the structured settlement

13    payments would cover the costs of his medical expenses

14    and living expenses for the rest of his life.

15         Well, I don't think there is any contest

16    here, nor could there be, that the original settlement

17    agreement is infirm in any way.

18         In 2009, Louise resigned, Louise Taylor, as

19    guardian, during her recovery from a serious automobile

20    accident, and payments under the structured settlement

21    were delivered directly to Terrence, presumably because

22    he was then an adult.

23         Now, then in 2012 he moved from Herndon,

24    Virginia, to Martinsburg, West Virginia, where he

25    resided apparently, according to the complaint, from

June 2012 to June 2014, and presumably still lives
there.  Is that correct?

ATTORNEY STONE:  No, your Honor.  He has
moved back to Virginia and lives with his parent.

THE COURT:  In Herndon.

ATTORNEY STONE:  In Manassas, Virginia.

THE COURT:  All right.

Now, thereafter it appears that he
eventually entered into at least 11 transfer agreements
with various companies who contacted him about selling
his periodic payments for a lump sum; in other words,
going the other way.

And he eventually entered into 11 transfer
agreements in just over 24 months, exchanging his future
payments for upfront lump sum payments from the
companies.  These transfers were pursuant to court
orders of the Portsmouth Circuit Court.  And I've got
one of them right here.  I have looked at them.

Now, when they got to the last one, the one
in July, I think, he apparently sought to stop the last
transfer by writing a letter to the Portsmouth Circuit
Court in July 2013.  The letter was received by Judge
Sword in August, after the transfer had been approved.
That's all the information we have on that.

So, plaintiffs allege essentially that the

defendants procured the, Taylor's agreement to these transaction through what the plaintiffs alleged are strong-arm tactics and predatory behavior.

Plaintiffs allege that defendants' so-called modus operandi was to befriend individuals with large structured settlements, gain their confidence and trust of so-called naive injury victims, and then systematically divest them of their payments.

Plaintiffs contend that large cash advances that the plaintiff, Taylor, got from these entities, in essence, as the complaint puts it, hooked them -- hooked him on spending large sums of cash. And the plaintiffs liken that to giving crack cocaine to an addict.

That doesn't move me at all. It's not actionable.

But in any event, plaintiffs also allege that defendants knew or should have known that he would need his structured settlement payments for support of himself in his dependent daughter; and that he is now as a result insolvent, unable to support himself and his child, evicted from his home in West Virginia, now living, as I have just been informed, with his parents here in Manassas, Virginia. And so they raise a number of claims.

Now I am going to review briefly with you

what I am thinking with respect to each of these claims.
So in the end I am going to defer ruling, but I am
giving you the luxury of being able to address precisely
what I am thinking.

Count 1, the Rooker Feldman Doctrine, I
think clearly provides, as the Feldman case points out,
that the United States District Court has no authority
to review final judgments of a state court in a judicial
proceeding.

So litigants can't circumvent state court
orders by instituting federal action which, although not
styled as an appeal, amounts to nothing more than an
attempt to seek review of the state court's decision by
a lower federal court. That's from an unpublished
Fourth Circuit decision, Smalley against Shapiro and
Burson.

And the Fourth Circuit has also said, in the
Barefoot case, that the prohibition extends not only to
law issues actually decided by a state court, but also
those that are inextricably intertwined with the
questions ruled upon by a state court; that is, success
of the federal claim depends on a determination made by
the state court wrongly decided -- that the state court
wrongly decided the issues before it.

So, the Supreme Court also made clear, more

1   recently, in 2005 that the doctrine applies to state

2   court losers complaining of injuries caused by state

3   court judgments rendered before Federal District Court

4   proceedings, commenced and inviting District Court

5   review and rejection of those judgments.

6           Now, Count 1 seems to me to fall squarely

7   within that.  I think the plaintiff can be considered,

8   in effect, a losing party, or at least a party in a

9   state court proceeding.  He clearly had the right to

10  appear.  He did the make an appearance through

11  affidavits and otherwise.  But he was furnished with

12  notice of the right to appear.  And although the Exxon

13  Mobil case in the Supreme Court says a state court

14  loser, the argument that he wasn't a state court loser

15  is really not persuasive to me, because Rooker Feldman

16  at its core is a doctrine about the appellate

17  jurisdiction of federal courts.

18          The state supreme -- or the Supreme Court

19  emphasized in Exxon Mobil case that Rooker Feldman is a

20  matter of whether, and which, federal courts has

21  appellate jurisdiction over the judgments of state

22  courts.

23          Section 1257 is what the Rooker Feldman

24  Doctrine derives from, and that confers appellate

25  jurisdiction solely on the United States Supreme Court

1    after the highest court of a state has rendered a

2    decision on the matter.

3              So Rooker Feldman is really a case about the

4    Doctrine of Federalism.  It's motivated by respect for

5    the competence in decisions of state courts.

6              So it seems to me sufficient that a federal

7    court plaintiff, as here, seeking to undo a state court

8    order on the ground that the order was contrary to law,

9    whether or not that plaintiff actually lost or prevailed

10   in that order, isn't crucial.

11             It's unusual for this sort of situation to

12   arise.  I don't remember any party citing a structured

13   settlement attack, that is, an attack on a state court

14   order approving the sale of future payments for a lump

15   sum.  I don't recall any case applying Rooker Feldman to

16   that.

17             Am I correct, Mr. --

18             ATTORNEY EICHHORN:  Your Honor, if I may, we

19   cited to a --

20             THE COURT:  -- Eichhorn?

21             ATTORNEY EICHHORN:  -- a District Court

22   decision from the United States District Court for the

23   Southern District of New York.

24             THE COURT:  Yes, Capela.

25             ATTORNEY EICHHORN:  Capela.

THE COURT:  Yes.  Other than that, no --

ATTORNEY EICHHORN:  Other than that.

THE COURT:  -- Circuit or Supreme Court decision.

ATTORNEY EICHHORN:  Other than that, no.

THE COURT:  All right.

Well, in any event, I think that issue is not troublesome to me.

I think that -- I now have a note saying that the settlement order has not been located from the 1989 case.  Very strange.  I don't know why that's the case, but I will explore that myself.

So, as to Count 1, I think that falls squarely within the analytical framework of Rooker Feldman.  The state court judgment in issue was clearly rendered before these federal court proceedings were initiated, and I think Taylor can be considered a losing party, or at least a party.  As I said, I don't even think it matters whether he is a losing party or even a winning party.  It's really an issue about doctrine about appellate jurisdiction of federal courts.

Although Taylor didn't technically lose in Portsmouth, his present allegation is that the order approved transfer in the Portsmouth court violates the law and harms him.  And that, I think, is sufficient to

establish this prong of Rooker Feldman.  And I think
that is in accord with at least two other District
Courts.  We mentioned Capela, which is the Eastern
District of New York.  It's also Meyers against General
Motors, which is the Northern District of Illinois; and
Sanders, which is a case in the Northern -- also
Northern District of Illinois, 2015.

The plaintiffs in, at least in Count 1
complained that the injuries wrought by the state court
judgment -- that's what he is complaining of -- the
transfer of Terrence's or Taylor's interest in his
structured settlement payments could not have occurred
without the Portsmouth judgment order.

So I think plaintiff has essentially invited
this Court to review and reject a state court judgment.

Plaintiffs claim that the agreements don't
comport with the -- don't comport with the Act and seek
to undermine the Circuit Court's -- the Portsmouth
Circuit Court's considered judgment that the agreements
did comply with the Virginia Structure Settlement
Protection Act.

Plaintiffs' prayer for relief makes it all
the more obvious that that's what we are doing, that's
what is being asked of this Court in Count 1, namely
rescission of all transactions pursuant to the court

order agreement, restoration of Terrence's payments that
were transferred as a consequence of the court approved
agreement, and declarations of all transactions,
pursuant to the court ordered agreement, that they are
all void.

If we look back at Rooker itself, the
Supreme Court there dismissed a case in which the
plaintiff asked a Federal District Court for relief from
a state court judgment that plaintiff alleged was
rendered in contravention of the Constitution.

I think that's roughly analogous to what is
going on here.  Plaintiff seeks to do that here.  He is
being obligated under a state court sanction
transaction, and he seeks an order rescinding and
undoing that transaction on the ground that the state
court's order is in contravention of Virginia and West
Virginia law pertaining to structured settlements.

So I think Rooker Feldman does dispose of
Count 1.

Now, the defendants claim that Rooker
Feldman disposes of all the counts.  I don't agree with
that.  The argument is that they are inextricably
intertwined with the court orders.

The defendants argued that because to
prevail on plaintiffs' other claims, plaintiff must show

that the defendants engaged in fraudulent or other bad
practices, which the Portsmouth Circuit Court expressly
found, by the transfer agreement, okay and in Taylor's
best interest.

But I think that the Exxon Mobil case
prohibits such a broad application of the Rooker Feldman
Doctrine.  The Supreme Court in that case made clear
that it's a doctrine of appellate versus original
jurisdiction, not of claim or issue preclusion.

So, I don't think it disposes of all the
claims.  I think it dispose of Claim 1.

To the extent that the plaintiffs allege
that defendants perpetrated a fraud on the Portsmouth
Circuit Court through alleged misrepresentations, I
think that's what is unmistakably clear in Fourth
Circuit precedent:  That issue should be addressed to
the Portsmouth Court, not here.

The proper forum, as the Fourth Circuit said
in Wiseman against Charles E. Smith, at 829 Federal 2nd,
the proper forum in which to assert that a party has
perpetrated a fraud on the court is the court which
allegedly was a victim of that fraud.  That's where that
claim should go, if that's the gravamen of or any
significant part of Count 1.

Now Count 2 asserts a violation of

West Virginia's Structured Settlement Procedures Act.
And as my questions from the bench reflected, I just
don't see how the West Virginia Settlement Procedures
Act plays any role in what the plaintiffs are seeking
here.

The West Virginia act itself allows the suit
to have been brought or the application to have been
made in Virginia.  It doesn't require, just because he
was domiciled there, to be made there.  It allows it to
be brought in Virginia.

The notion that the Internal Revenue Code,
some provision there requires some reports to be filed,
has absolutely, in my view, nothing to do with whether
Count 2 has any merit.  I don't know that there is any
private cause of action for violating that provision, or
whether there is any sanction or punishment for failing
to do that, or whether the Portsmouth Court would regard
that as something that they should have known about and
weren't told about by the lawyers involved.

But that's up to the Portsmouth Court.  I
don't think the West Virginia Structured Settlement
Procedure Act in Count 2 states a claim on which relief
can be founded -- can be based.  I don't there -- it's
true that the plaintiffs allege that the defendants
knowingly solicited Terrence in West Virginia with the

specific intent of inducing him to sign agreements that were contrived, misleading, deceptive and in violation of the West Virginia act.

Well, that isn't where it was done. There isn't an allegation here that that there was fraud in that regard. They certainly don't allege fraud. I am going to come to that in a moment.

So I don't think the West Virginia act, it certainly doesn't provide a private right of action, and there aren't any factual violations that would support a violation of the statute, which allows a West Virginia resident in this context to go to Virginia and to get it done in Virginia.

Now the plaintiff says, well, they knew they couldn't get it in West Virginia, apparently from their experience or what have you. I don't know why and I don't know that I have been persuaded why they would know that. But anyway, they wanted to get him 500 miles from his home so that he wouldn't have much to complain about. That's not a violation of the West Virginia act, which allows it to be done in that fashion.

Now, if the Virginia Court was misled or defrauded in any way, then that should be raised with the Virginia State Court.

There is another point I think that's

1  troublesome.  Taylor submitted an affidavit stating that

2  his current address was in Herndon, Virginia, at the

3  time.  So I guess the argument is:  Well, that's just a

4  document that the defendants gave to him and he signed

5  and they submitted it.

6           Well, that was fraudulent.  They both

7  committed fraud, the plaintiff and -- neither one has

8  clean hands.

9           There is a West Virginia law on whether a

10  statute provides a private cause of action, which

11  appears in the West Virginia case at 591 Southeast 2nd,

12  and I don't think it fits that.  So, Count 2 would go

13  for failure to state a claim.

14           Now, Count 3, as I understand it, is a count

15  alleging a breach of good faith and fair dealing.  The

16  problem I have with this count is simple.  The

17  allegations addressing how the defendants breached a

18  duty of good faith and fair dealing in the performance

19  of a contract with Taylor are all allegations that

20  occurred before there was a contract.

21           None of the allegations address how the

22  defendants, or any of them, breached a duty of good

23  faith and fair dealing, which apply only in the

24  performance of a contract with Taylor.

25           So, in essence, in Virginia if a contract

gives a party discretion on how to proceed in certain ways under the contract, it's clear under Virginia Law that that discretion must be exercised in good faith, fair dealing.

The acts that are alleged here purporting to be a lack of good faith and fair dealing all occurred before there was a contract.

The plaintiffs do not here identify any contractual provision that the defendants -- or in this case it would be Structured Asset Funding, they don't identify any provision that Structured Asset Funding breached or that granted Structured Asset Funding discretion, which it then abused.

So under Virginia Law the duty of good faith and fair dealing restrains the exercise of contractual discretion and bad faith, that is not a situation alleged here. There is no allegation that there is a breach of contract. There is no allegation here that Structured Asset Funding breached a contractual duty.

And I don't find facts alleged here that adequately allege a valid claim under Virginia's law of a breach of good faith and fair dealing, because the acts that are alleged occurred before there was a contract; and there is no specified provision identified that gave discretion to Structured Asset Funding, and no

1    allegations that they exercised that discretion -- which

2    I don't think existed -- in bad faith.

3         So then we go to the fraud.  And here,

4    simply put, the pleading requirements for fraud are

5    fairly stringent.  There has to be a false

6    representation of a material fact made intentionally and

7    knowingly with intent to mislead.  There must be

8    reliance by misled party and resulting damage.  Cases

9    holding that are legion.

10        And 9(b) also requires that that fraud be

11   alleged with particularity, the time, place and contents

12   of the false representations.

13        Now, plaintiff argues that the following --

14   or some allegations constitute the fraudulent

15   misrepresentations.  They say that eight specific

16   incidences between April 26, 2012, and June 20, 2012, of

17   Structured Asset Funding sending documents and a notary

18   public to Terrence's home in Virginia, so Terrence could

19   sign some type of advance agreement before the very

20   first transfer petition was approve by the Portsmouth

21   Circuit Court, that that's one.

22        I don't see any representation or

23   misrepresentation or any of the other requirements.

24        Then there is another one that says regular

25   telephone conversations between the -- between

Defendant Wadsworth and Taylor related specifically to advances, and plaintiff contends that, although Taylor does not have copies of these advance agreements which led him to, which led to him receiving more than a hundred thousand of advance cash prior to the Circuit Court's approval of the transfer agreement, that allegation, I don't think, says anything about fraud in accordance were Rule 8 or Virginia Law.

And they also note that the advances he received were all highly suspect, predatory and contrary to state and federal law.  That doesn't add anything.

Then we go to paragraphs 158, 159, 164(i), (ii) and 164(vi).  I have looked at and read those. They don't allege misrepresentations or representations that were false, material, relied on, caused damage and so forth.

So, at the moment, the fraud claim I am inclined to dismiss, but with leave to amend.

Now, failure to state a claim for violation of Virginia Consumer Protection Act.  That act makes it unlawful -- makes unlawful certain fraudulent acts or practices committed by a supplier in connection with a consumer transaction, including using other deception, fraud, false pretenses, false promises or misrepresentations in connection with a consumer

transaction.

And here, what's alleged is that they used, that the defendants used deception when Wadsworth stated that he would never take advantage of his friendship, that's a misrepresentation, they say.

I think there are a number of problems. First of all there is a statute of limitations issue. It's a two-year statute. It runs from the date the injury is sustained, in the case of damage to property, which I assume this would be. If it isn't, I am sure someone will address it.

But the suit was initiated in February of this year. So transactions prior to February of 2013, that is, the first three transactions with Blazingstar and Structured Funding, wouldn't be subject to that. And Blazingstar was not involved in any transactions after February 26, 2013.

But at the moment I am persuaded that Count 7 should be dismissed because -- in its entirety because the Virginia Consumer Protection Act makes certain fraudulent misleading practices illegal in the context of a consumer transaction, which is then defined in a certain way. I don't know whether they would identify it as goods or services. But it does not apply to any aspect of a consumer transaction, which aspect is

authorized under the laws or regulations of this commonwealth.

And this was authorized under the laws of this commonwealth by the orders of Judge Sword and the other individual.

I think the Portsmouth Circuit Court's approval of the transaction suggests strongly that the transaction was authorized, and thus would be excluded from the Virginia Consumer Protection Act coverage.

Now, tortious interference claim, which is in Counts 8 and 9, with respect to Count 8, it's hard for me to see how this is an interference with contract relations. Generally, a tortious interference would be an interference by these defendants in inducing a third party to breach an existing contract.

These defendants didn't cause any third party, in this case the settler, that was already obligated to make payments, to cease making payments, but simply agreed with Taylor that had the obligations transferred to defendants rather than to Taylor, and then paid Taylor a lump sum for those future payments.

As for the parents, Louise and Phillips, the amended complaint doesn't allege that they were entitled in their own right to any of the ongoing periodic payments under the settlement agreement. Although they

were parties to the settlement agreement that created the structured payments, it appears that any of their direct financial interest or obligation under the settlement agreement has already been satisfied. There are no factual allegations that they retain an interest, a contractual interest or actual contractual interest in Terrence's payments.

I have a serious doubt whether the assignment of Terrence's rights would constitute an intentional interference with his performance. If you look at the Restatement Second of Torts, Section 766, the only performance aspect of the settlement agreement was that Terrence dismissed his lawsuit and agreed not to bring any other suits. I don't think it fits at all here.

And with respect to Count 9, all of the allegations relate to -- these are all that -- this is the business expectancy count. They have to allege an existence of a business relationship or expectancy, the probability of future economic benefit, the defendant's knowledge of a relationship or expectancy, with reasonable certainty that absent the defendants' intentional misconduct, the plaintiff would have continued in the relationship or realized the expectancy; and damages.

1          Plaintiffs seem to argue that Louise and

2     Phillip had an expectation based on the contract that

3     the structured settlement would cover the costs of

4     Terrence's medical expenses and living expenses for the

5     rest of his life, and that they would not have to

6     support him financially.

7          That expectation, they claim, the plaintiffs

8     claim has been interfered with or lost by the transfer

9     of Terrence's payments to defendants, because Terrence

10    spent all of the money he received as a part of these

11    transactions, and is obviously no longer entitled to

12    future periodic payments.

13         I don't think there is a cognizable business

14    expectancy here.  To prove the existence of a business

15    expectancy, a party has to demonstrate an objective

16    expectation of future business.  Mere proof of a

17    plaintiff's belief and hope that a business relationship

18    will continue is inadequate under the laws -- under the

19    Virginia Law, and that's reflected in the South Print

20    case at 208 Federal Appendix 249.  It quotes a published

21    Virginia decision at 484 Southeast 2nd 892.

22         Louise's and Phillip's expectation that they

23    wouldn't have to support Terrence financially was not a

24    business expectancy.  It was a hope.

25         And the amended complaint discloses no

allegations that this expectation was a guarantee of the contract rather than a mere prediction or subjective expectation about how Terrence would manage the money he received, whether by the lump sum payment or even by the structured payments in the future.

So I don't think that interference with contract or business expectancy fits at all here.

In Counts 8 and 9, plaintiffs fail to allege that defendants caused a third party to breach a contractual relationship with plaintiffs. Plaintiffs failed to allege a cognizable business expectancy that defendant's actions interference with. And plaintiffs failed to allege that absent defendant's conduct plaintiffs would have continued to realize or would have realized that expectancy.

Now we come to lack of personal jurisdiction over Wadsworth. Now he is subject only to Counts 5, 6, and 7, which I have already addressed in other ways. But it's clear that, of course, that he is not subject to jurisdiction unless he has minimal contacts here under 8.01-328(1). He has got to fall within the Long-Arm Statute. And if he does, then we have to examine to see whether the reach of the long arm in this situation would exceed the long arm's constitutional grasp under the Due Process Clause.

And Virginia's Long-Arm Statute does extend jurisdiction to the full extent permitted by due process. Presumably what they are relying on 8.01-328(1), the first part of if, which is doing business in Virginia.

So the question is whether the facts that are alleged, the defendant can be said to have purposefully availed himself of the privilege of conducting activities in Virginia; and second, whether the plaintiffs' claim arises out of those activities; and third, whether the exercise of personal jurisdiction would be constitutionally reasonable. That's applying the analysis in the Consulting Engineers Corp case at 561 Federal 3rd.

It's clear, factually, so far, that defendant didn't maintain any offices or agents in the forum state. He didn't own property here.

What he did is he worked from his employer's job and he made calls to Virginia and sent documents to Virginia. Now Wadsworth was always in Florida, working with Taylor who was in Virginia. And he sent documents to him and had telephone calls with him, text messages, faxes and communications.

But they were all, they were all communications from Florida to West Virginia, not

1  Virginia.  He didn't then, Plaintiff Taylor didn't then

2  reside in Virginia at the time these solicitations were

3  occurring.  And Wadsworth didn't file any documents in

4  Virginia.

5          The contacts made, according to -- in

6  Wadsworth's view were contacts made by his employer,

7  were not done on Wadsworth's behalf; in other words, the

8  documents filed in Virginia.

9          I think it's clear that a defendant doesn't

10 exercise the privilege of conducting business in

11 Virginia when all the employee is doing is discharging

12 the duties of his employer as an employee.

13         Wadsworth wasn't encouraging Taylor to

14 execute documents that would be filed in Virginia or

15 making contracts with Terrence as an individual, as he

16 was an employee of Structured Asset Funding.

17         And it's clear, as the amendment complaint

18 suggests, that Structured Asset Funding prepared the

19 necessary paperwork to file transfer applications with

20 the Portsmouth County Circuit Court.  And he was not the

21 principal of any agents conducting business in Virginia.

22         So at the moment I am doubtful that there is

23 a claim against -- or I am doubtful that personal

24 jurisdiction exists over Wadsworth.

25         So just to summarize briefly, I think

Count 1 much be dismissed pursuant to the Rooker Feldman Doctrine.

Count 2, which is the West Virginia Structured Settlement Procedure act, must be dismissed for failure to state a claim. The West Virginia Act isn't applicable to the transfer in issue here. It doesn't provide for an express or implied right of action anyway. It permits the filing of the action in Virginia, even though the seller or the transferor resides in West Virginia.

Count 3 would have to be dismissed because, as I have already stated, there is no allegation of a breach of a contractual -- of discretionary contractual duty that should have been performed in good faith and fair dealing. The activities alleged there are all before a contract existed.

Counts 6 and 7 are the fraud claims, and I have already said that those fail to meet both the requirement of pleading fraud with particularity under state and federal law.

Count 7, I have indicated that I don't think this situation fits under the Virginia Consumer Protection Act. And I have -- I have just addressed the tortious interference.

Now I have taken the unusual step of

1    exposing to counsel what I am thinking, so that you can

2    address what I am thinking.

3        I am not insensitive to what the plaintiffs

4    are alleging.  They are alleging:  Look, we have a

5    vulnerable plaintiff.  These people came in,

6    sweet-talked him, induced him and did all kinds of

7    things to get him to give up his future payments in

8    return for a lump sum, and our plaintiff went and

9    squandered this money.  And everyone is upset about that

10   because the money was to take care of him for the rest

11   of his life.  I understand that.

12       But on the defendants' side of the coin,

13   it's -- it was his to do with what he wanted.  Now the

14   argument is that that violates the federal court order.

15   But I don't think that stops anything.  That still

16   should go to whether or not that was an obstacle to what

17   Portsmouth did.

18       The Portsmouth Circuit Court found it

19   lawful.  Maybe it construed the order that way.  I don't

20   know.

21       But the time for -- the time for filing a

22   motion to show cause why somebody should be held in

23   contempt for violating a court order is long gone.

24       I might issue a sanction for that.  I don't

25   know who I would sanction.  Would it be the Portsmouth

1    Court?  Would it be the Plaintiff Taylor?  Would it be

2    the defendants?  And the sanction would be paid to the

3    Clerk's Office.  It wouldn't be paid to one party or

4    another.  It would be a sanction for violating the court

5    order.

6          Now if -- and as I have said, if the

7    Portsmouth Court was misled or wasn't fully apprised of

8    all the pertinent facts, which I don't exclude that that

9    is a possibility, that should be taken to the Portsmouth

10    Court.  They are the ones who were misled.

11          So I have disclosed essentially what I am

12    thinking.  You all need to reflect on that.

13          And Mr. Rodriquez, how soon can you give

14    them a transcript for the usual fee?

15          THE REPORTER:  They can get it tomorrow

16    morning.

17          THE COURT:  You can't ask for anything

18    better than that, can you?

19          ATTORNEY EICHHORN:  That works, your Honor.

20          THE COURT:  And any reason why you couldn't

21    then -- the plaintiffs, since these rulings have gone

22    pretty much against the plaintiffs, if not entirely, why

23    you couldn't file something -- let's say that you don't

24    get it until Monday.  You make whatever financial

25    arrangements you think are appropriate.  I am going to

1  set dates.  And you'll have to see what Mr. Rodriquez's

2  rates are.

3  But I see no reason why the plaintiffs could

4  not then submit a further memorandum addressing all of

5  these points, and any other points it wants to address

6  for a final time, a week from Monday, by the close of

7  business a week from Monday.  And the defendants may

8  file, individually or jointly, a response to that by

9  Friday, close of business Friday.  And I'll decide the

10  matter thereafter without further oral argument.

11  In the meantime, of course, I am going to

12  stay discovery until I decide these threshold issues.

13  I don't understand why the settlement order

14  cannot be found, but I am going to continue to explore

15  that situation.

16  And I'll be interested in seeing what you

17  file and what arguments you make as to why I have missed

18  the boat on this.

19  Yes.

20  ATTORNEY HOLMES:  Your Honor, if I may.

21  Simply to advise the Court that prior to filing this

22  matter, I had requested from the Clerk's Office that the

23  original file from 1989 be recall from archives in order

24  to review it for --

25  THE COURT:  It has been.

1          ATTORNEY HOLMES:  -- settlement agreement.

2     The settlement agreement itself was not part of the

3     archival --

4          THE COURT:  That's why she hasn't been able

5     to find it.  Thank you for telling me that.

6          ATTORNEY HOLMES:  Yes, your Honor.  And,

7     your Honor --

8          THE COURT:  So it was never filed?

9          ATTORNEY HOLMES:  Your Honor, apparently

10    the --

11         THE COURT:  Oh, the original settlement

12    agreement was.

13         ATTORNEY HOLMES:  The original settlement

14    agreement.  So the file --

15         THE COURT:  But the order had to include, be

16    included in the file.

17         ATTORNEY HOLMES:  Correct, your Honor.  And

18    that order was signed by Judge Bryan.

19         THE COURT:  Ah.  Thank you.

20         ATTORNEY HOLMES:  And as I recall from those

21    days, your Honor, the system --

22         THE COURT:  You are too young to recall from

23    those days.

24         ATTORNEY HOLMES:  Would that it were true,

25    your Honor.

1            -- the system used by Ms. Casey at that time

2   was not as, I would say, rigorous as the present system

3   used by the Court.  And so with the Court's move from

4   its prior location to this one, I am sorry to report

5   that the Clerk's Office may be left with searching

6   through some boxes in the basement.

7            THE COURT:  They have already started that.

8            ATTORNEY HOLMES:  That is my understanding

9   as well, and with my apologies to Ms. Walker that that's

10  required.

11           THE COURT:  Yes.

12           The note I received says, "Glenda was unable

13  to locate the settlement agreement."  That's not what we

14  are looking for.  So I've got to make it clear that we

15  are looking for the settlement order.

16           ATTORNEY HOLMES:  Your Honor, again to

17  clarify, the order itself references the settlement

18  agreement --

19           THE COURT:  It may be attached it.

20           ATTORNEY HOLMES:  -- which, rather than

21  being attached as I hoped when I looked, instead it

22  simply referenced in and incorporated into the language

23  of the final dismissal order.

24           THE COURT:  I see.  So it should have been

25  maintained by the Clerk's Office.

1     ATTORNEY HOLMES: Correct, your Honor.

2     THE COURT: Yes. And I am going to continue

3 to have them search for it. They should find it.

4     ATTORNEY HOLMES: I am sure that they will

5 in time, your Honor.

6     THE COURT: But you should address in this

7 motion why that should -- why that's relevant, that is,

8 that provision that you have now informed me that says

9 nobody can change anything, that you have gotten from

10 somebody who was a lawyer back then who remembers that's

11 what it says, why that making any difference.

12    I mean, the people who violated that were

13 the Portsmouth Court and the parties thereto, which

14 include Taylor. He was maybe not a formal party, but he

15 certainly was invited to participate and received notice

16 and all of that, as the statute required.

17    So they are the ones who violated it, and I

18 don't see what that has to do with anything other than

19 if this Court is upset about that, it would issue a

20 sanction, an order to show cause why someone shouldn't

21 be held in contempt, maybe including your client, and

22 imposing a sanction. But I don't see how that gets to

23 the kind of remedy that you want.

24     ATTORNEY HOLMES: I understand the Court's

25 concerns and we will address them, your Honor.

1          THE COURT:  And I don't want to suggest that

2     I think that this is, you know, this is not a situation

3     of, not entirely a situation of -- it's apparently not a

4     situation where the plaintiff didn't get what he

5     bargained for.

6          What it is, is a situation that you all say

7     he was vulnerable, he was taken advantage of, he got

8     what he bargained for, but he should never have agreed

9     to get that, and that it was very harmful to him and to

10    his family for him to agree to the lump-sum payment for

11    payments that would otherwise have supported him and his

12    daughter for years to come.

13         How old is he now?

14         ATTORNEY STONE:  He was born in 1982.

15         THE COURT:  All right.  So, he is, yes --

16         ATTORNEY HOLMES:  Thirty-three.

17         THE COURT:  -- 33, 34 years old.

18         I thank counsel for your cooperation and

19    your briefs.  Anything further from any party today?

20         ATTORNEY STONE:  Your Honor, very briefly,

21    the further memorandum, what than page limitations do

22    you want us to employ?

23         THE COURT:  The same page limitations that

24    apply in the local rule.  You don't have to use 30

25    pages.

1          ATTORNEY STONE:  Thank you.

2          THE COURT:  In fact, I would be quite

3   surprised if you did use 30 pages.  But I am not going

4   to limit you.  I will read what you present.

5          Anything further in this matter today?

6          And I take it the persons sitting in the

7   courtroom are relatives of Mr. Taylor?

8          ATTORNEY STONE:  Mr. Taylor and --

9          THE COURT:  That's Mr. Taylor right there?

10          ATTORNEY STONE:  Yes, your Honor.

11          THE COURT:  All right.  And the others are

12   his family members.

13          ATTORNEY STONE:  Louise Taylor.

14          THE COURT:  All right.  I thank counsel for

15   your cooperation.

16          ATTORNEY STONE:  Thank you, your Honor.

17          ATTORNEY ELLEDGE:  Thank you, your Honor.

18          (Court recessed at 2:30 p.m.)

19                        ---

20

21

22

23

24

25

CERTIFICATE

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the motion hearing in the case of TERRENCE E. TAYLOR, et al., v. STRUCTURED ASSET FUNDING, LLC, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said motion hearing, and that the foregoing pages, numbered 1 to 75, inclusive, constitute the official transcript of said proceedings as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this __8th__ day of __May_____, 2015.

                              _____/S/_____
                              Michael A. Rodriquez, RPR/CM/RMR
                                 Official Court Reporter